UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————————

SERVANTS OF JESUS AND MARY, INC.,
d/b/a THE FATIMA CENTER

<em>Plaintiff</em>,

v.

THE NATIONAL COMMITTEE FOR THE NATIONAL
PILGRIM VIRGIN OF CANADA, and,

THE FATIMA CENTER U.S.A., INC., and,

ANDREW CESANEK

<em>Defendants</em>.

———————————————————————————

**VERIFIED ANSWER WITH
AFFIRMATIVE DEFENSES
AND COUNTERCLAIMS**

Civil Action No. 1:18-cv-00731

**DEFENDANT DEMANDS TRIAL BY JURY**

NOW COMES Defendant, "THE NATIONAL COMMITTEE FOR THE NATIONAL

PILGRIM VIRGIN OF CANADA," (hereinafter, "NPV" or "Defendant") by and through their

attorneys, KLOSS, STENGER & LOTEMPIO, and for their Answer to Plaintiff SERVANTS OF

JESUS AND MARY, INC., d/b/a THE FATIMA CENTER's (hereinafter, "SJM" or "Plaintiff")

Verified Amended Complaint, responds upon information and belief as follows:

1.      Denies, each and every allegation contained in paragraphs numbered 1, 10-11, 17,

22-33, 39-44, 54-56, 59, 71-72, 81-86, 89-90, 93-94, 96, 100-103, 106-107, 110, 112, 120-122,

126-131, 134-137, 139-144, 146-151, 153-158, 160-165, 167-170, 172-178, 180-188 190-195,

197-201, 203-209, 211-217, 219-225, and 236-239 of Plaintiff's Verified Amended Complaint.

2.      Denies information or knowledge sufficient to form a belief as to the truth or

falsity of the allegations contained in paragraphs numbered 5-9, 12-16, 18-20, 34-38, 46-53, 57,

60-70, 73-74, 77-80, 87-88, 91-92, 97-99, 104-105, 109, 113, 115, 123, 125, 132-133, and 227-234 of Plaintiff's Verified Amended Complaint.

3.      Admits, each and every allegation contained in paragraphs numbered 2, 21, 108, of Plaintiff's Verified Amended Complaint.

4.      In answering paragraphs 138, 145, 152, 159, 166, 171, 179, 189, 196, 202, 210, 218, 226, and 235 of Plaintiff's Verified Amended Complaint, this Defendant repeats and re-alleges each and every admission or denial of the allegations with the same force and effect as though fully set forth herein.

5.      In answering paragraph 4 of Plaintiff's Verified Amended Complaint, this Defendant admits that The Fatima Center U.S.A designated 468 19th Street, Niagara Falls, NY 14303, as its location for service of process in its Certificate of Incorporation; denies any knowledge or information sufficient to form a belief as to the allegations in paragraph 4 of Plaintiff's Verified Amended Complaint.

6.      Denies the allegations in paragraph 45 of Plaintiff's Verified Amended Complaint, in so far as it alleges that SJM has rights to subject marks.

7.      In answering the allegations in paragraph 58 of Plaintiff's Verified Amended Complaint, this Defendant admits that THE FATIMA CENTER U.S.A. was formed to continue promoting the message of Fatima within the United States, including New York State; denies the remaining allegations.

8.      In answering the allegations in paragraph 75 of Plaintiff's Verified Amended Complaint, this Defendant admits that it requested that Fr. Kramer be removed as president of SJM; denies the remaining allegations.

.

9.     In answering paragraph 76 of Plaintiff's Verified Amended Complaint, this Defendant admits that it sent a letter dated August 22, 2017; denies the remaining allegations.

10.     In answering the allegations in paragraph 95 of Plaintiff's Verified Amended Complaint, this Defendant denies the allegation in so far as Plaintiff's quotation contains a typographical error.

11.     In answering the allegations in paragraph 111 of Plaintiff's Verified Amended Complaint, this Defendant admits that its legal counsel sent a cease and desist letter dated November 22, 2017; denies the remaining allegations.

12.     In answering the allegations in paragraph 114 of Plaintiff's Verified Amended Complaint, this Defendant admits that the November 22, 2017 letter was sent to Community Bank; denies any knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

13.     In answering the allegations in paragraph 116 of Plaintiff's Verified Amended Complaint, this Defendant admits that it received a letter dated  December 21, 2017 from Plaintiff's Counsel; denies any knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

14.     In answering the allegations in paragraph 117 of Plaintiff's Verified Amended Complaint, this Defendant admits that it updated its website in 2018; denies any knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

15.     In answering the allegations in paragraph 118 of Plaintiff's Verified Amended Complaint, this Defendant admits admit that Plaintiff Counsel sent a letter dated May 8, 2018, with respect to the remaining allegations, the document speaks for itself.

.

16.     In answering the allegations in paragraph 119 of Plaintiff's Verified Amended Complaint, this Defendant admits that it updated its website in 2018; denies any knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

17.     In answering the allegations in paragraph 124 of Plaintiff's Verified Amended Complaint, this Defendant admits the allegation in so far as it has not abandoned the subject trademark application; denies the remaining allegations.

18.     Denies the allegations contained in every paragraph not heretofore denied, denies information or knowledge sufficient to form a belief or admitted of the Plaintiff's Verified Amended Complaint.

## AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:

19.     Plaintiff's Verified Amended Complaint, on one or more counts set forth therein, fails to state a claim upon which relief can be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:

20.     This Defendant has not infringed any applicable trademarks under federal or state law.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:

21.     This Defendant is the senior user of some or all of the alleged marks, or has been granted permission or rights to the use of some or all of the alleged marks from the senior user.

.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

22.    This Defendant has at all times acted in good faith and did not knowingly, maliciously, willfully, deliberately, fraudulently, recklessly, or in bad faith infringe, trade upon, or dilute any trademarks of Plaintiff.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

23.    This Defendant's use of the subject marks are unlikely to cause consumer confusion.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

24.    Plaintiff has acted in bad faith in bringing this action against this Defendant.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

25.    Plaintiff's claims against this Defendant are barred because Plaintiff's damages, if any, were not caused by this Defendant.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

26.    Without admitting that Plaintiff's Verified Amended Complaint states a claim, there has been no damage in any amount, manner, or at all by reason of any act alleged against this Defendant in Plaintiff's Verified Amended Complaint, and the relief prayed for in Plaintiff's Verified Amended Complaint therefore cannot be granted.

**AS AND FOR A NINTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

27.    Plaintiff's claims are barred by the doctrine of unclean hands.

.

**AS AND FOR A TENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

28.     Plaintiff's claims for injunctive relief are barred because Plaintiff cannot show that it will suffer any irreparable harm from this Defendant's actions.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

29.     The alleged injury or damages suffered by Plaintiff, if any, would be adequately compensated by damages. Accordingly, Plaintiff has a complete and adequate remedy at law and is not entitled to seek equitable relief.

**AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

30.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, because of a failure to mitigate damages, if such damages exist.

**AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

31.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, by the First Amendment to the Constitution of the United States.

**AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

32.     This Defendant is not subject to this Court's jurisdiction and or is immune with respect to some or all of the claims made within Plaintiff's Verified Amended Complaint pursuant to New York Civil Practice Laws and Rules § 302.

.

**AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

33.     Without admitting that Plaintiff's Verified Amended Complaint states a claim, any remedies are limited to the extent that there is sought an overlapping or duplicative recovery pursuant to the various claims for any alleged single wrong.

**AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

34.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, by abandonment of any marks at issue.

**AS AND FOR A SEVENTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

35.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, by reason of other parties' use of any marks at issue.

**AS AND FOR AN EIGHTEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

36.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, because this Defendant is not liable for the acts of others over whom it has no control.

**AS AND FOR A NINETEENTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

37.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, because any infringement, if any, was innocent.

**AS AND FOR A TWENTIETH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

38.     The claims made in the Verified Amended Complaint are barred, in whole or in part, by applicable statute of limitations.

.

**AS AND FOR A TWENTY-FIRST AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

39.     The claims made in Plaintiff's Verified Amended Complaint are barred by laches, in that Plaintiff has unreasonably delayed efforts to enforce its rights, if any, despite full awareness of this Defendant's actions.

**AS AND FOR A TWENTY-SECOND AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

40.     The claims made in Plaintiff's Verified Amended Complaint are barred, in whole or in part, on the basis that some or all marks at issue lack secondary meaning.

**AS AND FOR A TWENTY-THIRD AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

41.     Each of the purported claims set forth in Plaintiff's Verified Amended Complaint is barred by the doctrine of waiver, acquiescence, and estoppel.

**AS AND FOR A TWENTY-FOURTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

42.     Plaintiff's claims for treble damages, attorneys' fees, and interest are barred as to this Defendant because Plaintiff cannot show that this is an exceptional case.

**AS AND FOR A TWENTY-FIFTH AFFIRMATIVE DEFENSE, THIS ANSWERING DEFENDANT ALLEGES UPON INFORMATION AND BELIEF:**

43.     Any award for exemplary or punitive damages would violate the due process clauses of the United States and New York State Constitutions, the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section VI of the New York State Constitution because there are no meaningful standards for determining the amount of any award for exemplary or punitive damages and because New York State Law does not state with sufficient particularity the consequences of conduct giving rise to a claim for exemplary or punitive damages.

.

44.    This Defendant reserves the right to assert additional defenses based on information learned or obtained during discovery.

## COUNTERCLAIMS

Defendant THE NATIONAL COMMITTEE FOR THE NATIONAL PILGRIM VIRGIN OF CANADA, a Canadian corporation, by and through its attorneys, KLOSS, STENGER & LOTEMPIO, alleges the following counterclaims upon information and belief:

## THE PARTIES

1.    NPV is a Canadian corporation with its principal office located at 452 Kraft Road, Fort Erie, Ontario, Canada.

2.    SJM is a New York corporation with its principal office located at 17000 State Route 30, Constable, New York, within Franklin County, New York.

## NATURE OF THE ACTION

3.    This is an action for, *inter alia*, Unfair Competition (False Designation Of Origin, False Advertising) in violation of Section 43(a) of the Lanham Act, (15 U.S.C. § 1125(a)); as well as New York Unfair Competition, Trademark Dilution, Deceptive Business Practices, Use of Business Name With Intent To Deceive, and common law trademark infringement.

## JURISDICTION

4.    This is an action for, *inter alia*, violation of the Lanham Act, 15 U.S.C. § 1125. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, 1441, and 1446.

5.    All New York State law claims alleged herein arise under the same nucleus of operative facts as the federal causes of action, and therefore are part of the same case or

.

controversy as the federal causes of action. Accordingly, the Court has supplemental jurisdiction over NPV's state law claims under 28 U.S.C. § 1367.

6.      This court has personal jurisdiction over SJM as it is a domestic corporation organized pursuant to the laws of the State of New York.

7.      The amount in controversy exceeds the jurisdictional limits of all lower courts.

## BACKGROUND

8.      NPV was formally incorporated in July 1974. Since its formation, the mission of NPV has been to spread the true story of Fatima, and its teachings, to the world.

9.      In carrying out its mission, NPV would design, print, and distribute literature, including but not limited to solicitation letters, newsletters, and its magazine, "The Fatima Crusader," seeking to spread the Fatima Message, and solicit monetary donations and pledges to help support NPV's efforts. NPV first began printing its magazine, "THE FATIMA CRUSADER" in 1978.

10.     NPV would also organize conferences, rosary rallies, statue visits, pilgrimages, and develop multimedia content for use on television and the web. Many of the gatherings would occur within the United States.

11.     NPV's literature and content would be printed or developed in Canada by NPV, and would be distributed all across the world, including the United States, as well as New York State.

12.     NPV would distribute this literature and content to individuals and groups on a master address list that NPV began compiling at its formation (hereinafter, the "NPV Donor List").

.

13. Several years after NPV began printing and distributing literature, NPV was approached by SJM. SJM offered to help facilitate NPV's mission of spreading the message of Fatima.

14. SJM shared in many of the goals of NPV's mission to spread the true story of Fatima. Accordingly, NPV agreed to allow SJM to help.

15. NPV desired a physical location within the United States to act as a mail processing facility. SJM would act as that mail processing facility in Constable, New York.

16. NPV would then instruct its United States donors to send their response cards or reply forms and donations to be processed and deposited at the SJM location in Constable, New York.

17. The NPV literature retained a Canadian telephone number for donors to call. This number would be answered by an NPV employee or volunteer in Canada. If a caller were a United States resident, they would be directed to send their donation to the Constable, New York facility.

18. Over the years, in addition to direct mailing to NPV's donors, NPV would also ship its literature to SJM. This was done so that SJM could direct ship NPV literature to an NPV donor that had requested additional literature via the coded NPV Business Reply Envelope ("BRE") or a donor letter. It was also done because SJM did not have the capability or permission to create NPV literature at its Constable, New York location.

19. Not until after NPV ended its association with SJM did SJM begin actually creating and mailing its own literature.

.

20.      While SJM was a separate corporation, with a separate board of directors, for the entirety of the relationship, NPV directed and controlled SJM's activities as they related to the use and distribution of NPV literature and multimedia, as well as the processing of donations.

21.      NPV personnel would manage SJM personnel decisions, including the hiring and firing of SJM employees, as well as manage SJM's payroll.

22.      NPV controlled and had access to the SJM bank accounts for which the NPV donations were deposited and subsequently transferred back to NPV.

23.      In order to sustain SJM's continued operations as a mail processing facility for NPV, NPV permitted SJM to first deposit donations meant for NPV into SJM's bank account. NPV, who managed SJM's bank accounts, kept only sufficient monies in the SJM bank accounts to cover the operating expenses of the Constable facility. The entire remaining balance beyond SJM's operating expenses would be transferred into a NPV bank account.

24.      NPV was and is entitled to all of the monetary donations received in response to solicitations made by NPV literature and multimedia content.

### The NPV Donor List

25.      The NPV Donor List, which was started by NPV prior to SJM's acting as NPV's mail processing facility, would grow in size and detail with each passing year.

26.      In addition to manually adding individual names to the NPV Donor List, NPV would regularly purchase donor lists from other organizations. These purchased lists would be added to the NPV Donor List, and it would continue to grow.

27.      Since its creation approximately 40 years ago, the NPV Donor List has grown, and now contains hundreds of thousands of donor names and addresses.

.

28.     For the NPV literature intended for destinations in the United States, NPV would regularly transport the materials across the United States/Canadian border. NPV would then purchase postage and mail the literature at a USPS location in Buffalo, New York.

29.     This NPV literature would be received by potential donors all across the United States, including New York State.

30.     Most all of the literature printed and distributed by NPV would contain an identifying code. This code is unique to each particular piece of literature. Each time NPV printed and distributed the literature, it would record the code, and record when the literature was mailed, and to whom the literature was mailed.

31.     Additionally, NPV would insert Business Reply Envelopes with the literature to make it easier for donors to return the BREs with the donations.

32.     Not every recipient of NPV's literature would return a monetary donation. Sometimes, the literature recipient would return the BRE with a request that NPV send additional literature.

33.     NPV's BREs were also coded. When a recipient mailed the BRE back, NPV would know exactly from which piece of NPV literature and mailing campaign the BRE originated.

34.     Starting in the 1980s and early 1990s, NPV began digitizing the NPV Donor List. NPV hired several employees to develop a computer program to help facilitate NPV's use of the NPV Donor List.

35.     The NPV employees were successful in creating the first electronic NPV Donor List. After several revisions, the electronic database eventually became known as "Donor Tracker." This allowed NPV to maximize its resources and help fulfill its mission.

.

36.     Over the years, NPV would continue to hire companies and individuals to improve the functionality of its electronic database.

37.     Using this system, NPV has amassed a sophisticated database that it uses to track its donors, which literature and mail campaign they respond to, the donor's location, the amount of donation, and when the donations were made, among other things.

38.     In order to facilitate SJM's role in NPV's operations, NPV would grant SJM access to NPV's electronic database containing the NPV Donor List. This would enable SJM's mail processing facility to enter data from the NPV BREs that SJM would receive from NPV's donors. SJM would physically open the NPV BREs, and into NPV's electronic database would enter the unique BRE code, donor information, and deposit the donation.

39.     NPV established a secure electronic link to SJM's mail processing facility so that every night the new data entered in Constable, New York would be uploaded to NPV's master database in Canada.

40.     NPV would regularly hire and deploy information technology ("IT") specialists to help set up and maintain SJM's computer system and network so that the electronic data upload would work seamlessly with NPV's master database in Canada. At all times NPV would control and direct the activities of the IT Specialists.

41.     NPV's IT Specialists and data entry specialists would also train SJM personnel in how to utilize NPV's electronic database containing the NPV Donor List.

42.     NPV personnel would also regularly receive calls from confused SJM personnel who would periodically have difficulty using the NPV electronic database from Constable, New York. NPV would troubleshoot any problems that SJM would have with NPV's electronic database.

.

43.     Between 2014 and 2017, in an effort to update the sophistication of its electronic database containing the NPV Donor List, NPV purchased the software that would become known as "Fatima Tracker."

44.     NPV purchased this software to improve the electronic database's functionality and speed. The new system was designed to be web-based.

45.     To access the NPV Donor List via the new Fatima Tracker system, a user would open up a web browser on their computer, from anywhere in the world, and would enter a specific URL into the browser. The user would then be prompted for their login credentials. NPV would be the entity from which an individual would be granted login credentials to access the system.

46.     After successfully logging into the Fatima Tracker system, a user could access the NPV Donor List, which is stored on an NPV-owned server located at an NPV facility in Canada.

47.     At all times NPV owned and controlled the NPV server containing the electronic database.

### *NPV's Marks*

48.     Throughout the course of their relationship, only NPV would create, print, and distribute literature. SJM did not create any of its own literature. SJM would rely solely on the literature created and distributed by NPV.

49.     Since at least as early as 1978, NPV has been the sole and exclusive user of "THE FATIMA CRUSADER" mark in the United States, and also within New York State. NPV would use this mark in connection with its goods and services. At no point in time did NPV ever grant SJM rights to NPV's "THE FATIMA CRUSADER" mark.

.

50.     Since at least as early as April 1, 1994, NPV has been the sole and exclusive user of "THE FATIMA CENTER" mark in the United States, and also, within New York State. NPV would use this mark in connection with its goods and services. At no point in time did NPV ever grant SJM rights to NPV's "THE FATIMA CENTER" mark.

51.     Since at least as early as December 27, 1996, NPV has been the sole and exclusive user of "THE FATIMA NETWORK" mark in the United States, and also, within New York State. NPV would use this mark in connection with its goods and services. At no point in time did NPV ever grant SJM rights to NPV's "THE FATIMA NETWORK" mark.

52.     In 2017, THE FATIMA CENTER U.S.A., INC. was granted permission by NPV to use the NPV marks: "THE FATIMA CRUSADER," "THE FATIMA CENTER," and "THE FATIMA NETWORK" (hereinafter, collectively referred to as the "NPV Marks").

### *NPV's Termination of Relations with SJM*

53.     In August 2017, NPV decided that it no longer wished to be affiliated with SJM for several reasons, including some controversial and offensive public statements made by SJM personnel.

54.     Accordingly, NPV informed SJM that it was terminating its relationship, and that NPV would be utilizing another New York Corporation to help spread its message. That entity was THE FATIMA CENTER U.S.A., INC.

55.     NPV has granted permission to THE FATIMA CENTER U.S.A., INC. to distribute NPV's literature, including those bearing NPV Marks.

56.     SJM was informed that it no longer would be permitted to help distribute NPV literature, including but not limited to literature that used NPV's Marks.

.

57.     However, SJM willfully and in contravention of the expressed instructions of NPV, continued to use NPV's Marks in connection with SJM's own solicitation of donations.

58.     Attorneys for NPV and THE FATIMA CENTER U.S.A., INC. sent a cease and desist letter to SJM on November 22, 2017. Said letter demanded, *inter alia*, that SJM cease and desist from its use of "THE FATIMA CENTER" mark.

59.     SJM's willful and improper use of NPV Marks after the relationship between NPV and SJM ended, included, but was not limited to, the solicitation of donations, the receipt of donations made in response to NPV's literature which SJM continued to distribute, and SJM's action in depositing said donations meant for NPV and failing to turn the donations over to NPV.

60.     As recently as May 8, 2018, SJM's legal counsel has improperly asserted superior rights and exclusive use to NPV's "THE FATIMA CENTER" mark.

61.     It is clear that SJM's improper use of NPV's Marks was intended to and actually has confused and misdirected consumers seeking the services and goods of NPV and THE FATIMA CENTER U.S.A., INC.

## AS AND FOR ITS FIRST CAUSE OF ACTION AGAINST SJM

## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125

62.     NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

63.     NPV has filed an application with the United States Patent and Trademark Office to register the word mark "THE FATIMA CENTER" on the Principal Register.

64.     NPV has utilized "THE FATIMA CENTER" mark in connection with its goods and services in interstate commerce within the United States at least as early as April 1, 1994.

.

65.     NPV's goods and services used in connection with the "THE FATIMA CENTER" mark include booklets in the field of religion; calendars; catalogs in the field of religion; leaflets about promoting a greater awareness of the Holy Mother of God and her position within the Church; religious books; educational services, namely, conducting conferences, statue visits, rosemary rallies, pilgrimages in the field of religion and distribution of course and educational materials in connection therewith; providing religious instruction by means of websites, video, and computer networks in the United States, including New York, to spread the true story of Fatima and its message, as well as to solicit donations in connection with these activities. NPV has also engaged in these efforts and activities on the internet.

66.     Through extensive use of NPV's "THE FATIMA CENTER" mark since at least as early as April 1, 1994, NPV's mark has acquired secondary meaning.

67.     In connection with its activities, NPV has received donations from across the United States, including New York State.

68.     NPV's use of its "THE FATIMA CENTER" mark in connection with the goods and services it provides, has come to represent truth, integrity, charity, and a dedication to spreading the true story of Fatima and its message to the world.

69.     As a result of NPV's efforts and use of its mark, donors send monetary donations to NPV.

70.     NPV's "THE FATIMA CENTER" mark has become so distinctive that donors contact NPV and request to donate to "THE FATIMA CENTER."

71.     It has come to NPV's attention that despite its cessation of relations with SJM, SJM has continued to utilize NPV's "THE FATIMA CENTER" mark in an attempt to solicit

.

donations rightfully meant for NPV, and has kept donations made in connections with SJM's improper use of NPV's "THE FATIMA CENTER" mark.

72.    Further, SJM is currently utilizing a New York State fictitious name certificate, for the name "SERVANTS OF JESUS AND MARY, INC. D/B/A THE FATIMA CENTER."

73.    SJM has improperly utilized NPV'S "THE FATIMA CENTER" mark in commerce in both the United States, and New York.

74.    SJM's actions in the use of NPV's "THE FATIMA CENTER" mark have caused actual confusion and are likely to cause further confusion in the market place with respect to the origin of the subject goods and services.

75.    NPV has already received numerous calls, emails, and letters from its confused donors regarding SJM's use of NPV's "THE FATIMA CENTER" mark.

76.    SJM's false designation is likely to cause continued confusion, mistake, or deception amongst donors as to the origin, sponsorship, or approval of SJM's goods and services because of the similarity with NPV's mark.

77.    Affiliation and connection with NPV's mark and good name is precisely the implication, and the intent, of SJM's false designation. Consumers view this purposefully disseminated, clearly confusing misinformation in the marketplace and are getting, and will continue to get the false impression that SJM's services originate from NPV.

78.    Confusion and deception is further enhanced by the fact that SJM attempts to offer the similar religious services as NPV, namely, the promotion of the message of Fatima. This means that consumers are more likely to, and will in fact believe, the false designation put forth by SJM.

.

79.     SJM's actions have caused further damage to NPV because of the offensive and controversial public stances taken by SJM personnel. There is a strong likelihood that the public will be confused into believing that the stances and positions taken by SJM personnel are those taken by NPV because of SJM's improper use of the NPV mark.

## AS AND FOR ITS SECOND CAUSE OF ACTION AGAINST SJM

## NEW YORK UNFAIR COMPETITION

80.     NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

81.     The bad faith conduct of SJM, in using NPV's good will and reputation for monetary gain, has caused actual confusion to consumers, donors, and agents in the marketplace regarding which entity is providing goods and services in connection with "THE FATIMA CENTER" mark.

82.     SJM's willful use of an identical name evinces SJM's intention to capitalize on NPV's reputation, goodwill, and promotion by exploiting confusion amongst consumers.

83.     SJM continues to use certain images owned by or associated with NPV on various items of its literature, including but not limited to solicitation letters and thank you letters sent to donors. Such images feature depictions of certain statues of historical and religious significance that are owned by NPV. The images have been consistently and exclusively used by NPV, and have come to be associated with NPV in the minds of donors and potential donors. The use of these images by SJM is likely to cause continued confusion, mistake, or deception amongst donors as to the origin, sponsorship, or approval of SJM's goods and services by NPV.

84.     Based on SJM's unlawful use of NPV's mark and images, and related misconduct, SJM has engaged, and continues to engage in unfair competition and unlawful

.

appropriation of NPV's consumers, donors, labors, market share, sales, revenues, income, good will, intellectual property, and other business value in an attempt to increase donations to SJM.

85.     As a proximate result of SJM's unfair competition, NPV has suffered pecuniary damage, loss of goodwill, and other damages.

## AS AND FOR ITS THIRD CAUSE OF ACTION AGAINST SJM

## NEW YORK TRADEMARK DILUTION UNDER NY GBL § 360-I

86.     NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

87.     As described in the preceding paragraphs, NPV has valid common law trademark rights in the marks.

88.     As described in the preceding paragraphs, NPV's marks have acquired secondary meaning in the marketplace.

89.     As described in the preceding paragraphs, NPV is the senior user of "THE FATIMA CENTER" Mark.

90.     SJM's actions have resulted in a likelihood of injury to NPV's business reputation.

91.     There has been actual dilution of the distinctive quality of NPV's mark, through which NPV has generated the goodwill of the public, by SJM's actions of blurring and tarnishment.

92.     SJM's predatory intent to use a similar mark in a similar business has blurred NPV's mark and harmed NPV's reputation and business.

93.     NPV has also suffered monetary damages as a consequence of SJM's actions in diluting NPV's mark.

.

**AS AND FOR ITS FOURTH CAUSE OF ACTION AGAINST SJM**

**NEW YORK DECEPTIVE BUSINESS PRACTICES UNDER NY GBL § 349**

94.     NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

95.     Defendant's actions were directed at consumers by way of their direct and targeted literature solicitations via the mail as well as via the internet.

96.     SJM's actions by imitating and adopting a confusingly similar name and mark as NPV were materially misleading so as to cause consumers to believe that SJM's goods and services were the same or related to NPV's services.

97.     SJM knowingly and willingly continued its unauthorized use of a confusingly similar name and mark to intentionally deceive consumers in the marketplace and to trade off of the valuable goodwill of NPV's mark and reputation.

98.     NPV has been damaged in the form of loss revenue as a result of the confusion, as well as by harm to its reputation and public goodwill.

99.     Due to SJM's violation of GBL § 349, NPV is entitled to an award of treble damages and attorney's fees in an amount to be awarded at trial

**AS AND FOR ITS FIFTH CAUSE OF ACTION AGAINST SJM**

**NEW YORK USE OF NAME WITH INTENT TO DECEIVE UNDER NY GBL § 133**

100.     NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

101.     NPV has been using the name "THE FATIMA CENTER" in the United States, including New York, since at least as early as April 1, 1994.

.

102.    Through extensive use of "THE FATIMA CENTER" name, NPV's name has acquired secondary meaning.

103.    Consumers associate NPV's name "THE FATIMA CENTER," with truth, integrity, charity, and a dedication to spreading the true story of Fatima and its message to the world.

104.    As a result of SJM's actions, people seeking to donate to NPV have experienced confusion as to where to send their monies.

105.    Subsequent to NPV's termination of relations with SJM, SJM has used NPV's "THE FATIMA CENTER" name in connection with the same or similar goods and services as are offered by NPV.

106.    SJM has used NPV's "THE FATIMA CENTER" name with the intent to deceive and mislead the public into believing that SJM's goods and services were the same or affiliated with NPV.

107.    SJM has continued to utilize "THE FATIMA CENTER" name despite the termination of relations with NPV and SJM's receipt of a Cease and Desist letter from the attorneys for NPV and THE FATIMA CENTER U.S.A, INC.

108.    SJM is knowingly and willfully continuing its unauthorized use of a confusingly similar name to intentionally deceive consumers in the marketplace and to trade off the valuable goodwill of NPV's mark and reputation.

109.    NPV has been damaged as a result of SJM's actions.

.

## AS AND FOR ITS SIXTH CAUSE OF ACTION AGAINST SJM

### NEW YORK TRADEMARK INFRINGEMENT

110.    NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

111.    Independent of NPV's federal trademark application, at common law NPV owns the exclusive right to use its "THE FATIMA CENTER" mark, based on *inter alia*, the fact that NPV was the first to use these mark in commerce within the State of New York.

112.    Since at least as early as April 1, 1994, NPV adopted and began using "THE FATIMA CENTER" mark in commerce in the State of New York in conjunction with NPV's goods and services as described above.

113.    As a result, NPV's "THE FATIMA CENTER" mark became associated in the minds of the public with NPV's goods and services, and NPV thus owns the right to use the marks in connection with its goods and services.

114.    After NPV terminated its relationship with SJM, SJM continued to use NPV's "THE FATIMA CENTER" mark to market and sell identical goods and services in the same market, and SJM falsely designated its goods and services so as to be associated with NPV's "THE FATIMA CENTER" mark, in direct competition with NPV.

115.    SJM's use of the mark in connection with the same or similar goods and services has caused actual confusion and their continued use will cause continued confusion as to the source of the goods and services in the minds of the consumer.

116.    SJM has infringed, and continues to infringe, NPV's common law rights in the subject mark.

.

117.    As a direct and proximate result of SJM's common law trademark infringement, NPV has suffered and will continue to suffer loss of revenue, income, and donor goodwill.

118.    As a direct and proximate result of SJM's common law trademark infringement, SJM has unfairly acquired revenue, income, and goodwill.

## AS AND FOR ITS SEVENTH CAUSE OF ACTION AGAINST SJM

### CONVERSION

119.    NPV repeats and re-alleges all previous allegations contained within NPV's counterclaims as if fully set forth herein.

120.    Subsequent to NPV's termination of its relations with SJM, SJM has intentionally, and without authorization, exercised dominion and control over property that belongs to NPV.

121.    Said property includes but is not limited to money, chattel, and NPV proprietary information.

122.    NPV has superior rights to the property over which SJM is exercising dominion and control.

123.    SJM's intentional actions have interfered with and are in contravention of the superior rights of NPV.

124.    NPV has been damaged as a result of SJM's actions.

### PRAYER FOR RELIEF

WHEREFORE, the Defendant "THE NATIONAL COMMITTEE FOR THE NATIONAL PILGRIM VIRGIN OF CANADA" prays for a judgment, declarations, and other relief as follows:

.

1.      For a judgment and declaration that Defendant is the superior user of and owns exclusive rights in and to the subject trademarks.

2.      For a judgment and declaration that Defendant owns the exclusive rights in and to the NPV Donor List.

3.      For a judgment and declaration that Plaintiff does not have any rights in and to the subject trademarks.

4.      For a judgment and declaration that Plaintiff does not have any rights in and to the NPV Donor List.

5.      For a judgment and declaration that Plaintiff's use of the Defendant's mark constitutes federal unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

6.      For a judgment and declaration that Defendant's trademark has been and continues to be infringed by Plaintiff in violation of New York unfair competition law.

7.      For a judgment and declaration that Defendant's trademark has been and continues to be infringed by Plaintiff in violation of New York trademark dilution law under NY GBL § 360-I.

8.      For a judgment and declaration that Defendant's trademark has been and continues to be infringed by Plaintiff in violation of New York deceptive business practice law under NY GBL § 349.

9.      For a judgment and declaration that Defendant's trademark has been and continues to be infringed by Plaintiff in violation of New York's intent to deceive law under NY GBL § 133.

.

10.     For a judgment and declaration that Plaintiff's use of the mark violates New York common law trademark infringement and unfair competition laws.

11.     For a judgment and declaration that Plaintiff has intentionally, and without authorization, exercised dominion and control over property that belongs to Defendant in violation of New York's conversion laws.

12.     For permanent injunctive relief against Plaintiff restraining and enjoining Plaintiff and each of its respective agents, officers, directors, servants, and employees, and all persons acting under, in concert, or for them from using the mark alone or in combination with other words or symbols, trademarks, trade names, or otherwise to market, advertise, distribute, or identify Plaintiff's goods where such designation would create a likelihood of confusion, mistake, or deception with Defendant's marks, and in particular, from using said trademarks in any fashion in connection with any goods or services.

13.     For permanent injunctive relief against Plaintiff restraining and enjoining Plaintiff and Plaintiff's respective agents, officers, directors, servants, and employees, and all persons acting under, in concert, or for them from using goods displaying images substantially identical to or confusingly similar to the trademark of the Defendant, and ordering seizure and destruction of any such goods in Plaintiff's possession or control.

14.     For permanent injunctive relief against Plaintiff requiring Plaintiff and Plaintiff's agents, servants, and employees, and all persons acting under, in concert, or for Plaintiff to turn over to all goods under the infringing trademark for destruction or other reasonable disposal, along with copies of all literature, advertising, labels, and other material in their possession bearing such infringing mark.

.

15. For an accounting of all sales, revenues, income, or any other pecuniary gain obtained by Plaintiff in connection with any goods or services branded, sold, or otherwise marketed utilizing the subject trademarks.

16. For actual damages and Plaintiff's profits, incomes, and other gains resulting from Plaintiff's infringement of Defendant's trademarks in an amount to be determined at trial.

17. For a judgment directing Plaintiff to pay to Defendant the sum of any and all pecuniary damages sustained by Defendant as a result of any of the Plaintiff's wrongful conduct as alleged hereinabove, including, without limitation, Defendant's damages, costs, and attorneys' fees incurred herein, including treble damages pursuant to NY GBL § 349.

18. For a judgment and order requiring Plaintiff to pay such other damages and further relief as the Court deems fit under the circumstances, or as may be sought by Defendant according to proof at trial or otherwise during this litigation.

19. For a judgment and order sustaining each of the causes of actions set forth herein against Plaintiff.

20. For a declaration finding the instant case to be exceptional for the purpose of awarding defendants attorneys' fees.

21. For attorneys' fees, costs, and expenses as allowed by law.

22. For any and all other relief as the Court deems just and reasonable.

.

Dated:      July 9, 2018
              Buffalo, New York

                                                KLOSS, STENGER & LOTEMPIO


                                              s/Justin D. Kloss
                                              Justin D. Kloss
                                              *Attorney for Defendant*
                                              *THE NATIONAL COMMITTEE*
                                              *FOR THE NATIONAL PILGRIM*
                                              *VIRGIN OF CANADA*
                                              69 Delaware Avenue, Suite 1003
                                              Buffalo, New York 14202
                                              Telephone:  (716) 853-1111
                                              Email: jdkloss@klosslaw.com


TO:    Matthew J. Larkin, Esq.
        Jason S. Nardiello, Esq.
        *Attorneys for Plaintiff*
        Barclay Damon, LLP
        Barclay Damon Tower
        125 East Jefferson Street
        Syracuse, New York 13202

.

**UNITED STATES DISTRICT COURT**    )
                                                  ) ss.:

**WESTERN DISTRICT OF NEW YORK**    )

    **Justin D. Kloss**, an attorney admitted to practice in the United States District Court for the Western District of New York, and not a party to this action, hereby affirms the following to be true under the penalties of perjury:

    I am the attorney for the defendant in this action. I have read the annexed answer, and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

    The grounds for my belief as to all matters not stated upon my personal knowledge are correspondence and other writings furnished to me by Plaintiff and interviews with officers and employees of the defendant.

    The reason why this verification is not made by the defendant is that the defendant is not in the county where I have my office, is a foreign corporation, and none of the parties that I represent, who are acquainted with the facts, reside in the county where I have my office.

Dated:        July 9, 2018
                Buffalo, New York

                                         KLOSS, STENGER & LOTEMPIO

                                         s/Justin D. Kloss
                                         Justin D. Kloss
                                         *Attorney for Defendant*
                                         *THE NATIONAL COMMITTEE*
                                         *FOR THE NATIONAL PILGRIM*
                                         *VIRGIN OF CANADA*
                                         69 Delaware Avenue, Suite 1003
                                         Buffalo, New York 14202
                                         Telephone:  (716) 853-1111
                                         Email: jdkloss@klosslaw.com

.