# Exhibit 15

SJM009161

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK (White Plains)

———————————————————————

P. MICHEAL ANDERSON                   :
                                      :    Civil Action No.
                      Plaintiff       :    93-CIV-1850 (CLB)
                                      :
              v.                      :
                                      :
                                      :
FATHER NICHOLAS GRUNER and            :
THE NATIONAL COMMITTEE FOR THE        :    REPLY AFFIDAVIT
NATIONAL PILGRIM VIRGIN OF CANADA,    :    in Support of Defendants'
                                      :    Motion to Dismiss under
                                      :    Rule 12 (b)1 and 19
                                      :
                      Defendants      :

———————————————————————

DOMINION OF CANADA   )
                          ss.
PROVINCE OF ONTARIO  )

    FATHER NICHOLAS GRUNER, being duly sworn, deposes and says:

    1. I am the individually-named defendant in this action, as well as President of defendant The National Committee for The National Pilgrim Virgin of Canada (NCC).  I am also President of Servants of Jesus and Mary, Inc. (SJM), the non-joined New York corporation plaintiff P. Micheal Anderson (Anderson) represented in the so-called Reproducta litigation which produced the bulk of his disputed bill.

    2. I make this affidavit in reply to Anderson's Feb. 28, 1992 Declaration opposing defendants' motion to dismiss this case because of Anderson's failure to join SJM, which was his corporate client in the Reproducta litigation, as proven by his own prior sworn statements and representations to the Court discussed below.

    3. Before addressing the particulars of Mr. Anderson's Feb. 28th Declaration, I note that he has used his Declaration to repeat

1

SJM009162

a number of arguments having nothing whatsoever to do with opposing defendants' motion to dismiss. Those extraneous arguments relate to (a) Mr. Anderson's continuing after-the-fact attempt to inflate the importance of the Reproducta case so as to justify a fee which defendants' expert has found to be six times greater than a reasonable fee (not to mention a violation of his express fee agreement); and (b) his incessant "red-herring" debate about the nature and extent of the emergency caused by his freezing NCC's entire $125,000.00 bank account without notice—at a time when the apostolate was already past due on $282,000.00 in bills. [See par. 45(h) of my April 29, 1993 affidavit opposing the TRO]   Since Mr. Anderson is still raising these issues in papers opposing a motion to dismiss for failure to join SJM, I am forced to address them, however briefly, in this reply affidavit.

### What Mr. Anderson Hasn't Told the Court About Reproducta

4. As noted in my affidavit of March 2, 1994, defendants' expert, Barry Cooper, Esq.—an experienced copyright litigator and managing partner of a reputable Manhattan law firm—has reviewed Mr. Anderson's file and concluded that a reasonable fee for his work in Reproducta would be not more than $25,000.00, a figure well within the maximum fee I negotiated with him at our June 18, 1992 meeting and, as it happens, exactly what Reproducta demanded as a cash payment to settle the case.

5. In a wandering footnote taking up more than two pages of single-spaced, small-character text (n. 26 at pp. 21-22; n. 30 at pages 26-27), Mr. Anderson tries to explain how his fee of nearly $145,000.00 is justified on the basis of other groundless suits

SJM009163

that Reproducta could have filed, but didn't, and astronomical damage calculations that may amuse Mr. Anderson but were never employed by Reproducta's lawyer, Mr. Relson, who dropped his suit voluntarily after billing only $30,000.00 to his client --on a <u>monthly</u> basis, by the way. (Exhibit A)

6.  Mr. Anderson is so desperate to justify his wildly exorbitant fee that he even misquotes and misrepresents privileged conversations with SJM's staff attorney, John Kladde, Esq., (n.26,p.21, bottom paragraph) in a lame attempt to implicate me and the apostolate in <u>other</u> so-called "infringements" of religious art which Reproducta <u>never pursued</u> because it had <u>no copyrights</u> in the artworks themselves, but only (allegedly) in its "rip-off" color separations of other people's art sent to Reproducta for printing. Not even these bogus copyrights were "infringed" in any case, as Mr. Kladde knows but Anderson isn't telling.

7.  So that the Court will be able to focus on the matter Anderson was actually assigned to handle, as opposed to the legal bugaboo he has created in footnotes to justify his fraudulently excessive legal fees, I am attaching as Exhibit B to this affidavit a document I have just come across in our files which Anderson <u>has never shown to the Court</u>: Judge McKenna's "memo endorsed" <u>denial</u> of Reproducta's motion to obtain a money judgement for $60,000 and then triple it as a penalty for "contempt". The Court will note that although this <u>unopposed</u> motion was supposed to be heard on April 2, 1992 (see page 2 of Exhibit C). Judge McKenna summarily denied it on March 19, 1992--only two days after it was filed and

3

SJM009164

without even a hearing!  In denying Reproducta's "contempt" motion,
Judge McKenna made the following notation on the <u>rejected</u> proposed
order:

> Plaintiff has failed to submit under this proposed order
> <u>substantiation of the matter on which it is based</u>. So
> ordered.

8. It was the <u>same unsubstantiated</u> "contempt" motion, based on
essentially the <u>same "resubmitted" papers,</u> which Anderson charged
an astronomical $145,000.00 to oppose in violation of his maximum
fee agreement. The "contempt" motion was "resubmitted" on July 27,
1992 (Exhibit D) only because Anderson did <u>nothing</u> to resolve the
case from June 18, 1992 to July 27, 1992, despite having received
$10,000.00 to "clear his calendar" and work quickly on the matter--
$5,000.00 of which he extracted from Coralie Graham without my
knowledge while I was on a trip. (See Anderson's bill from June 18
through August 6, 1992, showing no drafting of court papers, no
court appearances and no contact with opposing or former counsel,
but many telephone calls to the apostolate, "study" of documents,
"research" into copyright law and "conferences" with Rizzo, the
referring attorney.)

### Anderson Uses NCC Letterhead
### To Hide From The Court

9.  In fact, during the period June 18 through August 6, 1992
the only court document Anderson worked on was a letter from NCC to
Judge McKenna dated June 26, 1992 (Exhibit 4 to Anderson's Feb.
28th Declaration), which Anderson directed Coralie Graham to use
NCC stationery and to sign the letter in my name while I was away.
In that letter Anderson has NCC tell the Court that **SJM** and the

4

SJM009165

other Reproducta defendants needed more time to obtain new counsel, <u>even though Anderson had already been paid $10,000 as "new counsel" and had been "working" on the case for nearly a month.</u> In other words, <u>Anderson used NCC'S letterhead to hide his representation from the Court</u>. Only after Reproducta "resubmitted" this "contempt of court" motion did Anderson write to Judge McKenna in his own name on August 6, 1992 to give the false impression that he had just been retained and needed <u>still more time</u> to "reconstruct the case file" he had never demanded from former counsel as our new lawyer. (See Exhibit E) Since Anderson was the lawyer, we dutifully followed his instructions to send the June 26th letter on NCC stationery,especially in view of his warning to me at the June 18th meeting that once he was retained the <u>Reproducta</u> defendants were "stuck" with him because Judge McKenna would be most annoyed if we changed attorneys again.

10. In case Anderson claims that the June 26th letter from NCC to the Court was my idea, I am attaching to this affidavit as Exhibit F another document I have just come across in the files and which Anderson has not revealed to the Court: the <u>draft</u> of the June 26th letter from NCC to the Court <u>prepared by Anderson</u> with instructions that it be sent on NCC letterhead. Now, of course, Anderson offers <u>his</u> instructions that we use NCC letterhead as "proof" that NCC, not SJM, was his "real" client even though the June 26th letter makes it clear that it was SJM and the other <u>Reproducta</u> defendants, <u>not</u> NCC, which needed time to find new counsel in the case Anderson had already been handling for a month.

5

SJM009166

### The Bottom Line On Reproducta

11.   At any rate, as Anderson pointed out in his own hugely overpriced nine-page, typo-filled brief,  the default judgment in Reproducta was never valid as to me and IFRC because we were never served, and the negligence of former counsel Hill/Sommer could not be imputed to SJM, the only properly served defendant—and Anderson's only corporate client in Reproducta.  So, despite all of Anderson's efforts now to complicate the case and justify his fraudulent overbilling, the bottom line on Reproducta was this: SJM had distributed Catholic magazines containing a picture of Our Lady not unlike many other available pictures, deriving no profit and violating no valid copyright. Relson knew it, I knew it and Anderson knew it.   Accordingly, rather than fight to defend his flimsy default judgement, Relson did what any sensible lawyer would do after billing his client $30,000 for a case that could go nowhere: he dropped it.

12.   With facts like these, it is no wonder Mr. Anderson continues to argue irrelevant matters in his Feb. 28th Declaration instead of attempting to justify the particulars of his $145,000 bill for $25,000 worth of legal work, at most. (See expert report of Barry Cooper, Esq.).  Since Anderson continues to raise these irrelevant matters, however, I must address them, so that the Court will not lose sight of the bouncing ball, as Anderson obviously hopes it will.

### Anderson's Claim That SJM,
#### Was Not His "Real" Client in  Reproducta

13.   Although nearly $145,000.00 of Anderson's outrageous

6

SJM009167

$186,000.00 bill relates to a set of papers he filed as SJM's attorney in the <u>Reproducta</u> matter, Anderson insists he can keep this case in federal court because SJM (a New York corporation) wasn't really his client:

> " . . . at no time [from] June, 1992 to March, 1993 in my telephone communications with Father Gruner, Mrs. Roos or anyone else at the NCC and in none of the written communication between me and the NCC during the same period did Fr. Gruner, Mrs. Roos or anyone ever state <u>or suggest</u> to me that my services were being obtained by anyone other than . . . Fr. Gruner and the NCC." (par 20)

Mr. Anderson even goes so far as to state no fewer than four times in his opposing Memorandum of Law that he had <u>no contractual relationship with SJM</u> in litigation in which he appeared as SJM's attorney! (March 3, 1994 Memorandum of Law, pp.28, 29, 30 and 31) Reaching the height of absurdity, Mr. Anderson even claims that SJM, the corporation he represented before the Court, was <u>an undisclosed principal</u>! (March 3rd Memorandum of Law, p.21,n.21)

14.   I ask the Court to consider carefully what Anderson is willing to say, under oath, to keep this case in federal court: That he had <u>no idea</u>--and no one even <u>suggested</u> to him--that SJM had "obtained" his services in the <u>Reproducta</u> matter. In view of the copies of Anderson's own letters and sworn statements in our files, I am simply amazed that Anderson would swear to such an absurdity.

15.   In the first place, <u>at the beginning of the June 18, 1992 meeting I specifically advised Anderson that I was speaking to him as President of SJM.</u> Why?  Because Anderson specifically <u>asked me</u> to identify my status in SJM in his letter of June 16, 1992 which <u>set the agenda for our June 18th meeting</u>.  I am attaching hereto as

7

891600WrS

Exhibit G, the relevant portion of that letter which Anderson has also kept from the Court:

> "What, if any, is your position with SOJM [Servants of Jesus and Mary, Inc.]?"

16. In answer to Anderson's written question in the June 16th letter—a letter we referred to repeatedly throughout the June 18th meeting—I clearly, definitely and most emphatically told him I was President of SJM.   But I would have told Anderson I was SJM's President even if he hadn't asked me to provide that information in the June 16th letter, because I am always conscious of the legal distinction between the two corporations, and was especially conscious of it in the Reproducta matter.  In fact, Anderson unwittingly admits how important that distinction was when he discusses how in his opinion NCC was the real "infringer" of Reproducta's non-existent copyright, and therefore his "real" client in this fee dispute. [ADec.Feb.28,par.3]

17. Of course, whether NCC was the "real" infringer has no bearing on who was Anderson's "real" corporate client in Reproducta; that client was obviously SJM at all times, and Anderson knew from "day one" that I was SJM's President as well as NCC's President because he asked me, and I told him. In any event, if NCC was the "real" infringer in the Reproducta case then Anderson, as SJM's lawyer, was obliged to use that defense by insisting upon the very distinction between NCC and SJM he now conveniently ignores.  In discussing precisely that distinction during our June 18th meeting, I made it quite clear that I was speaking to Anderson as President of SJM, which was not the real

8

SJM000169

"culprit" in the case (not that there was any "culprit").

18.   Committing further gross self-contradictions on this point, Anderson forgets his own prior acknowledgement of my presidency of SJM even within the space of the same footnote!   I respectfully direct the Court's attention to page 15 of Anderson's opposing Memorandum of Law.   In a footnote that begins on page 15 and continues to the next page, Anderson <u>admits</u> that when he sued to collect his fee he alleged my "<u>simultaneous presidency of both the NCC and SJM</u>", thereby conceding that he knew about it all along.   Indeed, nowhere in his complaint does Anderson claim that he was unaware at the June 18th meeting that I was SJM's president. Yet, in the following footnote, he accuses Mr. Ferrara of committing a typographical error in the paragraph of my Verified Answer which states that I retained Anderson in my "corporate capacity as President of Servants of Jesus and Mary, Inc." <u>In other words, while Anderson acknowledges my presidency of SJM in his own verified complaint, he asserts Mr. Ferrara must have been mistaken in reciting the same fact!</u>

19.   At any rate, there can obviously be no question that Anderson knew he had been retained by SJM when he finally wrote to Judge McKenna on Aug. 6th--45 days after he had received $10,000 in NCC checks on behalf of SJM--to create the false impression that he had <u>just</u> been retained to represent <u>SJM</u> and the other Reproducta defendants:

> I have been <u>retained</u> to represent the defendants (Father Gruner, SJM and IFRC) in the above-captioned action ... I am <u>now</u> working with <u>the defendants</u> to develop and document the facts pertinent to the motion to vacate the

SJM009170

default judgment.

20. <u>Nowhere in Anderson's letter to Judge McKenna is there the slightest reference to NCC or the $10,000.00 in payments NCC had advanced on behalf of the Reproducta defendants</u>.   To the contrary, in the same letter (page 2) Anderson relies on the "limited resources" of me, <u>SJM</u> and IFRC in asking the Court for more time to reconstruct the file the defendants could <u>not afford</u> to retrieve from Mr. Sommer, who was claiming a "lien" for his $5,000.00 fee. NCC is not even mentioned in the "cc:" list at the end of that letter, but SJM very definitely is:

> cc:  Morris Relson, Esq., Darby & Darby
> Fr. Nicholas Gruner
> The International Fatima Rosary Crusade
> <u>Servants of Jesus and Mary, Inc.</u>

21. I respectfully ask the court to note how in his plea to Judge McKenna for the Court's indulgence because of SJM's and my own limited resources, Anderson makes no mention of having received from NCC checks totalling $10,000.00. Why? Because Anderson knew those checks had been issued on behalf of SJM and the other <u>Reproducta</u> defendants, and that NCC was <u>not</u> his client in <u>Reproducta</u>. In other words, when it suited Anderson's purpose of delay he acknowledged the limited resources of his <u>client</u>, SJM, but now proposes to tell a different judge of the same court that SJM's separate legal existence was irrelevant because NCC was his "real" client all along.   But that's not what he told the Court or his adversary in the <u>Reproducta</u> case!

22. As if all of this weren't enough to put the lie to Anderson's sham argument about who his corporate client was in

10

SJM009171

_Reproducta_, there is his own sworn statement to the Court in his Declaration of September 11, 1992:

> I am counsel to defendants Father Nicholas Gruner, The International Fatima Rosary Crusade (IFRC) and _Servants of Jesus and Mary, Inc._ ("Servants")

23. Also, it must be noted that Anderson's _own bills_ for Reproducta are referenced not to NCC, but to Father Nicholas Gruner, **SJM** and IFRC—although "nominally" (to use Anderson's favorite word) addressed to NCC. Anderson amusingly professes to be confused about my "switching hats" as President of the two corporations (ADec.Feb.28,par.29); but as someone who claims to be an expert in corporate finance (ADep.7-7) and "corporate restructuring" as well as litigation, I find it hard to believe that Anderson has never encountered a corporate officer who holds titles and sits on the boards of affiliated corporations.

### SJM was Anderson's Client
### Even in the "Alleged Corporate Work"

24. Furthermore, not even Anderson's so-called "corporate work" is properly chargeable to NCC because Anderson cannot practice law in Canada. I assume Mr. Anderson would prudently agree that he did not render legal advice about "restructuring" to a Canadian corporation without a license to practice in Canada. Indeed, the $4,000 he was paid for _everything_ he did beyond _Reproducta_ has been properly allocated by journal entry to what he must agree was the only client he was "competent" to represent in the so-called "corporate matters": SJM, the New York component of the apostolate as well as his only validly served client in _Reproducta_. In summary, SJM was Anderson's only corporate client.

11

SJM009172

All NCC ever did was process checks and provide administrative support on behalf of Anderson's actual clients: SJM, IFRC and myself.

### Anderson Relies On His Own Failure
### To Provide A Written Retainer Agreement

25.   Whatever confusion Anderson has managed to create about his representation of SJM in Reproducta results entirely from his failure to send the written retainer agreement he promised.  Had Anderson provided the promised retainer agreement, I certainly would have scrutinized it not only for the maximum fee commitment but also for the proper identity of the clients, although I do not deny that NCC did process payment on behalf of SJM with an appropriate journal entry later on for administrative convenience. Now, Anderson tries to take advantage of the ambiguity in the attorney-client relationship he created by breaking his promise to put our fee agreement in writing.

26.   To add insult to injury, Anderson specifically cites the lack of a retainer agreement as "evidence" that his client was really NCC, stating that "there were no memorializations of any discussions had at the June 18, 1992 [meeting]..." (ADec.Feb.28,par.28).  Of course there were no "memorializations" of the agreement: Anderson saw to that.

27.   In short, Anderson's claim that he never understood he had been retained by SJM in Reproducta is a brazen contradiction of his prior sworn statements and representations to me, to SJM and to the Court, and a shameless attempt to take advantage of his own failure to do what he promised.

12

SJM009173

### Anderson's Claim That NCC And SJM
### Have Identical Interests

28. Throughout his Feb. 28th Declaration and March 3rd
memorandum of law, Anderson argues that I and/or NCC totally
"dominate" and control SJM to the point that SJM really had no
separate interest or involvement in the Reproducta litigation,
making NCC the "real" client. I respectfully ask the Court to note
that aside from Anderson's journalistic descriptions of me as a
"mastermind" and so forth in his papers, he has not provided a
single fact to prove that I "dominate" corporate finances or
disregard corporate formalities--not one solitary fact.

29. Regarding the so-called "identity of interest" between
myself, NCC and SJM, Anderson contradicts himself by arguing that
NCC was the actual creator and publisher of the "infringing"
publications containing the picture of Our Lady which Reproducta
falsely claimed to own (ADec.Feb.28,par.3). Assuming this is true,
then NCC and SJM obviously had very different interests in the
case, a point I made during our June 18th meeting. Anderson
certainly did not take the position during Reproducta that NCC and
SJM were one, so that SJM had no separate defenses apart from NCC.
In fact, he argued to the contrary: that NCC was the responsible
party, not SJM. If Anderson recognized the distinction between the
two corporations and their defenses during Reproducta, it is only
fair that he recognize it now.

30. Then there are these facts which Anderson consistently
ignores: that SJM was incorporated in New York State in 1987; that
NCC was incorporated in Canada in 1974; that NCC and SJM have

13

SJM009174

separate boards of Directors which do not completely overlap (David Lamica, Coralie Graham, Ellen Montgomery and David Skelton serve only one of the two corporations); that each has its own headquarters, staff, payroll[1] and bank account; that each has its own corporate charter and purpose clause; and that each is subjected to a separate audit by major accounting firms in order to maintain the accounting integrity of each corporation, despite the flow of funds between them and their interrelationship in the work of the apostolate. Where, then, is "the dominance" of SJM by me/NCC? Again, Anderson offers nothing but adjectives in his papers and no hard facts. All NCC does is provide administrative support to, and receive revenue from, SJM. What Anderson calls "dominance" is a typical corporate relationship which should hardly confuse a lawyer who claims to be a specialist in corporate finance.

31. Anderson's argument that SJM is merely a puppet with no viable existence as a legal entity is just as frivolous as his argument that SJM was not "really" his client. NCC and SJM not only have separate existences, they also had separate positions and separate defenses to take in the Reproducta case <u>just as they do in this case</u>. Anderson recognized the distinction then; he should be compelled to recognize it now.

Anderson's Claim That SJM
Never "Actively Participated"
In The Reproducta Case

---

[1]Although NCC administers all major apostolate-promotion expenses for SJM, SJM retains sufficient U.S. donations to handle its own payroll and office expenses. (See affidavit of David Lamica, Vice-president of SJM, who is <u>not</u> an officer or director of NCC)

14

SJM009175

32.   Continuing to ignore every inconvenient fact, Anderson claims SJM is not "indispensable" to this case because it did not actively participate in its own defense in <u>Reproducta</u>. In the first place, as President of SJM, I myself participated actively in the case. Not only did I obviously supply an important affidavit, but, as Anderson concedes in his November 30th letter demanding payment of his three day-old partial bill, I reviewed and approved every final document and received periodic reports from him and from John Kladde, Esq., who was an employee of <u>SJM</u>, hired by me as President of SJM.

33.   Furthermore, Anderson's own prior sworn statement to this Court demolishes his whole pretense on this point. In his Declaration of September 11, 1992, referred to earlier (Exhibit H) Anderson <u>admits under oath</u> all the following facts which contradict his position today.

- That he was counsel in the Reproducta case to SJM, with no mention of NCC

- <u>That John Kladde, Esq., was an employee of SJM</u>, not NCC

- That Mr. Kladde, <u>an SJM employee</u>, did "detailed research at the United States copyright office" and conducted interviews with key witnesses to establish doubt about Reproducta's claims <u>even before Anderson had been retained</u>.

- That Mr. Kladde made purchases <u>on behalf of SJM</u> of various reproductions tending to show that Reproducta had no rights in the picture of Our Lady at issue.

- That David Lamica, <u>SJM's vice-president</u>, offered an affidavit establishing SJM's limited role in the "infringement" that never was.

- That Father Michael Jarecki, <u>a Director and then Treasurer of SJM</u>, offered an affidavit establishing Reproducta's copyright pirating activities, which he

15

SJM009176

discovered through field investigation on behalf of SJM <u>before Anderson was retained</u>.

34.   As Anderson's own prior sworn statement makes clear, John Kladde's work for SJM <u>alone</u> was "active" defense of Reproducta. Recognizing this, Anderson now tries to claim that Mr. Kladde was only a "nominal" employee of SJM, but was "really" the employee of NCC--just the way NCC was "really" the client, and I was "really" acting for NCC when I met with him on June 18th. Searching for still more specious accusations with which to prejudice the Court, Anderson suggests that I circumvented Canadian immigration laws because Kladde did so much of his work from NCC offices, where he was required to be only because that is where the records were centralized and where I was most available for conferences to answer factual questions.

35.   What Mr. Anderson doesn't tell the court in fact is this "nominal" employee of NCC was hired by SJM at the principal offices of SJM in Constable N.Y. on May 22, 1992 following an interview by myself, President of SJM and David Lamica, SJM's Vice-President and Chief Operations Manager. Mr. Kladde was anything but a nominal employee hired by me on a whim as Mr. Anderson falsely asserts in an effort to pretend that SJM did nothing in Reproducta.

36.   Here again, Anderson trips over his own prior writings and statements.   I attach as (Exhibit I), Mr. Anderson's letter of June 25, 1992 to my attention and that of Mr. Kladde. The court will note that in the "Re:" of that letter, Mr. Anderson distinguishes Mr. Kladde as an employee of SJM. The June 25th letter is interesting for another reason: It accompanies the draft

16

SJM009177

of the June 26th letter which Mr. Anderson directed us to send to
Judge McKenna on NCC letterhead so that he could pretend he hadn't
yet been retained and paid $10,000.00.   I also attach (Exhibit J)
a copy of an envelope from The Library of Congress  to Mr. Kladde's
place of employment: Servants of Jesus and Mary, Inc. in Constable,
N.Y.

37.   Anderson's own sworn summary of the extensive work done
by SJM employees, officers and directors in exposing Reproducta's
groundless claims <u>without his involvement</u> utterly refutes his
frivolous claim that SJM did not actively participate in its own
defense, a claim he certainly did not make to the Court in
<u>Reproducta</u>!

38.   Ironically, Anderson accuses Father Michael Jarecki, a
good and holy priest, of being willing "to adopt and support any
position perceived to be advantageous to the NCC." (ADec.Feb.28,
par. 35) I respectfully state to the Court that it is Anderson who
is willing to adopt and support any position perceived to be
advantageous to himself.

### Anderson Raises The TRO Issue--Again

39.   At this point in the case it seems that Anderson has
abandoned any attempt to defend the particulars of his outrageous
bill.  Instead, he wants to continue to argue about how much of an
emergency he caused in April 1993 when he seized $125,000.00 in
funds from NCC without notice, after checks on those funds had
already been issued to past due creditors. Although Anderson's Feb.
28th declaration is <u>supposed</u> to be in opposition to defendants'

17

SJM009178

motion to dismiss, he somehow finds a way to insert at paragraphs 36-39, with accompanying footnotes, another elaborate showcasing of wandering footnote 4 from Audrey Roos's affidavit of January 27, 1994, accusing me of making up the whole crisis in order to swindle Mr. Anderson of his reasonable fee.

40.   In our prior affidavits Coralie Graham and I have already documented abundantly the catastrophe Mr. Anderson caused by seizing that account. We have already detailed the bounced checks, the layoffs, the cancelled projects, the inability to go to press on <u>The Fatima Crusader</u>, the double duty required of remaining staff members, the emergency telephone conferences with board members, the frantic monitoring of the total of $94,000 in which had already bounced or were about to bounce, the worry about not making payroll due on May 7th, and all the other worries and problems that Anderson's legal tactics caused.   (FG, Apr. 29, pars. 43-56; Mar. 2, par. 107 (b), (c); CG, Mar. 2, pars. 88-100] I also refer the Court to the reply affidavit of C. Graham being filed with this affidavit providing still more particulars on the TRO emergency.

41.   In footnote 32 of his Feb. 28th Declaration, Mr. Anderson inaccurately summarizes my April 29, 1993 affidavit opposing the TRO and stating my concerns on that date about what had happened and what <u>would</u> happen if we did not unfreeze NCC's funds within the next week to ten days. Rather than belaboring this issue any further, I respectfully ask the Court to reread pars. 46-56 of my April 29th affidavit and see for itself how Anderson has deceptively misrepresented my concerns at the time by omitting

18

SJM009179

crucial verb tenses and carefully cropping his selected quotes to caricature what I said. Every one of the concerns Anderson quotes out of context in his footnote 32 was real and present, or likely to occur, when I signed my April 29, 1993 affidavit, and I stand by every one of them.[2]

42. As a result of the TRO and the two extra weeks of work that were lost due to the emergency legal work, emergency banking and accounting work and other emergency conditions created by the TRO, the Crusader was published two weeks later than scheduled and due to the uncertainty created by the TRO emergency we only published 250,000 copies of that Crusader magazine. This was the lowest we published of the Crusader since 1984, 9 years prior to the emergency. We have had no similar emergency in the whole history of the Apostolate. This would not have happened had not the TRO crippled us to the extent it did.

43. The Court should also note the clever use of verb tenses in the paragraph of Audrey's January 27th affidavit quoted at page 30 of Anderson's Feb.28th Declaration: Here Audrey seems to say that NCC's emergency appeal "proved to be extraordinarily effective" (a lie in itself) before May 4, 1993; but later in the same paragraph she cautiously concedes that by May 4th funds had only begun to arrive in response to that appeal. Audrey hedges on her verb tenses because she knows very well that there had been almost no response to the appeal as of May 4th, and that when Mr.

---

[2]If anything, my concern about bouncing checks was understated in my April 29, 1993 affidavit, since more than $31,000 in checks bounced, not the $26,000 I had projected in paragraph 45(e).

SJM009180

Ferrara and I went to the Court in White Plains that day to oppose the TRO NCC was  still in the midst of the unprecedented emergency Anderson had caused.  <u>On May 4th I had no way of knowing that the appeal would help us</u>.  And <u>that</u> is why on May 4th the apostolate, including the Board of SJM,  agreed to pay Anderson a premium of $25,000.00 to get NCC's funds unfrozen <u>and</u> grant him a $100,000.00 mortgage on SJM's headquarters' building—the same building Anderson ignores when he absurdly claims that SJM has no separate existence apart from NCC, and that SJM was never "really" his client.

44. <u>Furthermore, and for the last time, the emergency appeal Anderson forced us to conduct was not the windfall Audrey falsely claims, and actually hurt our donor base.  That appeal only replaced funds the apostolate would otherwise have raised in the ordinary course of its activities.  The apostolate's total income for the 1993 was actually some $200,000.00 lower than the previous year, probably because the "Anderson appeal" hurt donor confidence.</u>  (See affidavits of Coralie Graham and Elizabeth Holdsworth in opposition to Anderson's motion for partial summary judgement.

45. A close reading of Audrey's vaguely worded accusations shows that all she really says is that sometime after May 4th the "dire consequences" I reasonably feared did not occur. But after May 4th most of those consequences were averted <u>only because the funds were unfrozen</u>, not because of the emergency appeal.  And, of course, Audrey conceals from the Court the fact that even before May 4th over $31,000.00 in checks had bounced (which she laughably describes as a "few checks" and a "temporary inconvenience")

SJM009181

layoffs had occurred and we had suffered the other consequences which could not be helped until the funds were unfrozen on May 7th. Audrey's allegations about the TRO emergency have the same quality as the rest of her Anderson-produced affidavit: when the words are examined very closely, one finds only vague suggestions and no hard facts.

46.   In   summary,   if   Mr.   Anderson   does   not   think   the apostolate's survival was threatened by his sudden seizure of NCC's entire bank account at a time when we were already $282,000.00 behind to our creditors, or by the bouncing of more than $31,000.00 in checks with another $63,000.00 about to bounce, then he knows even less about nonprofit Catholic apostolates than I thought he did.   For seventeen years this apostolate has been engaged in a <u>constant</u> struggle for survival, yet we had always survived before and managed to pay our creditors through constant work and prayer. But until the TRO emergency, we had <u>never</u> encountered a predator like Mr. Anderson, who waited exactly ninety days from the date of his final bill to seize NCC's bank account in order to collect a fee which was an outrageous breach of every promise he made to us.

47.   Anderson speaks of the "Gruner/Ferrara" hyperbole about the emergency he caused, and ominously quotes Rule 11. If Mr. Anderson wants to talk about hyperbole and Rule 11 he should now present to the Court the <u>specific facts</u> and the <u>reasonable investigation</u> on which he based the following, false, reckless and scandalous claims in his various pleadings and affidavits:

- That I exert "virtually absolute" and "arbitrary" dominance over two corporations which have separate

21

SJM009182

boards of directors and are annually audited by
nationally recognized accountants, the first auditor
being the current Auditor General of Canada.
(ADec.Apr.16,1993,par.6)[3]

-That the distinctions between NCC and SJM, two entirely
different corporations in different countries, are
"nominal" (Id.par.58)

- That the distinctions between my personal finances and
those of NCC and SJM are "illusory at best"--at best!
(Id.par.58)

- That I consider myself "above the rules which guide the
conduct of lesser men". (Id.par.6)

- That I am a "dominant figure" that would shift
charitable contributions "at will" to foreign countries
to evade payment of Anderson's bill. (Id.par.10)

- That I have a pattern of cheating suppliers by forcing
them to compromise after I use them to resolve crises.
(AR.Jan.27,1994,par.25-34)

- That I customarily "duck" my obligations whenever I
find them distasteful. (ADec.Apr.16,1993,par.7)

- That I avoided Anderson's bill in order to indulge in
"empire building impulses". (Id.par.66)

. . . and so on, and so forth, ad nauseum.

48.  I respectfully ask the Court to consider whether Mr.
Anderson has ever offered a single objective fact to prove any of
these frivolous allegations beyond my completely justified dispute
with him over his breach of promise and fraudulently excessive
bill, a situation I have never encountered with any of the
reputable lawyers and accountants I have dealt with over the years.
Mr. Anderson should stop rattling his Rule 11 sabre before he hurts
himself. It is time for him to start confronting the real issues of

---

[3]NCC has been audited annually since 1979, SJM has been
audited since its incorporation in 1987.

SJM009183

this case. He should also be admonished not to presume upon the Court's judgment the way he does at page 17 of his March 3rd legal memorandum:

> Thus, there is little doubt that any judgement against the defendants herein <u>will be satisfied from the assets of Defendant NCC once this Court requires Father Gruner to honor his obligations</u> to Plaintiff.

49. That sentence is all too typical of the high-handed, arrogant approach Mr. Anderson has taken throughout this matter. I respectfully suggest that the Court instruct Mr. Anderson to cease his diversionary tactics and face the jury--either in state court, where this case should have been filed in the first place; or, if the Court does not grant our motion to dismiss, then in this Court, where I expect the unjust result Mr. Anderson presumes to dictate to the Court will not occur.


SWORN BEFORE ME
at the Town of Fort Erie            )
in the Regional Municipality        )
of Niagara                          )    _Father Nicholas Gru_____
this 15th day of March A.D. 1994.)


_Jaime W. Brunick_____
Notary Public, Province of Ontario
_My commission expires
at the pleasure of Her Majesty_

23