UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SERVANTS OF JESUS AND MARY, INC., d/b/a THE
FATIMA CENTER

               *Plaintiff,*

     *-vs-*

THE NATIONAL COMMITTEE FOR THE NATIONAL
PILGRIM VIRGIN OF CANADA, THE FATIMA
CENTER U.S.A., INC., and ANDREW CESANEK,

               *Defendants.*

1:18-CV-00731-JJM

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS THE NATIONAL
COMMITTEE FOR THE NATIONAL PILGRIM VIRGIN OF CANADA'S AND THE
FATIMA CENTER U.S.A., INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**BARCLAY DAMON LLP**
*Attorneys for Plaintiff*
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Telephone:   (315) 425-2805
Facsimile:   (315) 703-6247
Email:  mlarkin@barclaydamon.com

**MATTHEW J. LARKIN**
**JOHN D. COOK**
**DAVID M. FULVIO**
   *of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ......................................................................................2

THE APPLICABLE LEGAL STANDARD.................................................................2

ARGUMENT .......................................................................................................5

POINT I:      THE MOTION SHOULD BE DENIED BECAUSE
              NATIONAL PILGRIM FAILED TO ESTABLISH THAT
              IT THE OWNER OF A VALID, PROTECTABLE MARK......................5

       A.     National Pilgrim did not create FATIMA CENTER Mark. ........................7

       B.     National Pilgrim and SJM operated jointly as The Fatima Center...........11

       C.     The FATIMA CENTER Mark identified SJM's and National Pilgrim's
              Combined activities and products……………………………………..14

       D.     National Pilgrim failed to establish first use of The FATIMA CENTER
              Mark ...................................................................................................20

              i.      National Pilgrim is not engaged in commerce in the
                      United States ................................................................21

              ii.     The *Crusader* was not solely a National Pilgrim publication........23

              iii.    The first "use in commerce" of The FATIMA CENTER
                      Mark in the United States was SJM's use of the
                      *Crusader* Issue 46 ........................................................25

              iv.     National Pilgrim failed to establish that it transported
                      *Crusader* Issue 46 in commerce ....................................26

              v.      The "sale" of *Crusader* Issue 46 to SJM was not
                      "use in commerce" ..........................................................28

       E.     National Pilgrim failed to establish its continuous use of The
              FATIMA Center Mark ............................................................................30

       F.     Conclusion ............................................................................................32

POINT II:     THE MOTION SHOULD BE DENIED BECAUSE
NATIONAL PILGRIM FAILED TO ESTABLISH
SUPERIOR OWNERSHIP OF THE MARK BY VIRTUE
OF A MANUFACTURER-DISTRIBUTOR
RELATIONSHIP ........................................................................32

    A.    There is No Dispute Arising Out of a Manufacturer-Distribution
Relationship .........................................................................33

    B.    Which Party First Invested and Affixed the Mark on the Product..........34

    C.    Which Party's Name Approved with the Trademark ...............................35

    D.    Which Party Maintained the Quality and Uniformity of the Product......35

    E.    With Which Party Did The Public Identify The Product and to
To Whom Did Purchasers Make Complaints……………………………36

    F.    Which Party Possesses The Goodwill Associated With The Product or
Which Party the Public Believes Stands Behind the Product ...................37

POINT III:    ALTERNATIVELY, THE MOTION SHOULD BE
DENIED AS TO NATIONAL PILGRIM'S FIRST, SECOND
AND FIFTH COUNTERCLAIMS BECAUSE NATIONAL
PILGRIM HAS FAILED TO ESTABLISH THE
LIKELIHOOD OF CONFUSION ............................................................37

    A.    The Strength of the Mark.........................................................39

    B.    Similarity of the Marks ...........................................................41

    C.    Proximity of the Products .......................................................42

    D.    Bridging the Gap....................................................................43

    E.    Actual Confusion ...................................................................43

    F.    Defendant's Good Faith in Adopting its Mark ........................................44

    G.    Quality of Defendant's Products or Service .............................................45

    H.    Sophistication of the Buyers ...................................................46

    I.    Balancing the aforesaid factors.................................................46

22270473.1

POINT IV:    ALTERNATIVELY, THE MOTION SHOULD BE DENIED
AS TO NATIONAL PILGRIM'S THIRD COUNTERCLAIM
BECAUSE NATIONAL PILGRIM FAILED TO ESTABLISH
BLURRING AND TARNISHMENT ........................................................46

    A.    Blurring ...................................................................................47

    B.    Tarnishment............................................................................47

    C.    Conclusion ..............................................................................49

POINT V:    ALTERNATIVELY, THE MOTION SHOULD BE DENIED
AS TO NATIONAL PILGRIM'S FOURTH COUNTERCLAIM
BECAUSE NATIONAL PILGRIM FAILED TO ESTABLISH
INTENT TO DECEIVE...........................................................................49

POINT VI:    ALTERNATIVELY, THE MOTION SHOULD BE DENIED
PURSUANT TO THE DOCTRINES OF ACQUIESCENCE
AND LACHES ......................................................................................50

POINT VII:    THE MOTION SHOULD BE DENIED AS TO SJM'S CAUSES
OF ACTION FOR VIOLATION OF GBL§§ 349, 397 BECAUSE
DEFENDANTS HAVE MISCONSTRUED THOSE CLAIMS AND
FAILED TO ESTABLISH THEIR ENTITLEMENT TO SUMMARY
JUDGMENT .........................................................................................53

CONCLUSION..................................................................................................................55

22270473.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
  414 F.3d 400 (2d Cir. 2005)................................................................................29, 37

*Aldrich v. Randolph Cent. Sch. Dist.*,
  963 F.2d 520 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992) ......................................................3

*Allard Enters. v Advanced Programming Resources, Inc.*,
  146 F3d 350 (6th Cir. 1998) ................................................................................28

*Almacenes Exito S.A. v. El Gallo Meat Mkt., Inc.*,
  381 F. Supp. 2d 324 (S.D.N.Y. 2005)................................................................................20

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am.,
  Inc.*, 307 F. Supp. 3d 260 (S.D.N.Y. April 20, 2018)......................................40, 42, 44, 45, 46

*American Intern. Group, Inc., v. London American Intern. Corp., Ltd*,
  664 F.2d 348 (2d Cir. 1981)................................................................................4

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................3

*Arrow Fastener Co. v. Stanley Works*,
  59 F.3d 384 (2d Cir. 1995)................................................................................39, 45, 46

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
  2015 U.S. Dist. LEXIS 24013 (S.D.N.Y. Feb. 26, 2015) ......................................................33

*Blue Bell, Inc. v Farah Mfg. Co.*,
  508 F2d 1260 (5th Cir. 1975) ................................................................................30

*Buti v. Impressa Perosa, S.R.L.*,
  139 F.3d 98 (2d Cir. 1997)................................................................................21

*Cadbury Beverages, Inc. v. Cott Corp.*
  73 F.3d 474 (2d Cir. 1996)................................................................................4, 7, 38

*Derminer v. Kramer*,
  406 F. Supp. 2d 756 (E.D. Mich. 2005)................................................................................14

*Dessert Beauty, Inc. v. Fox*,
  568 F. Supp. 2d 416 (S.D.N.Y. 2008)................................................................................49

iv

*Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,*
   890 F.2d 165 (9th Cir.1989) ........................................................................52

*Dwinell-Wright Co. v White House Milk Co.,*
   132 F2d 822 (2d Cir. 1943).........................................................................51

*Egelston v. State Univ. College at Geneseo,*
   535 F.2d 752 (2d Cir. 1976)........................................................................3, 4

*Empresa Cubana Del Tabaco v Culbro Corp.,*
   399 F.3d 462 (2d Cir. 2005).........................................................................6

*ESPN, Inc. v. Quiksilver, Inc.,*
   586 F. Supp. 2d 219 (S.D.N.Y. 2008)........................................................6, 38

*Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,*
   88 F. Supp.2d 188 (S.D.N.Y. 2000)............................................................52

*Gaidon v. Guardian Life Ins. Co. of America,*
   94 N.Y.2d 330 (1999) ...............................................................................54

*Genesee Brewing Company, Inc. v. Stroh Brewing Company, Inc.,*
   124 F.3d 137 (2d. Cir. 1997)......................................................................38

*Girl Scouts of U.S.A. v Bantam Doubleday Dell Pub. Group, Inc.,*
   808 F. Supp. 1112 (S.D.N.Y. 1992).............................................................38

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,*
   523 F.2d 1331 (2d Cir 1975)......................................................................41

*Harley-Davidson, Inc. v. O'Connell,*
   13 F. Supp.2d 271 (N.D.N.Y. 1998)............................................................52

*ITC Limited v. Punchgini Inc.,*
   482 F.3d 135 (2d Cir. 2007).......................................................................6, 30

*Jahr USA Pub., v. Meredith Corp.,*
   991 F.2d 1072 (2d Cir.1993).......................................................................6

*Katz v. Modiri,*
   283 F. Supp. 2d 883 (S.D.N.Y. 2003)..........................................................47

*Kavanagh v. Zwilling,*
   997 F. Supp. 2d 241 (S.D.N.Y. 2014)..........................................................48

*Kelly Servs. v Creative Harbor, LLC,*
   124 F. Supp. 3d 768 (E.D. Mich. 2015).......................................................29, 30

*Kim v. Francis*,
184 A.D.3d 413 (1st Dep't 2020) .......................................................................6

*L & L Wings, Inc. v. Marco-Destin, Inc.*,
676 F. Supp. 2d 179 (S.D.N.Y. 2009)................................................................49

*La Societe Anonyme des Parfums le Galion v Jean Patou, Inc.*,
495 F.2d 1265 (2d Cir. 1974)..............................................................26, 31, 32

*Lang v. Retirement Living Publishing Co.*,
949 F.2d 576 (2d Cir. 1991)........................................................................42, 44

*Marvel Characters v. Simon*,
310 F.3d (2d Cir. 2002)...................................................................................3, 32

*Marvel Comics Ltd. v Defiant*,
837 F Supp 546 (S.D.N.Y. 1993) .....................................................................29

*McGregor-Doniger Inc. v. Drizzle, Inc.*,
99 F.2d 1126 (2d Cir. 1979)..............................................................................41

*Merck & Co. v Mediplan Health Consulting*,
425 F. Supp. 2d 402 (S.D.N.Y. 2006)...............................................................38

*Metropolitan Opera Assoc., Inc. v. Figaro Systems, Inc.*,
7 Misc.3d 503 (Sup. Ct., N.Y., Cty 2005) .......................................................54

*N.Y. State Soc'y of CPA's v. Eric Louis Assocs.*,
79 F. Supp. 2d 331 (S.D.N.Y. 1999)..................................................................49

*Natl. Bd. of the YWCA v YWCA*,
335 F. Supp. 615 D.S.C. 1971 ..........................................................................48

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
317 F.3d 209 (2d Cir. 2003)..............................................................................43

*Phillips v. Kidder Peabody & Co.*,
782 F. Supp. 854 (S.D.N.Y. 1991) .....................................................................3

*Piccari v. GTLO Productions, LLC*,
115 F. Supp. 3d 509 (E.D. Pa. 2015) ................................................................14

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 7 L. Ed. 2d 25, 82 S. Ct. 36
(1961).......................................................................................................... *passim*

*Premier Dental Prods. Co. v. Darby Dental Supply Co.*,
794 F.2d 850 (3d Cir. 1986)..............................................................................37

vi

*Procter & Gamble Co. v. Ultreo, Inc.,*
  574 F. Supp. 2d 339 (S.D.N.Y. 2008).........................................................................53

*Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical
  Therapy P.C.,*
  314 F.3d 62 (2d Cir. 2002)................................................................................51, 52

*Raintree Publishers, Inc. v. Brewer,*
  218 U.S.P.Q. 272 (T.T.A.B. 1983) ..........................................................................29

*Rush Indus. v. Garnier LLC,*
  496 F. Supp. 2d 220 (E.D.N.Y. 2007) .....................................................................49

*Sasson Jeans, Inc. v. SASSON JEANS, LA, INC.,*
  632 F. Supp. 1525 (S.D.N.Y. April 17, 1986) ........................................................39

*SCS Communications, Inc. v. Herrick Co.,*
  360 F.3d 329 (2d Cir. 2004)......................................................................................3

*Sengoku Works v. RMC Int'l,*
  96 F.3d 1217 (9th Cir.1996) ....................................................................................33

*Star Indus. v. Bacardi & Co.,*
  412 F.3d 373 (2d Cir. 2005)...............................................................................43, 45

*Sports Authority, Inc. v. Prime Hospitality Corp.,*
  89 F.3d 955 (2d Cir. 1996)........................................................................41, 43, 44

*Spring Mills, Inc. v. Ultracashmere House, Ltd.,*
  689 F.2d 1127 (2d Cir. 1982).................................................................................41

*Sterling Drug, Inc. v. Knoll A.G. Chemische Fabriken,*
  159 U.S.P.Q. 628 (T.T.A.B. 1968) ..........................................................................29

*Suburban Propane v. Proctor Gas, Inc.,*
  953 F.2d 780 (2d Cir. 1992)......................................................................................3

*Tristar Pictures Inc., v. Leisure Time Productions,*
  17 F.3d 38 (2d Cir. 1994)............................................................................6, 10, 32

*United Drug Co. v. Theodore Recantus, Co.,*
  248 U.S. 90 (1918)...................................................................................................20

*United We Stand America, Inc. v. United We Stand America New York, Inc.,*
  128 F.3d 86 (2d Cir. 1997)......................................................................................25

*Ushodaya Enters. v V.R.S. Intl., Inc.,*
  63 F. Supp. 2d 329 (S.D.N.Y. 1999).........................................................................6

22270473.1

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
   373 F.3d 241 (2d Cir. 2004) ............................................................. 3, 7, 32

*W.W.W. Pharmaceutical Co., Inc., v. Gillette Co.*,
   984 F.2d 567 (2d Cir. 1993) .......................................................... 39, 40, 49

*WE Media, Inc. v. Cablevision Sys. Corp.*,
   94 F. App'x 29 (2d Cir. 2004) ................................................................. 46

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
   728 F. Supp. 1058 (S.D.N.Y. Jan. 17, 1990) .......................................... 49

**Statutes and Rules**

15 U.S.C. § 1114(1)(a), (5) ....................................................................... 37

15 U.S.C. § 1125 .......................................................................................... 1

15 U.S.C. § 1125(c) ................................................................................... 14

15 U.S.C. § 1127 .................................................................................. 7, 28

Fed. R. Civ. P. 56(a) ........................................................................ 2, 20, 38

GBL § 360-L ...................................................................... 1, 2, 5, 6, 46

GBL § 133 .......................................................................... 2, 5, 6, 49

GBL § 349 ....................................................................... 1, 2, 5, 54, 55

GBL § 349(a) ............................................................................................ 54

GBL § 360(a) ......................................................................................... 7, 9

GBL § 397 .......................................................................................... 1, 2, 5

GBL § 397(1) ....................................................................................... 53, 54

Lanham Act Section 43(a)(1)(A) ................................................................ 6

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:40
   (5th ed.) (2020) ................................................................ 14, 48, 51, 53

Rev. Rul. 68-489        53

## PRELIMINARY STATEMENT

Plaintiff Servants of Jesus and Mary, Inc., d/b/a The Fatima Center ("Plaintiff" or "SJM"), respectfully submits this Memorandum of Law in opposition to Defendants The National Committee for the National Pilgrim Virgin of Canada's ("National Pilgrim") and The Fatima Center U.S.A., Inc.'s ("Fatima Center U.S.A.") (collectively "Defendants"), motion for partial summary judgment.

Plaintiff's Second Amended Complaint alleges causes of action for common law trademark infringement, violation of 15 U.S.C. § 1125 (the "Lanham Act"), violations of New York General Business Law ("GBL") §§ 349, 360-L, 397, common law unfair competition, conversion, defamation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. *See* Docket No. 78. Named as defendants are National Pilgrim, Fatima Center U.S.A., and Andrew Cesanek ("Cesanek").

National Pilgrim has asserted counterclaims against SJM alleging violation of the Lanham Act, New York unfair competition, violations of GBL §§ 360-L, 133, common law trademark infringement and conversion. *See* Docket No. 79. National Pilgrim's counterclaim for conversion has been voluntarily discontinued. *See* Docket No. 129.

For more than thirty-five years, SJM and National Pilgrim worked collaboratively sharing a common mission, with SJM operating in the United States and National Pilgrim operating in Canada. During much of that time, the two shared a common president and operated under the common name "The Fatima Center." In June 2017, unbeknownst to SJM, National Pilgrim's leadership, with the support and participation of Cesanek, established Fatima Center U.S.A. for the purpose of diverting donations from SJM. National Pilgrim then severed its connection to SJM by issuing false and defamatory statements and cutting off SJM's access to its own donors. At the

1

same time, National Pilgrim and Fatima Center U.S.A. misappropriated earmarked donations, converted SJM's property, interfered with SJM's banking, and engaged in an organized campaign to redirect estate bequests intended for SJM.

National Pilgrim and Fatima Center U.S.A. seek an order: (i) dismissing SJM's claims for common law trademark infringement, unfair competition pursuant to the Lanham Act, unlawful use of name or identification of a non-profit organization in violation of GBL § 397, common law unfair competition, injury to business reputation and dilution and unfair competition in violation of GBL § 360-L, deceptive business practices in violation of GBL § 349; and, (ii) granting partial summary judgment with respect to National Pilgrim's counterclaims against SJM for unfair competition pursuant to the Lanham Act, common law unfair competition, trademark dilution under GBL § 360-L, use of name with intent to deceive under GBL § 133, and common law trademark infringement.

For the reasons set forth herein, National Pilgrim's and Fatima Center U.S.A.'s motion should be denied in its entirety.

## STATEMENT OF FACTS

The facts relied upon by SJM in opposition to the motion are set forth in its Response to National Pilgrim's and Fatima Center U.S.A.'s Statement of Material Facts and, to the extent relevant, SJM's Statement of Material Facts and exhibits supporting SJM's motion for partial summary judgment. *See* Docket No. 110. The facts need not be repeated at length here.

## THE APPLICABLE LEGAL STANDARD

A motion for summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Second Circuit has "emphasized that summary judgment must be used sparingly 'since its prophylactic function, when exercised, cuts off a party's

right to present his case to the jury.'" *Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2d Cir. 1976) (citations omitted).   The moving party bears the burden of establishing that there are no unresolved genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986); *SCS Communications, Inc. v. Herrick Co*., 360 F.3d 329, 338 (2d Cir. 2004).  The failure of the moving party to carry this dual burden requires the court to deny the motion regardless of the sufficiency of the non-moving party's opposition.  *See e.g., Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied *even if no opposing evidentiary matter is presented*.'") (citation omitted).  Only if the moving party has met this high burden of showing that there are no material facts in dispute *and* that it is entitled to judgment as a matter of law, does the burden shift to the non-moving party to come "forward with 'specific facts showing that there is a genuine issue for trial.'"  *Phillips v. Kidder Peabody & Co*., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (citations omitted); *see also Vermont Teddy Bear*,   373 F.3d at 244.

A genuine dispute of material fact exists, "`if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist*., 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992) (quoting *Anderson*, 477 U.S. at 248).  "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant."  *Marvel Characters v. Simon*, 310 F.3d, 280, 285-286 (2d Cir. 2002); *see also Suburban Propane v. Proctor Gas, Inc*., 953 F.2d 780, 788 (2d Cir. 1992) (court must view "the evidence in the light most favorable to the nonmovant").

Lawsuits brought under the Lanham Act and corresponding common law trademark infringement and unfair competition claims are particularly unsuitable for summary judgment because the seminal issue, the likelihood of confusion, is a question of fact.  *See e.g., American Intern. Group, Inc., v. London American Intern. Corp., Ltd,* 664 F.2d 348, 351 (2d Cir. 1981) ("likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties").   In vacating a lower court order granting summary judgment, the Second Circuit held that summary judgment on a Lanham Act claim is permitted in the rare instance "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.* 73 F.3d 474, 478 (2d Cir. 1996).  Indeed, the Second Circuit in *Cadbury Beverages* cautioned the lower courts against awarding summary judgment where the likelihood of confusion is at issue: "If a factual inference must be drawn . . . and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Id.*  Yet, Defendants ask this Court to employ summary judgment to cut off SJM's "'right to present [its] case to the jury'" on a record that is rife with factual disputes regarding the trademark issues. *Egelston*, 535 F.2d at 754.

Defendants' motion is based entirely on the premise that National Pilgrim is the owner of the "The Fatima Center" trademark (the "FATIMA CENTER Mark").  Indeed, National Pilgrim's surviving counterclaims upon which it seeks summary judgment, all require National Pilgrim to establish that it is the owner of a valid protectable trademark.  Correspondingly, if National Pilgrim owns the FATIMA CENTER Mark, SJM's trademark related claims against National Pilgrim and Fatima Center U.S.A., would necessarily fail.  National Pilgrim, however, failed to establish that

4

there are no genuine disputes as to the material facts regarding the validity and ownership of the FATIMA CENTER Mark.

In addition, there remain unresolved disputes regarding the elements of the counterclaims. Further, there are adequate facts and issues in the record supporting SJM's affirmative defenses based on the First Amendment, estoppel, laches and unclean hands to prevent summary judgment. Defendants have also misstated SJM's claims for GBL §§ 349, 397 in an effort to obtain dismissal. Consequently, the motion should be denied.

## ARGUMENT

### POINT I

### THE MOTION SHOULD BE DENIED BECAUSE NATIONAL PILGRIM FAILED TO ESTABLISH THAT IT THE OWNER OF A VALID, PROTECTABLE MARK

National Pilgrim seeks an order granting partial summary judgment with respect to its counterclaims against SJM for unfair competition pursuant to the Lanham Act, common law unfair competition, trademark dilution under GBL § 360-L, use of name with intent to deceive under GBL § 133, and common law trademark infringement. Defendants also seek dismissal of SJM's claims for common law trademark infringement, unfair competition pursuant to the Lanham Act, common law unfair competition, and injury to business reputation and dilution and unfair competition in violation of GBL § 360-L.

The motion is premised on National Pilgrim's ownership of the FATIMA CENTER Mark. The FATIMA CENTER Mark is not a registered mark with the U.S. Patent and Trademark Office. Accordingly, Defendants must prove that the FATIMA CENTER Mark, is a valid, protectable trademark and that National Pilgrim is the owner of the trademark under common law principles long recognized in federal and New York law.  They have not done so.

5

It is axiomatic, that in order "[t]o prevail on a statutory or common law claim of trademark infringement, a party must establish that the symbols for which it seeks trademark protection are valid, legally protectable marks." *Tristar Pictures Inc., v. Leisure Time Productions*, 17 F.3d 38, 43 (2d Cir. 1994); *see also Empresa Cubana Del Tabaco v Culbro Corp.,* 399 F.3d 462, 472 (2d Cir. 2005) (dismissing Lanham Act claims due to lack of trademark ownership); *Gruner + Jahr USA Pub., v. Meredith Corp*., 991 F.2d 1072, 1075 (2d Cir.1993) ("plaintiff needs to demonstrate is that it has a valid mark entitled to protection").  Concomitantly, the Second Circuit has held that a party asserting a claim brought under Section 43(a)(1)(A) of the Lanham Act must first "demonstrate its own right to use the mark or dress in question." *ITC Limited v. Punchgini Inc*., 482 F.3d 135, 154 (2d Cir. 2007).

New York State courts have also held that proof of trademark ownership is a threshold element to a claim of infringement.  *See e.g., Kim v. Francis*, 184 A.D.3d 413, 414 (1st Dep't 2020).  Similarly, "to state a claim for New York common law unfair competition, the party making the claim must demonstrate that (1) it 'possesses a valid, protectable mark,'" *ESPN, Inc. v. Quiksilver, Inc*., 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008) (citations omitted).  The same rule applies to dilution claims brought under GBL § 360-L. *See Empresa Cubana*, 399 F.3d at 485-486.  Although claims brought under GBL § 133 do not necessarily require a valid trademark, if the claim is premised upon a trademark or trade name, the party asserting the claim must prove the elements of a valid trademark or trade name.  *See Ushodaya Enters. v V.R.S. Intl., Inc*., 63 F. Supp. 2d 329, 339-340 (S.D.N.Y. 1999).  At best, the record submitted in support of the motion shows that National Pilgrim's ownership and right to use the FATIMA CENTER Mark are in doubt.  When the evidence is viewed in the light most favorable to SJM, it is clear that National Pilgrim

failed to carry its burden and the motion "must be denied." *See Vermont Teddy Bear,* 373 F.3d at 244; *see also Cadbury Beverages,* 73 F.3d at 478.

The Lanham Act states in relevant part, that "the term 'trademark' includes any word, name, symbol, or device, or any combination thereof . . .  used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  New York applies an almost identical trademark definition.  *See* GBL § 360(a).  National Pilgrim has failed to carry its initial burden of establishing that there are no material facts in dispute as to whether it holds a valid, protectable mark.  To the contrary, the record contains various facts which either establish that National Pilgrim does not hold the FATIMA CENTER Mark or, minimally, that the validity and ownership of the mark are questions that must be resolved by a jury at trial.

### A.  National Pilgrim did not create the FATIMA CENTER Mark

SJM was not merely the United States distributor for The Fatima Center.  SJM was the American half of The Fatima Center.  On this fact there is no dispute. Witnesses produced on behalf of all parties in the litigation – SJM, National Pilgrim, Fatima Center U.S.A. and Cesanek – concurred that The Fatima Center name referred to both SJM and National Pilgrim even though they remained separate legal entities.  The Fatima Center name, which became the FATIMA CENTER Mark, was chosen by Fr. Gruner in his capacity as president of both SJM and National Pilgrim.  *See* NPV Exhibit[1] 8, p. 59, l. 10 – p. 61, l. 16.  It was intended to be used by both organizations in reference to their joint activities and it was used for that purpose.  *Id.*

---

[1] References to "NPV Exhibit" refer to the exhibits to the Declaration of Justin D. Kloss, dated February 24, 2021, submitted in support of National Pilgrim's and Fatima Center U.S.A.'s motion.

In support of the motion, National Pilgrim provided the testimony of its current general manager Denise Beaulieu ("Beaulieu"). She was the only witness deposed who was present when Fr. Gruner decided upon The Fatima Center name. Her testimony is uncontroverted:

> Q.   . . . . Do you know when The Fatima Center name started being used?
>
> A.   1993, '94.
>
> Q.   When you say -- in what context?
>
> A.   That's when the decision was made that the various names that we had, we were going to be under one umbrella of the Fatima Center.
>
> Q.   Okay. **Who made that decision?**
>
> A.   **Father Gruner**. And then there was various managers that attended that meeting.
>
> * * * *
>
> Q.   Okay. What names were in use prior to that?
>
> A.   . . . Servants of Jesus and Mary, National Pilgrim, the Consecration Crusader [*sic*], the Immaculate Heart Publications, there was -- . . . .
>
> Q.   International Fatima Rosary Crusader [*sic*]?
>
> A.   Yes.
>
> Q.   **So at the meeting a decision was made that going forward the name Fatima Center would be used?**
>
> A.   **Yes.**
>
> Q.   **And that would be used by both National Pilgrim and also by Servants of Jesus and Mary?**
>
> A.   **Yes**.
>
> * * * *
>
> Q.   And then ultimately who made the decision?
>
> A.   He did.

8

Q.      Did he do it at the meeting?

A.      Yes.

* * * * *

Q.      Okay. At the time of that meeting in 1993, he was the president of National Pilgrim?

A.      Yes.

MR. KLOSS: Object to the form.

MR. LARKIN: And he was also the president of Servants?

THE WITNESS: Yes.

*Id.* (emphasis added).

Beaulieu's testimony, offered in support of the motion, instead belies National Pilgrim's attempts to recast the FATIMA CENTER Mark as a creation of "NPV managers and NPV's President Fr. Gruner." *See* Docket No. 92-2, Defendants' Statement of Material Facts, dated February 24, 2021 ("NPV Stmt. of Facts"), ¶ 80. If anything, Beaulieu's testimony calls into question the very premise of National Pilgrim's counterclaims. As Beaulieu testified, Fr. Gruner was the president of both organizations at the time he conceived of the FATIMA CENTER Mark for use by both organizations. *See* NPV Exhibit 8, p. 60, l. 19 – p. 61, l. 16. Secondly, National Pilgrim has accurately asserted that there were never any contractual agreements governing the relationship between SJM and National Pilgrim. *See* NPV Stmt. of Facts, ¶¶ 35, 52; NPV Exhibit 4, p. 23, l. 16 – 19; NPV Exhibit 3, p. 283, l. 9 – p. 284, l. 23.

Consequently, Fr. Gruner could not have been acting solely as "NPV President." Absent a contract granting such authority to NPV's president, he would not have been able to determine what name SJM would use in marketing and promotional materials. The record supplied by Defendants makes clear that Fr. Gruner was acting in his capacity as the president of National Pilgrim *and* as the president of SJM when he first conceived of the FATIMA CENTER Mark and

9

set its use in motion.  These facts, gleaned from Defendants' own moving papers, establish the existence of a genuine dispute as to whether National Pilgrim holds a "valid, protectable mark," a requisite element of its claims.  *See e.g., Tristar Pictures*, 17 F.3d at  43.  This issue must be resolved by a jury and should lead the Court to deny the motion.

The Court, however, is not confined to the record provided by Defendants to find that there were no contracts that vested it with any control over SJM and that Fr. Gruner's  authority to act on behalf of SJM flowed solely from his position as its president.  Additional supportive evidence is found elsewhere in the record in the testimony of multiple witnesses with different allegiances. *See* Docket No., 109-3, p. 23, l. 16 – p. 24, l. 10, p. 87, l. 21 – p. 88, l. 7; Docket No., 109-5, p. 283, l. 9 – p. 284, l. 23; Docket No., 109-11, p. 24, l. 9 – p. 26, l. 17; Docket No. 109-12, p. 63, l. 6 – p. 64, l. 2; p. 250, l. 19 – p. 256, l. 3; p. 330, l. 4 – 15; Docket No., 109-13, p. 11, l. 12 – p. 13, l. 10; Docket No., 109-15, p. 80, l. 18 – p. 81, l. 3.

In recounting Fr. Gruner's position as president of both organizations, "Fatima Center General Manager" Michael Longval ("Longval") succinctly described his management style: "He made all the decisions."  *See* Docket No., 109-11, p. 192, l. 14 – 19.  Former National Pilgrim manager, director and corporate secretary Coralie Graham ("Graham") explained in her testimony: "I can't get away from the fact he was president of both corporations. So whatever he did in Canada also reflected on his presidency of Servants of Jesus and Mary."  *See* Docket No., 109-5, p. 62, l. 11 – 14. Fr. Gruner could not have decided The Fatima Center name "would be used by both National Pilgrim and also by Servants of Jesus and Mary" except in his capacity as president of both National Pilgrim and SJM.  *See* NPV Exhibit 8, p. 60, l. 19 – 20.  He had no authority over either organization otherwise.  *See* Docket No., 109-15, p. 80, l. 18 – p. 81, l. 3.

Contrary to National Pilgrim's arguments, the facts show that the FATIMA CENTER Mark was the product of Fr. Gruner, acting as the simultaneous president of National Pilgrim and SJM. Certainly, National Pilgrim's claim that it "first created" the FATIMA CENTER Mark is in dispute. *See* Docket No. 92-1, National Pilgrim's and Fatima Center U.S.A.'s Memorandum of Law, dated February 24, 2021 ("NPV Mem.") p. 12.

### B.  National Pilgrim and SJM operated jointly as The Fatima Center

The use of the FATIMA CENTER Mark to refer to the combined activities of SJM and National Pilgrim was not merely a marketing ploy.  For years before the name was adopted, SJM and National Pilgrim operated jointly, referring to the combined entity as the "Apostolate" or "Our Lady's Apostolate."  *See* Docket No. 100-4, NPV08258, NPV08261, NPV08263; Docket No. 109-4, p. 44, l. 16 – p. 45, l. 7; Docket No. 109-5, p. 680 – 681; Docket No. 109-9, p. 71, l. 13 – p. 72, l. 17.   Cesanek explained that the Apostolate and The Fatima Center were "interchangeable." Docket No. 109-9, p. 72, l. 15 – 17.   He described: "Fatima Center as a whole. ***The two organizations combined. As like a -- we refer to it as a single entity***. One reference is to the SJM portion, the other reference is to the [NPV] portion."  *Id.*, p. 71, l. 20 – 24 (emphasis added). Miriam Gruner ("M. Gruner"), Fr. Gruner's niece and current National Pilgrim director, similarly testified, "they weren't two operations -- two corporations or two entities functioning with the same president. It seemed to be that, to me, that ***it was really Father Gruner treating them both as one***." Docket No. 109-14, p. 23, l. 1 – 6 (emphasis added).

Cesanek's and M. Gruner's descriptions of the joint operations of SJM and National Pilgrim were hardly unique.  Graham testified, "in Father Gruner's mind it was one umbrella, one apostolate."  Docket No. 109-5, p. 287, l. 1 – 3.  Ellen Montgomery ("Montgomery"), a founding member of SJM in 1978, explained that there were never contracts between SJM and National

Pilgrim "because we had Father Gruner as our president for both boards. ***We were unified.***
***Everything that went on was a unified unit***. . . .   We would have said, NPV, you are part of us
and we are part of you, and we all are unified."  Docket No. 109-3, p. 87, l. 25 – p. 88, l. 7 (emphasis
added).  SJM's current president Fr. Paul Kramer ("Fr. Kramer") expressed a similar
understanding, "as Father Gruner explained to me in 1988, the Fatima Apostolate operated in the
United States under the direction of SJM and it operates in Canada under NPV, but it's one
Apostolate, and in that sense, the work was joint -- it was a joint work that was done, a joint
Apostolate."  Docket No. 109-4, p. 54, l. 1 – 8.

A similar description is found in the "Discussion Points" memorandum prepared by
National Pilgrim's managers prior to a joint meeting held on July 24, 2017:  "Father directed the
apostolate as one company one corporation, but needed to maintain it as two separate companies
for tax receipt purposes. However, he was the president of both."  *See* Docket No., 106-8, SJM
001219, ¶ 1.  Longval explained that SJM was viewed as "our sister company."  *See* Docket No.,
109-11, p. 381, l. 16 – 18.  It was under this rubric, of a combined organization, that Longval rose
to become the "General Manager of The Fatima Center" and was allowed to keep this position
even after Fr. Gruner's death.  *Id.*, p. 24, l. 9 – p. 26, l. 17, p. 192, l. 14 – 19; Docket 109-15,  p.
319, l. 8 – 13.

Tracking back to the beginning, it is clear that National Pilgrim's revisionist view of SJM
is not supported in the facts.  In addition to Fr. Gruner, Fr. Michael Jarecki, SJM's original spiritual
advisor and chairman, and Fr. Victor Soroka, served on the boards of both organizations for many
years.  *See* Docket No. 109-3, p. 60, 1. 5 – 12, p. 348, 1. 21 – p. 349, 1. 21; Docket No. 109-5,  p.
663, 1. 1 - 21. From the time their affiliation, joint meetings were often held of members of both
organizations and consolidated financial statements were prepared.  *See* e.g., Docket No. 102-1,

SJM000422 (July 24, 1990 Annual Meeting); SJM000453 (March 31, 1993 Joint Meeting).  As president of both SJM and National Pilgrim, Fr. Gruner had the authority to hire employees, assign their work locations and duties, and establish reporting procedures utilizing employees of both organizations in the chain of command.  *See* Docket No. 109-3, p. 87, l. 21 – p. 88, l. 7; Docket No. 109-11, p. 24, l. 9 – p. 26, l. 17, p. 192, l. 14 – 19; Docket No. 109-13, p. 11, l. 12 – p. 13, l. 3; Docket No. 109-15, p. 80, l. 22 – p. 81, l. 3.  As result, SJM employees often worked from National Pilgrim's facility in Fort Erie, Ontario.  *See* Docket No. 109-9, p. 23, 1. 21 – p. 30, 1. 21; Docket No. 109-12, p. 57, 1. 11 – p. 60, 1. 15; Docket No. 109-15, p. 148, 1. 16 – p. 149, 1. 12.

Following Fr. Gruner's death in 2015, joint meetings were often held of the SJM and National Pilgrim boards of directors, or directors of one organization would appear as guests at the other organization's meetings.  *See* Docket No. 102, NPV14060-14075, NPV014077-014081; Docket No. 102-1, SJM001969, SJM001971-001975, SJM001978, SJM001985.  In fact, the boards of each organization adopted a policy following Fr. Gruner's death that "all material going outside The Fatima Center" was subject to "final approval, release and/or veto" by Graham, Cesanek and Fr. Kramer.  *See* Docket No. 102, NPV14070(12) (May 19, 2015 Minutes); Docket No. 102-1, SJM001973(13) (May 19, 2015 Minutes); Docket No. 109-5, p. 649, l. 9 – p. 652, l. 2; Docket No. 109-15, p. 296, l. 22 – p. 297, l. 23.

It would be difficult to identify a more significant piece of evidence to the Court's inquiry than undisputed documentary proof that SJM's president and vice president were two of the three individuals vested with ultimate authority over "all material going outside The Fatima Center." Yet, the record includes additional unquestioned proof of SJM's coequal role within The Fatima Center.  National Pilgrim proposed that the SJM board and the National Pilgrim board become completely overlapping where "the same persons serve as directors of both the NPV and SJM

boards." *See* Docket No. 106-8, SJM001220, ¶ 6. National Pilgrim's proposal to join the SJM and National Pilgrim leadership, is totally at odds with National Pilgrim's depiction of SJM as nothing more than a mail processor and distribution center. Minimally, there is a genuine dispute over SJM's role within The Fatima Center, and therefore its ownership of the FATIMA CENTER Mark, which warrants consideration by a jury.

### C. The FATIMA CENTER Mark identified SJM's and National Pilgrim's combined activities and products

"It is fundamental that a trademark or service mark identifies a *single*, albeit anonymous, source." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:40 (5th ed.) (2020) ("McCarthy"). Yet, the record is clear that the FATIMA CENTER Mark identified both SJM and National Pilgrim. This usage is not necessarily fatal to the existence of a valid mark because various combined entities, partnerships and joint ventures can own a valid trademark. *Id.*, It does, however, undermine National Pilgrim's claims of exclusive ownership, which is fatal to its counterclaims. *See Piccari v. GTLO Productions, LLC*, 115 F. Supp. 3d 509, 515 (E.D. Pa. 2015) ("The purpose of the Lanham Act is not furthered by permitting co-owners to lodge trademark infringement claims against one another premised upon a co-owner's use of the mark"); *Derminer v. Kramer*, 406 F. Supp. 2d 756, 758 (E.D. Mich. 2005) ("an action between co-owners of a trademark for dilution of that mark under 15 U.S.C. § 1125(c) is not permitted"). Minimally, there is a question of fact whether the FATIMA CENTER Mark was co-owned.

Beaulieu's account of the origin of the FATIMA CENTER Mark is consistent with the joint usage that followed. For example, Fatima Center U.S.A.'s current vice president Cesanek, testified as follows:

> Q.    . . . Fatima Center was a name or an assumed name that both National Pilgrim and Servants of Jesus and Mary were using?

14

\* \* \* \*

THE WITNESS: ***The name included both***, by my understanding.

\* \* \* \*

A        . . . ***they were both viewed as [] The Fatima Center***, that was
my understanding.

\* \* \* \*

A.        Here ***the term Fatima Center is – I believe, is used to
describe collectively the entire organization. National
Pilgrim Virgin and Servants of Jesus and Mary***.

Docket No. 109-9, p. 55, l. 16 – 21, p. 57, l. 3 – 5, p. 70, l. 18 - 21 (emphasis added).

Multiple witnesses produced by National Pilgrim, including Longval, current division managers Joanna Swords and Kelly Maciek, and former president Leonard Cecere ("Cecere"), testified like Cesanek, that The Fatima Center referred to the combined organizations. *See* Docket No., 109-11, p. 24, l. 9 – 12; Docket No. 109-12,  p. 67, l. 10 – 15; Docket No. 109-13, p. 14, l. 1 – 3 ("they were two separate groups, but under the umbrella of The Fatima Center"); Docket No. 109-15, p. 214, l. 22 – p. 215, l. 1.   The evidence is not limited to their testimony.   National Pilgrim's own business records include references to the boards of both organizations together as "The 'Fatima Center' Board Members."   *See* Docket No. 102, NPV14055 (December 18, 2013 Minutes).

Consistent with testimony of Cesanek and the National Pilgrim witnesses, several witnesses produced by SJM, such as founding member and vice president Montgomery, Fr. Kramer, and SJM director Thomas Masset, also testified that The Fatima Center included both SJM and National Pilgrim.  *See e.g.,* Docket No. 109-3, p. 57, l. 3 – 18, p. 177, l. 2 – 11; Docket No. 109-4, p. 53, l. 24 – p. 54, l. 8; Docket No. 109-6, p. 18, l. 14 – p. 19, l. 5, p. 27, l. – p. 28, l. 10 ("***Both NPV and SJM.  They were the Fatima Center***") (emphasis added).

Defendants made much of a few isolated instances where National Pilgrim was referred to as The Fatima Center in an email or correspondence.  *See e.g.,* NPV Stmt. of Facts, ¶¶ 104, 160. The examples cited by Defendants are of no consequence to the issues before this Court.  There are examples in the other direction as well.  For instance, in an electronic mail message on April 17, 2017, to a potential new hire, National Pilgrim's president Cecere accurately explained: "FC is comprised of two Corporations - NPV in Canada and SJM (Servants of Jesus and Mary, US)." Docket No. 102-10, SJM0001293; *see also* Docket 109-15, p. 217, l. 10 – p. 218, l. 18.

Most pertinently, the FATIMA CENTER Mark was actively used with supporters, donors and other members of the public to signify the combined organizations.  Similar to Beaulieu's account, Graham testified that the FATIMA CENTER Mark, "was meant as a -- to combine NPV and SJM in the eyes of all the donors and supporters." *See* Docket No. 109-5, p. 617, l. 23 – p. 618, l. 5.

The most prominent example is the promotional campaign announcing SJM's vice president Cesanek as the "Vice President of the Fatima Center." *See* Docket No. 105-4; *see also* Docket No. 107-5, SJM008975; Docket No. 109-9, p. 64, l. 1 p. 65, l. 23; p. 69 l. 4 – 22.  The vice president title listed in the promotional campaign referred to Cesanek's position with SJM.  *See* Docket 109-9, p. 69 l. 4 – 22.  He was never an officer or director of National Pilgrim.  *Id.* p. 18, l. 18 – 23, p. 66, l. 3 – 6.  This announcement was in connection to his selection by "[t]he directors of both boards" to be the signer of fund raising letters sent out on behalf of The Fatima Center. *See* Docket 105-3.

The brochure includes the following image:



*See* Docket No. 105-4, SJM001525;

The record submitted in support of the motion contains additional examples too numerous to cite of the use of the FATIMA CENTER Mark to signify the combined organizations. For instance, the masthead of *Crusader* Issue 47, was published under the banner: "Send your petition/plea for the Holy Father to Father Nicholas Gruner, The Fatima Center at the address below." Which was followed by the address block in the masthead, clearly identifying SJM as The Fatima Center in the United States. *See* NPV Exhibit 19, SJM006161.

For instance, *Crusader* Issue 83, contained the following contact information on its masthead page:



*See* NPV Exhibit 19, SJM007712 (Issue 83).

Similarly, Crusader Issue 102, included both organizations contacts as "The Fatima Center" on its masthead page.



*See* NPV Exhibit 19,SJM008462 (Issue 102).

Crusader Issue 118, not only included SJM's contact information, it listed the SJM board of directors as the "Directors U.S.A." on the masthead.

**WRITE TO US IN NORTH AMERICA**
*In the USA:* Servants of Jesus and Mary: 17000 State Route 30, Constable, NY 12926
*In Canada:* National Pilgrim Virgin of Canada: 452 Kraft Road, Fort Erie, ON L2A 4M7

**The Fatima Crusader** is published by the National Committee for the National Pilgrim Virgin of Canada. It is distributed in the U.S.A. with the co-operation of the Servants of Jesus and Mary.
**Editor:** Coralie Graham. **Directors Canada:** Leonard Cecere, Coralie Graham, and Miriam Gruner. **Directors U.S.A.:** Ellen Montgomery, Andrew Cesanek, Father Paul Kramer, Tom Masset, David Skelton. **This printing, 150,000 copies.** This magazine is sent free of charge, but a donation to cover the cost of postage and printing is appreciated. It is only through the generosity of our supporters who give more than the minimum that we are able to continue publishing this magazine. Your continued prayerful support is greatly appreciated.

*See* NPV Exhibit 19, SJM009003 (Issue 118).

18

Indeed, from December 1982 to the summer of 2017, every *Crusader* masthead page included contact information for SJM as the location to send donations to in the United States.  *See e.g.*, NPV Exhibit 16, SJM004841 (Issue 9-10); NPV Exhibit 18, SJM006129 (Issue 46); NPV Exhibit 19, SJM007804 (Issue 85), SJM007929 (Issue 88), SJM008904 (Issue 115), SJM000244 (Issue 119).

The FATIMA CENTER Mark was not only used in the Crusader to signify the combined organizations, it was displayed on an array of marketing materials, literature and business documents.  For instance, a brochure entitled "What Is The Fatima Center?", provides SJM's address "In U.S.A."  *See* NPV Exhibit 40, NPV07862.  Indeed, the Court need look no further than National Pilgrim's TTAB Application to find several similar examples.  *See* NPV Exhibit 53, NPV04853, NPV04857, NPV04860 – 04868.

In other instances, The FATIMA CENTER Mark was used only in reference to SJM.  For example, included in the record is an exhibit which National Pilgrim describes as "the packaging and cover of various DVD programs produced by NPV."  *See* Docket No. 92-4, Declaration of Justin D. Kloss, dated February 24, 2021 ("Kloss Dec."), ¶ 46.  Yet, the label on one DVD included in the exhibit provides only SJM's information as The Fatima Center.



NPV Exhibit 43, SJM000281.  This labeling is consistent with various other examples of materials using The FATIMA CENTER Mark to identify SJM.  *See e.g.,* Docket No. 102-11, SJM006341, SJM007246, SJM007594.

It is impossible to reconcile the facts with National Pilgrim's claim that SJM was relegated to "limited distributing and receiving responsibilities . . . for the entirety of the relationship between the two organizations." *See* NPV Mem., p. 8. This record is utterly at odds with the description of events portrayed by Defendants in their moving papers. Rather than establish that Defendants are entitled to the relief requested, the record, even limited to the issues salient to their motion, indicates not only that their motion should be denied but it also exposes the tenuous footing of National Pilgrim's counterclaims.

### D.  National Pilgrim failed to establish first use of The FATIMA CENTER Mark

The Supreme Court has held: "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . .  the right to a particular mark grows out of its use, not its mere adoption." *United Drug Co. v. Theodore Recantus, Co.*, 248 U.S. 90, 97 (1918). Consistent with this view, "[i]t has long been a bedrock principle of federal trademark law that registration or prior use of a mark in the United States is a precondition to maintaining a cause of action for infringement of the mark and the like." *Almacenes Exito S.A. v. El Gallo Meat Mkt., Inc.*, 381 F. Supp. 2d 324 (S.D.N.Y. 2005) (internal citations omitted). Known as the "'territoriality principle,' this principle provides that 'priority of trademark rights in the United States depends solely upon priority of use in the United States, not on propriety of use anywhere in the world.'" *Id.* (citations omitted).

Therefore, for Defendants to establish that they are "entitled to a judgment as a matter of law," they must establish that there is "no genuine dispute" as to whether National Pilgrim used the FATIMA CENTER Mark in commerce in the United States prior to SJM. *See* Fed. R. Civ. P. 56(a) . The record does not support this conclusion.

National Pilgrim asserts that its first used of the FATIMA CENTER Mark in commerce in the United States by affixing it to *Crusader* Issue 46, transporting it across Canadian border and depositing it in a mailbox Buffalo, New York.  It alleges that from that date forward it continuously used the FATIMA CENTER Mark.  Alternatively, it argues that by shipping materials bearing the FATIMA CENTER Mark to SJM, it also used the FATIMA CENTER Mark in commerce.  All of the facts National Pilgrim relies upon to support these arguments are subject to dispute in the record.

        **i.**   **National Pilgrim is not engaged in commerce in the United States**

As a dispositive matter, National Pilgrim is not engaged in commerce in the United States. The Second Circuit has held, the mere advertising or promotion of services in the United States "unaccompanied by any actual rendering in the United States or in 'commerce which may lawfully be regulated by Congress' of the services in connection with which the mark is employed," is insufficient to establish use of a trademark in commerce.  *See Buti v. Impressa Perosa, S.R.L.*, 139 F.3d 98 (2d Cir. 1997).  Although National Pilgrim has portrayed itself as a far-reaching international organization, in reality it is a Canadian not-for-profit and its activities are geographically limited "amongst the people of Canada." *See* NPV Exhibit 1, NPV01488.

National Pilgrim has never been recognized as a tax-exempt charitable organization in the United States.  *See* Docket No. 109-5, p. 622, 1. 9 – 12, p. 683, l. 6 - 15; Docket No. 109-10, p. 14, 1. 13 – 20.   Nor does it solicit or collect donations from residents of the United States.  *See* Docket No. 109-3, p. 383, 1. 23 – p. 384, 1. 21; Docket No. 109-5, p. 176, 1. 14 – p. 179, 1. 8; Docket 109-10, p. 141, 13 – 20.  It is no coincidence that *Crusader* Issue 9-10, the first issue involving SJM, was also the first time United States residents were advised they could make tax-

deductible donations to support Fr. Gruner's work.  Donors were encouraged to do this by sending their donations to SJM.  *See* NPV Exhibit 16, SJM004841; Docket No. 99-1, ¶ 13.

Consistent with the fact that it does not operate within United States, National Pilgrim does not file federal income tax returns, annual information returns (Form 990), New York State income tax returns, or any annual filings with the New York State Attorney General's Charity Bureau.  *See* Docket 99-7, ¶¶ 72 – 74. For years, National Pilgrim's auditor's noted: "SJM collects and issues receipts for *all donations received in the United States*." *See* Docket No. 100-6, SJM004672; Docket No. 102-2, NPV01842(Note 5); NPV01918(Note 10); NPV01901(Note 10) (emphasis added).  Even the most recent financial records available for National Pilgrim show that in 2019 it received "0.00" in revenue in U.S. dollars. *See* Docket No. 109-1, NPV14903 (Income Statement).

National Pilgrim attempts to fill the obvious void in its argument by claiming that "SJM would then remit all money that net of SJM's operating costs back to NPV." *See* NPV Mem., p. 15.  Glaringly absent from the National Pilgrim's version, are the facts that "SJM's operating costs" were seven-figures annually and supported every aspect of The Fatima Center's activities; and that the funds remitted to National Pilgrim were used for the benefit of both organizations. *See e.g.* Docket No., 102-5, SJM001569, SJM001574 (Note 4) ("Monies raised by [SJM] are transferred to [National Pilgrim] on a periodic basis.  [National Pilgrim] spends this money on television and radio broadcasting, printing and the cost of pilgrimages *for both organizations*") (emphasis added).  According to Cesanek, in addition to employee compensation and benefits and the overhead related to its properties, SJM funds paid for: "*All the publications, the events, the conferences, the rosary rallies . . .  all the events and all the literature and all the publications*." *See* Docket No. 109-9, p. 127, l. 5 – 21 (emphasis added).

On these facts alone, the Court should conclude that there is a question of fact whether National Pilgrim used the FATIMA CENTER Mark in commerce.  To the contrary, they show the mark was used in commerce by SJM.

### ii.   The *Crusader* was not solely a National Pilgrim publication

National Pilgrim vests much of its argument on its claim that the *Crusader* was its "official publication."  While the Crusader may have started as National Pilgrim's newsletter, much had changed by 1994 when the FATIMA CENTER Mark was created.  The *Crusader* has not included "The National Pilgrim Virgin of Canada" on its cover page / nameplate in 40 years.  *Compare* NPV Exhibit 16 SJM004746 (Issue 7) *with* SJM004778 (Issue 8).  The *Crusader* stopped including "the 'official publication of the National Committee for the National Pilgrim Virgin of Canada'" in its masthead in 1982.  *See* NPV Exhibit 16, SJM004809 (masthead), SJM004841 (masthead); *see also* NPV Exhibit 17, NPV07398 (masthead), NPV Exhibit 18, SJM006129.  In fact, the phrase was removed from *Crusader* Issue 9-10, which corresponds with SJM's first involvement with the periodical.  *Compare* NPV Exhibit 16, SJM 004809 (masthead) *with* SJM004841 (masthead).

When the *Crusader* was last described as the "official publication" of National Pilgrim, the circulation was 35,000.  *See*  NPV Exhibit 16, SJM 004809.  By 1994, the circulation had grown more than tenfold to 425,000.  *See* NPV Exhibit 18, SJM006129; Docket No.109-11, p. 105, l. 13 – 14.  It is hardly compelling evidence to point out that less than 10% of the recipients first saw the FATIMA CENTER Mark on *Crusader* Issue 46, may have recalled that twelve years earlier the same literature was described as the "official publication" of National Pilgrim.  It is particularly hard to make that leap in light of the fact that the *Crusader* has also been published as "The Official Publication of the International Fatima Rosary Crusade."  *See* Docket No. 103, SJM005104, SJM005138.

In addition, the *Crusader* was largely funded by SJM.  From the outset of their relationship, SJM donated its surplus funds to National Pilgrim to pay for the production costs of the *Crusader*. *See* Docket No. 99-1, ¶ 15; Docket No. 109-3, p. 24, l. 11 – p. 28, l. 3.  SJM maintained oversight over the use of the funds donated to National Pilgrim through Fr. Gruner and the other dual board members. *See* Docket No. 99-1, ¶¶, 19, 27; Docket No. 109-11, p. 197, l. 3 – 14; Docket No. 109-15, p. 83, l. 10 – p. 84, l. 3, p. 109, l. 2 – 25.  All literature that was produced during the years of collaboration between National Pilgrim and SJM, was produced for the benefit of both organizations.  *See e.g.* Docket No. 102-5, SJM001707 (Note 4).  In addition, SJM retained and paid various contract writers who produced materials for the Crusader and other literature for The Fatima Center, both before and after Fr. Gruner's death, including Fr. Kramer, Ed Faust, John Vennari and Christopher Ferrara.  *See* Docket No. 109-4,  p. 10, l. 7 – 25, p. 27, l. 22 – p. 40, l. 12; Docket No. 109-16, p. 22, l. 5 – p. 25, l. 5; Docket No. 109-13, p. 78, l. 14 – p. 79, l. 21; Docket No. 109-5, p. 587, l. 6 – 588, l. 18; Docket No. 102-6.

The content of the literature bearing the FATIMA CENTER Mark was ultimately determined by Fr. Gruner, in his role as president of both National Pilgrim and SJM.  *See* Docket No. 109-9, p. 282, l. 13 – 22, p. 283, l. 2 – 5; Docket No. 109-13, p. 11, l. 12 – p. 12, l. 10; Docket No. 109-15, p. 110, l. 15 – 25, p. 249, l. 16 – p. 250, l. 1.  Following Fr. Gruner's death, Cesanek, SJM's employee and vice president, was responsible for "content review" of The Fatima Center literature.  *See* Docket No. 109-9, p. 73, l. 7 – 16, p. 75, l. 14 – p. 76, l. 13.  Additionally, "all material going outside The Fatima Center" was subject to "final approval, release and/or veto" by Cesanek, Fr. Kramer, and Graham.  *See* Docket No. 102, NPV14070(12) (May 19, 2015 Minutes); Docket No. 102-1, SJM001973(13) (May 19, 2015 Minutes); Docket No. 109-5, p. 649, l. 9 – p. 652, l. 2; Docket No. 109-15, p. 296, l. 22 – p. 297, l. 23.

22270473.1

### iii. The first "use in commerce" of The FATIMA CENTER Mark in the United States was SJM's use of *Crusader* Issue 46

The first publication of the FATIMA CENTER Mark by either SJM or National Pilgrim was *Crusader* Issue 46. *See* NPV Exhibit 18, SJM006130; Docket 102-8, SJM001559; Docket No. 109-12, p. 17, l. 10 – p. 18, l. 9; Docket No. 109-5, p. 616, l. 14 – p. 617, l. 16. The first use in commerce of the FATIMA CENTER Mark in the United States was on the back cover of *Crusader* Issue 46 in reference to SJM's solicitation of donations. *See generally, United We Stand America, Inc. v. United We Stand America New York, Inc*., 128 F.3d 86 (2d Cir. 1997).

The back cover of the version of the *Crusader* Issue 46 which was distributed in the United States, identified SJM as the Fatima Center, as follows:



*See* NPV Exhibit 18, SJM006130. SJM was also referenced as the Fatima Center "IN U.S.A." in the masthead of *Crusader* Issue 46, which again included a request for donations. *See* NPV Exhibit 18, SJM006479; Docket 102-8, SJM001558. SJM's usage of the FATIMA CENTER Mark is entirely consistent with the fact that all donations from United States residents to The Fatima Center were made to SJM. *See* Docket No. 102-2, SJM002134, Note 2; NPV01932, Note 8;

Docket No. 109-5,  p. 735, l. 23 – p. 736, l. 4; Docket No. 109-10, p. 13, l. 17 – p. 14, 11; Docket No. 109-13, p. 14, l. 9 – p. 16, l. 9.

A separate back cover for *Crusader* Issue 46 was printed for Canadian distribution, referencing the "Fatima Centre" and providing National Pilgrim's address.  *See* NPV Exhibit 17, NPV07399. The Canadian version of *Crusader* Issue 46 was not distributed in the United States. *See* Docket No. 109-5, p. 154, l. 21 – p. 157, l. 16, p. 616, l. 14 – p. 620, l. 14.  "It is well settled that foreign use is ineffectual to create trademark rights in the United States."  *La Societe Anonyme des Parfums le Galion v Jean Patou, Inc*., 495 F.2d 1265, 1270, n 4 (2d Cir. 1974).  National Pilgrim's use of "Fatima Centre" in Canada and other foreign locales does not create any rights in the United States.

The publication that National Pilgrim claims was the first use of the FATIMA CENTER Mark in commerce was used in the United States in relation to SJM not National Pilgrim.  *See* NPV Exhibit 18.  Moreover, as indicated above, National Pilgrim does not engage in solicitation of donations or any other commerce in the United States.  These are sufficient grounds to deny Defendant's motion.

### iv. National Pilgrim failed to establish that it transported *Crusader* Issue 46 in commerce

National Pilgrim also claims that it "transported issues of Crusader 46 in commerce" in the United States.  *See* NPV Mem., p. 12, 29.  According to National Pilgrim, this involved National Pilgrim employees determining the recipients of the mailing, physically transporting the publication over the Canadian border and mailing it out from a United States Post Office in Buffalo, New York.  *Id.*, p. 12 – 13.  The facts surrounding this claim, however, are in also dispute. Longval is the key witness to Defendants' argument but he repeatedly testified "I don't remember" when asked various questions regarding mail out of *Crusader* Issue 46. *See* Docket No. 109-11, p.

98, l. 17 – p. 102, l. 3. He did recall, however, that it was Fr. Gruner, not the National Pilgrim employees, who determined the mailing list. "Father Gruner would review [the recipient list], sign it off, say, Yes, that's the groups I want to go to, based on [how] much money we had in our budget to spend." *See* NPV Exhibit 5, p. 95, l. 14 – 17.

Contrary to the account presented in the motion of trucks crossing the international border, Longval testified that the *Crusader*, was mailed from Fort Erie to recipients in the United States with the postage paid by SJM. *See* Docket No. 109-11, p. 100, l. 25 – p. 102, l. 3.  Another version of the *Crusader* distribution process at the time is found Montgomery's deposition. She recalled that SJM member Armand Garneau "would go pick them up" and bring them to SJM for distribution. *See* Docket No. 109-3, p. 16, l.  22 – 17, l. 3, p. 32, l. 9 – 13, p. 44, l. 9 – 23.  She recalled this taking place "[r]ight, until Armand passed away," which occurred in November 1994. *Id.*, p. 44, l. 18 – 23; NPV Exhibit 19, SJM006173 (*Crusader* Issue 48).  Montgomery's testimony is even confirmed in the *Crusader*, "Armand continued doing what he could, even driving our trucks and vans for delivery and pickup right to the end." NPV Exhibit 19, SJM006173 (*Crusader* Issue 48)

National Pilgrim also claims that it paid for the distribution of *Crusader* Issue 46, but the record National Pilgrim submitted in support of the motion indicates that any payments to the USPS by National Pilgrim were made "on behalf of SJM" *See* NPV Exhibit 3, p. 189, l. 9 – 11, p. 192, l. 22 – p. 193, l. 1, p. 198, l. 3 – 13; *see also* Docket No. 109-5, p. 623, l. 1 – p. 626, l. 7. Moreover, the USPS mailing receipts in the record were issued to Fr. Gruner, not National Pilgrim. *See* NPV Exhibit 25, NPV02636, NPV02643, NPV02658, NPV02679, NPV02695; see also Docket No. Docket No. 109-11, p. 102, l. 16 – 25.   Further complicating the issue is the fact that

27

printed on the *Crusader* itself it states: "U.S. Postage **PAID** Servants of Jesus and Mary." *See* NPV Exhibit 18, SJM006130; see also Docket No. 109-5, p. 620, l. 7 – 14.

Certainly, there are unresolved disputes of material fact as to who determined the distribution list for the mailing of *Crusader* Issue 46 in the United States, how it was transported into the United States, and who paid for the mailing.

### v.   The "sale" of *Crusader* Issue 46 to SJM was not "use in commerce"

National Pilgrim argues alternatively that "NPV's provision of Crusader 46 to its distributor SJM" constitutes use in commerce. *See* NPV Mem., p. 30 – 31.  This argument is completely at odds with National Pilgrim's claim that it "physically transported via truck, hundreds of thousands of copies of Crusader 46 across the United States/Canadian border and deposited them in a USPS mailbox Buffalo, New York" *See* NPV Mem., p. 13.  Nor does it comport with the claim that "NPV resumed responsibility for the initial large-scale distribution of literature in in the U.S. and Canada during the mid-to-late 1980s." *See* NPV Stmt. of Facts, ¶ 72.  These conflicting accounts in Defendants' own motion papers indicate that there are disputes of fact must be resolved by a jury.

National Pilgrim's argument is also not supported by precedent.  The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  Under this statutory definition, "prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction." *Allard Enters. v Advanced Programming Resources, Inc.*, 146 F3d 350, 358 (6th Cir. 1998).  Applying these standards, courts have held that to determine "sufficient 'use in commerce,' the 'talismanic test' is whether or not the use was 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'"

*Marvel Comics Ltd. v Defiant*, 837 F Supp 546, 548 (S.D.N.Y. 1993) (citations omitted). Accordingly, the U.S. Trademark Trial and Appeal Board has held "'internal' use . . . cannot give rise" to priority rights in a trademark. *Sterling Drug, Inc. v. Knoll A.G. Chemische Fabriken*, 159 U.S.P.Q. 628, 631 (T.T.A.B. 1968).   In a corollary situation where the plaintiff claimed infringement based on internal use, the Second Circuit quickly dispatched the issue, noting that "internal utilization of a trademark in a way that does not communicate it to the public is analogous to a individual's private thoughts about a trademark." *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 409 (2d Cir. 2005)

National Pilgrim relies on *Raintree Publishers, Inc. v. Brewer*, 218 U.S.P.Q. 272 (T.T.A.B. 1983) in support of its argument that "sale and shipment" of *Crusader* Issue 46 to SJM was sufficient use in commerce to establish priority in the FATIMA CENTER Mark. *See* NPV Mem., p. 30.  Similar arguments have been rejected.  For instance, in *Kelly Servs. v Creative Harbor, LLC*, 124 F. Supp. 3d 768 (E.D. Mich. 2015), the District Court described the salient facts of *Raintree Publishers* as follows: "Raintree Publishers had a "contractual relationship" with its distributor. Pursuant to that contract, Raintree Publishers actually sold its book to the distributor — i.e., the distributor was Raintree Publisher's customer." *Id.*, at 776.  The court in *Kelly Servs.*, found *Raintree Publishers* "inapplicable" because the manufacturer "has not presented any evidence of a distributorship agreement. . . nor the terms governing [the manufacturer's] business relationship with [the distributor]. . . [and] presented no evidence that it actually sold or attempted to sell" the product to the distributor.  *Id.*  The same facts are operative here.

There has never been a contractual relationship National Pilgrim and SJM.  *See* NPV Stmt. of Facts, ¶¶ 35, 50; NPV Exhibit 4, p. 23, l. 16 – 19; NPV Exhibit 3, p. 283, l. 9 – p. 284, l. 23. Consequently, like *Kelly Servs.*, there is no evidence in the record of a "distributorship agreement.

. . nor the terms governing" National Pilgrim's "business relationship with" SJM. *Id.*  In addition, the "sale" of the *Crusaders* to SJM was merely "a bookkeeping principle" and also "to comply with the import laws" in which unpaid invoices were deducted from SJM's "donations" to National Pilgrim and treated as "sales" at year-end.  *See* Docket No. 109-5, p. 149, l. 21 – p. 154, l. 11. Perhaps this accounts for National Pilgrim's failure to produce any evidence "that it actually sold or attempted to sell" *Crusader* Issue 46 to SJM.  *Kelly Servs.*, 124 F. Supp. 3d at 776.  Even if National Pilgrim produced such evidence, an internal sale and shipment to SJM "does not distinguish the product in an appropriate segment of the public mind" sufficient to constitute use in commerce.  *Id.* at 777; *see also Blue Bell, Inc. v Farah Mfg. Co.*, 508 F2d 1260, 1265 (5th Cir. 1975) ("Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use'").

Again, there is clearly a genuine dispute surrounding the material facts of National Pilgrim's claim of first "use in commerce" which should lead the Court to deny Defendants' motion.

### E.  National Pilgrim failed to establish its continuous use of The FATIMA CENTER Mark

In order to prove that it holds a valid, enforceable trademark, National Pilgrim must show not only that it first used the FATIMA CENTER Mark in commerce, but that it used it continuously thereafter.  *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) (proponent must show that it was "the first to use a particular mark" and that it "continues to make use of the mark"). The Second Circuit Court of Appeals has stated the rule as follows:

> Under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the

> initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially. . . .
>
> To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory.

*La Societe*, 495 F.2d at 1271-1272 (citations omitted).

Even if National Pilgrim could establish it first used the FATIMA CENTER Mark in commerce in the United States, there remains an unresolved dispute of fact as to subsequent continuous use.  In support of its claim of continuous use, National Pilgrim cites to *Crusader* Issues 47 – 118 as well as various other examples of materials purported bearing the FATIMA CENTER Mark, spanning the twenty-seven years since 1994.  *See* NPV Stmt. of Facts, ¶ 120.  This evidence is not persuasive.

For instance, the back pages of *Crusader* Issues 47 and 48, the FATIMA CENTER Mark refers only to SJM.  *See* NPV Exhibit 19, SJM006162, SJM006196.  Starting with *Crusader* Issue 49, the FATIMA CENTER Mark no longer appeared in the addresses of both organizations which had appeared in Crusader Issues 46 – 48.  *Id*., SJM006251.  Instead, National Pilgrim was identified as "**IN CANADA:** The Fatima Crusader" followed by its mailing address.  *Id*., SJM is listed as "**IN U.S.A:**" *Id*.  The FATIMA CENTER Mark did not appear again in the masthead until 1998 in *Crusader* Issue 58, where it refers to both organizations.  *Id*., SJM006600.  In other instances, National Pilgrim and SJM are denoted under the banner of "The Fatima Crusade." *See e.g., id*., SJM006677.  Absent altogether from the record is any evidence that the FATIMA CENTER Mark was ever used by National Pilgrim in the United States except in conjunction with SJM.  The lack of evidence in the record is because there no such evidence of National Pilgrim's use of the FATIMA CENTER Mark in the United States.  *See* Docket No. 109-3, p. 361, l. 23 – p. 362, l. 5; Docket No. 109-9, p. 176, l. 8 – 14.

31

On the record, National Pilgrim has clearly failed to establish that its use of the FATIMA CENTER Mark "has been deliberate and continuous, not sporadic, casual or transitory." *La Societe*, 495 F.2d at 1272.  As a result, the motion should be denied.

### F.  Conclusion

Viewing "the evidence in the light most favorable to, and draw[ing] all inferences in favor of" SJM, Defendants failed to establish that National Pilgrim holds a "valid, protectable mark." *Marvel Characters*, 310 F.3d at 285-286; *Tristar Pictures*, 17 F.3d at 43.  Defendants have certainly not met their burden of showing that there are no material facts in dispute as to whether National Pilgrim holds the FATIMA CENTER Mark, or showing that SJM does not hold the FATIMA CENTER Mark.  As a result, Defendants' motion should be denied in as to both its counterclaims and SJM's trademark related claims. *See Vermont Teddy Bear*, 373 F.3d at 244

**POINT II**

**THE MOTION SHOULD BE DENIED BECAUSE
NATIONAL PILGRIM FAILED TO ESTABLISH
SUPERIOR OWNERSHIP OF THE MARK BY VIRTUE OF
A MANUFACTURER-DISTRIBUTOR RELATIONSHIP**

Despite the lack of a manufacturer-distributor relationship, National Pilgrim relies heavily on this theory in an attempt to establish ownership of the FATIMA CENTER Mark, to overcome proof that it did not use the FATIMA CENTER Mark in commerce in the United States. This argument is particularly unsuited given the undisputed evidence that SJM was not the "distributor" of The Fatima Center, it was the American half of the joint operation.  This theory should be rejected by the Court and the motion denied.

Even if this concept did apply to the relationship between National Pilgrim and SJM, the formula utilized by the Courts simply does not apply.  "When disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding

32

trademark rights." *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1220 (9th Cir.1996).  There clearly was an "agreement" between National Pilgrim and SJM to jointly use the FATIMA CENTER Mark.  It just was not reduced to a written contact.  Accordingly, this entire concept is not applicable to the facts before the Court.

Even if the formula relied on by Defendants could apply by analogy to this situation, they have failed to establish National Pilgrim's ownership of the mark.  Although it is the manufacturer who presumptively owns the mark, where "disputes as to trademark or trade dress ownership arise between manufacturers and exclusive distributors and no agreement controls, courts often apply four factors to determine superior ownership: '(1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints.'" *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, 2015 U.S. Dist. LEXIS 24013 *9 (S.D.N.Y. Feb. 26, 2015) (quoting *Tactica Int'l, Inc. v. Atl. Horizon Int'l,* Inc., 154 F. Supp. 2d 586, 600 (S.D.N.Y.  2001)).  In addition, the court may "look at 'which party possesses the goodwill associated with the product, or which party the public believes stands behind the product.'" *Tactica*, 154 F. Supp. 2d at 600, (quoting P*remier Dental Prods. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 854 (3d Cir. 1986)).  For the reasons that follow, the manufacturer-distributor analysis is inapplicable to the instant matter, but even if applied, the four factors to determine superior ownership of the mark balance in favor SJM.

### A.  There is No Dispute Arising Out of a Manufacturer-Distributor Relationship

National Pilgrim conflates the alleged manufacturer-distributor relationship between National Pilgrim and SJM in regards to the *Crusader* with a manufacturer-distributor relationship involving the use of the FATIMA CENTER Mark, to argue that is entitled to a presumption of the

33

mark's ownership.  *See* NPV Mem., p. 34 – 40.   SJM has never made any claim to the *Crusader*

name or claimed that it holds a trademark for the *Crusader*.   Nor has National Pilgrim proffered

any evidence that SJM has used the *Crusader* name as part of its counterclaims.   The *Crusader* is

one product that was produced and distributed, whereas FATIMA CENTER Mark was used by

The Fatima Center, *i.e*. SJM and National Pilgrim together, in their broad missions of promoting

the message of Our Lady of Fatima and related matters.  *See* Docket No. 99-1 ¶ 29; Docket No.

102-1, SJM001978-001979 (December 16, 2015 Minutes); Docket No. 109-3, p. 78, 1. 17 – p. 79,

1. 13; Docket No. 106-2, NPV00901.

All fundraising activities in United States, which included more than the distribution of the

*Crusader*, were funded by and conducted on behalf of SJM under the FATIMA CENTER Mark.

*See* Docket No. 102-1,  SJM001925(12) (March 23, 2004 Minutes), SJM000390(5) (January 25,

2005 Minutes), SJM001930(11) (March 10, 2007 Minutes); Docket No. 99-1. ¶ 29; Docket No.

109-5, p. 641, 1. 16 – p. 644, 1. 21; Docket No. 109-11, p. 23, l. 14 – 25.   Events and conferences

in the United States using the FATIMA CENTER Mark were funded by SJM.  *See* Docket No.

102-1, SJM000436 (January 15, 1992 Directors' Rpt); Docket No. 109-5, p. 735, 1. 7 – 22; Docket

No. 109-3, p. 153, l. 5 – p. 154, l. 4; Docket No. 109-9, p. 127, l. 9 – 21.   SJM paid employees

were also involved in organizing conference events and preparing conference materials.  *See*

Docket No. 109-6, p. 15, l. 1 – 6, p. 17, l. 4 – 13, p. 22, l. 17 – p. 23, l. 8; Docket No. 109-9, p. 75,

l. 14 – p. 76, l. 13; p. 79, l. 2 – 12.   SJM paid contractors appeared as speakers and moderators at

conferences hosted by The Fatima Center as part of their services.  *See e.g*., Docket 109-16, p. 36,

1. 9 – p. 42, 1. 9, p. 85, l. 2 – 5.   The Fatima Center fees incurred to broadcast the recordings on

television and radio in the United States were paid by SJM as well.   Clearly, these activities

conducted under FATIMA CENTER mark were not simply "manufactured" by National Pilgrim

or "distributed" by SJM.   Accordingly, National Pilgrim's attempt to assert ownership of the FATIMA CENTER mark on the manufacturer-distribution basis must fail.

Nonetheless, even upon consideration of the *Tactica* factors, National Pilgrim still cannot establish superior ownership of the FATIMA CENTER mark.

### B.  Which Party First Invested and Affixed the Mark on the Product

To claim this factor balances in its favor, National Pilgrim erroneously claims the mark was "invented at a meeting of NPV manager and was first affixed by NPV to its official magazine, *The Fatima Crusader.*"  NPV Mem, p. 36.  The evidence establishes, however, that The Fatima Center name was actually chosen by Fr. Gruner in his capacity as president of *both* SJM and National Pilgrim.  *See* NPV Exhibit 8, p. 59, l. 10 – p. 61, l. 16.  The Fatima Center name was intended to be used by both organizations in reference to their joint activities and was used for that purpose. *Id.*  There were no contracts that vested National Pilgrim with any control over SJM or vice versa.  *See* Docket No., 109-3, p. 23, l. 16 – p. 24, l. 10; Docket No., 109-5, p. 283, l. 9 – p. 284, l. 23; Docket No., 109-15, p. 80, l. 18 – p. 81, l. 3.  Thus, this factor is neutral.

### C.  Which Party's Name Appeared with the Trademark

National Pilgrim disingenuously claims this factor "lean's in NPV's favor" because, although both parties' names were included on mailings displaying the mark, "NPV would distinguish SJM from THE FATIMA CENTER . . . by identifying SJM only as 'c/o' or "care of Servants of Jesus and Mary."  NPV Mem., p. 36.  As explained in further detail above (*see* Point I[C]), the *Crusader* magazine consistently referred to both organizations by their corporate names for purposes of delineating their respective roles and geographical location.  *See* Docket No. 102-11.  This factor is also neutral.

### D.  Which Party Maintained the Quality and Uniformity of the Product

National Pilgrim claims that this factor "strongly favors NPV" because the *Crusader* "pictorial and content decisions were made by NPV staff." NPV Mem., p. 38. However, the record establishes that the content of the literature was ultimately determined by Fr. Gruner, in his role as president of both National Pilgrim and SJM. *See* Docket No. 109-9, p. 282, l. 13 – 22, p. 283, l. 2 – 5; Docket No. 109-13, p. 11, l. 12 – p. 12, l. 10; Docket No. 109-15, p. 110, l. 15 – 25, p. 249, l. 16 – p. 250, l. 1. Following Fr. Gruner's death, SJM employee and vice president Cesanek was responsible for "content review" of The Fatima Center literature. *See* Docket No. 109-9, p. 73, l. 7 – 16, p. 75, l. 14 – p. 76, l. 13. Additionally, "all material going outside The Fatima Center" was subject to "final approval, release and/or veto" by Cesanek, SJM board member and eventual president, Fr. Kramer, and Graham, a National Pilgrim employee and director who was also serving as the corporate secretary of both National Pilgrim and SJM. *See* Docket No. 102, NPV14070(12) (May 19, 2015 Minutes); Docket No. 102-1, SJM001973(13) (May 19, 2015 Minutes); Docket No. 109-5, p. 649, l. 9 – p. 652, l. 2; Docket No. 109-15, p. 296, l. 22 – p. 297, l. 23. This factor favors SJM.

### E.  With Which Party Did The Public Identify The Product and to Whom Did Purchasers Make Complaints

Instead of referring to the evidence in the record setting forth who the public identified in connection with the FATIMA  CENTER Mark, National Pilgrim claims this factor "favors NPV" because NPV's contact information and location was distributed in some of the mailings. *See* NPV Mem., p. 39. National Pilgrim ignores that United States donors were directed to contact SJM, not National Pilgrim. *See e.g.* NPV Exhibit 19, SJM006161. As evidence of the public's actual perception, upon the creation of the Fatima Center U.S.A., confused donors wrote SJM, not National Pilgrim. *See* Docket No. 108-2; *see also* NPV Exhibit 10, p. 187, l. 15 – 21. This factor weighs in favor of SJM.

**F.  Which Party Possesses The Goodwill Associated With The Product or Which Party the Public Believes Stands Behind The Product.**

Finally, National Pilgrim argues that it has the goodwill associated with "the goods and services promoted using the FATIMA CENTER Mark, because National Pilgrim began producing the *Crusader* "at least three years prior to its association with SJM's precursor prayer group."  NPV Mem., p. 39 – 40.  The early production of the *Crusader* magazine pre-dating the FATIMA CENTER Mark is irrelevant.  National Pilgrim was not affiliated with an American organization during that period and Fr. Gruner was not able to solicit tax exempt donations to support his work through a non-profit in the United States.

"If the public believes that the exclusive distributor is responsible for the product . . . or if the distributor has obtained a valuable reputation for himself . . . that is proof that he possess the goodwill associated with the product."  *Premier Dental Products Co.*, 794 F.2d at 854.  Here, as set forth above, there is no evidence in the record that United States donors or the public at large believed anyone other than SJM was behind the literature and activities of the Fatima Center.  Thus, SJM owns the goodwill associated with the mark, not NPV.

## POINT III

## ALTERNATIVELY, THE MOTION SHOULD BE DENIED AS TO NATIONAL PILGRIM'S FIRST, SECOND AND FIFTH COUNTERCLAIMS BECAUSE NATIONAL PILGRIM HAS FAILED TO ESTABLISHED THE LIKELIHOOD OF CONFUSION

In order to prevail on its First Counterclaim for unfair competition under the Lanham Act, National Pilgrim must prove "that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) "in connection with the sale . . . or advertising of goods or services," 15 U.S.C. § 1114(1)(a), (5) without the plaintiff's consent."  *1-800 Contacts*, 414 F.3d at 407 (citing *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113,

117 (2d Cir. 1999).  It must also show that SJM's use of the FATIMA CENTER Mark "is likely to cause confusion . . . as to the affiliation, connection, or association of [SJM] with [National Pilgrim], or as to the origin, sponsorship, or approval of [SJM's] goods, services, or commercial activities by [National Pilgrim]." *Id.* "Courts often narrow this analysis to two prongs: (1) the validity of plaintiff's trademark and (2) likelihood of confusion." *Merck & Co. v Mediplan Health Consulting*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006).

National Pilgrim's Fifth Counterclaim for common law trademark infringement requires the same proof.  *See e.g., ESPN*, 586 F. Supp. 2d at 230 (S.D.N.Y. 2008) ("The elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims").  In order to prove that it is entitled to summary judgment on its Second Counterclaim for unfair competition claim under New York common law, National Pilgrim must prove the same as the Lanham Act elements, but with an added bad faith requirement. *See Genesee Brewing Company, Inc. v. Stroh Brewing Company, Inc*., 124 F.3d 137, 149-150 (2d. Cir. 1997); *see also Girl Scouts of U.S.A. v Bantam Doubleday Dell Pub. Group, Inc*., 808 F. Supp. 1112, 1131 (S.D.N.Y. 1992).

Accordingly, even if National Pilgrim is able to establish a valid and enforceable mark, its motion for summary judgment on its Lanham Act and common law unfair competition and infringement counterclaims must still fail, unless the record shows there is "no genuine dispute as to" the likelihood of confusion.  *See* Fed. R. Civ. P. 56(a).  To meet this burden, National Pilgrim must show "the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages*, 73 F.3d at 478.  The motion must be denied: "If a factual inference must be drawn . . . and if a reasonable trier of fact could reach a different conclusion." *Id.*  National Pilgrim has clearly failed to meet that standard.

The "'confusion' test for trademark infringement governs both the federal trademark infringement claims and New York Business Law trademark infringement and unfair competition claims." *Sasson Jeans, Inc. v. SASSON JEANS, LA, INC.*, 632 F. Supp. 1525 , 1528 (S.D.N.Y. April 17, 1986*)*.  As summarized by the Second Circuit Court of Appeals:

> Under the law of this Circuit, courts deciding whether a plaintiff has established likelihood of confusion must consider the eight factors elaborated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 7 L. Ed. 2d 25, 82 S. Ct. 36 (1961). The factors, explained in greater detail below, are: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap" ... (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers.

*Arrow  Fastener Co. v. Stanley Works,*  59 F.3d 384, 398 (2d Cir. 1995).

Applying the *Polaroid* factors test, the Court should be led to the inescapable conclusion that National Pilgrim has failed to meet its burden and summary judgment must be denied.

**A.  The Strength of the Mark**

"The term 'strength' refers to a mark's 'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" *Id.* (citing *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 [2d Cir. 1979]). It is well established that "a mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharmaceutical Co., Inc.,  v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir. 1993) (internal citations omitted).

There are four categories regarding the inherent distinctiveness or conceptual strength of a mark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, defined as follows:

> A generic mark is generally a common description of goods and is ineligible for trademark protection. . . . A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. . . . A suggestive mark employs terms which do not describe but merely

> suggest the features of the product, requiring the purchaser to use 'imagination, thought, and perception to reach a conclusion as to the nature of goods. . . . Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and 'with ease of establishing infringement.

*Id.* at 572 (citations omitted).

In *Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.,* 307 F. Supp. 3d 260, 288 (S.D.N.Y. April 20, 2018), the Court held that the "Alzheimer's Association" is "descriptive; it describes a charitable organization that does work related to the disease called Alzheimer's" and thus, "conceptually weak," requiring proof of "secondary meaning."  Here, like the "Alzheimer's Association," THE FATIMA CENTER describes a charitable organization that does work related to the promotion of the message of Our Lady of Fatima.  Thus, National Pilgrim must establish secondary meaning..

Whether a mark has acquired "secondary meaning "is a factual determination which "entails vigorous evidentiary requirements."  *Id.* (quoting *Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 217 [2d Cir. 1985]).  "The indicia commonly recognized as showing secondary meaning are (1) advertising expenditures; (2) consumers studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Id.* .

National Pilgrim has offered no such evidence in support of its contention that the mark has acquired secondary meaning in its favor.  Instead, National Pilgrim merely refers to its receipts of an unspecified "substantial amount of donation money" and that National Pilgrim filed a trademark application that it claims would have been granted but for SJM's opposition.  *See* NPV Mem., pp. 45 – 46.  This identical line of reasoning was rejected by in *Alzheimer's Disease & Related Disorders Assn'n.* in which the court found the plaintiff failed to establish its mark had acquired secondary meaning even though it had been a registered trademark used by the plaintiff since 1988 through

which it received "$160 million in contributions . . . had spent more than $44 million on advertising or public awareness in 2016 alone" . . . had nearly 9 billion media impressions and more than 41 million website visits in 2016." 307 F. Supp. 3d at 288 – 289.

Furthermore, not a single letter cited in the record as potential evidence of consumer confusion was addressed to National Pilgrim. *See* NPV Exhibits 47 and 48. Clearly, the donors did not associate the mark to National Pilgrim. As such, National Pilgrim has failed to establish this factor balances in its favor.

### B.  Similarity of the Marks

The second *Polaroid* factor requires the Court to determine "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 962 (2d Cir. 1996) (Internal citations omitted).

National Pilgrim offers nothing more than a comparison of the words THE FATIMA CENTER and THE FATIMA CENTER SINCE 1994. *See* NPV Mem., p. 46. This is overly simplistic. As explained by the Second Circuit, "an inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves" as National Pilgrim attempts. *Spring Mills, Inc. v. Ultracashmere House, Ltd*., 689 F.2d 1127, 1130 (2d Cir. 1982). Instead, the Court must analyze whether there are differences in how the marks are displayed to the public to determine the likelihood of confusion. *See e.g. McGregor-Doniger Inc. v. Drizzle, Inc.*, 99 F.2d 1126, 1134 (2d Cir. 1979) (noting "the fact that only one mark generally appears in close conjunction with the red plaid McGregor name increases the likelihood that the public, even when viewing the marks individually, will not confuse the two."); *see also*, *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1339 (2d Cir. 1975) (plaintiff's "mark is in Old English

41

type while that of [defendant] is in Roman type. This difference serves to distinguish the marks visually")

National Pilgrim offers no evidence as to its actual use of the mark and the similarity in how the marks are displayed to the consuming public.  Instead, National Pilgrim's analysis begins and ends with a comparison of the marks themselves.   As such, National Pilgrim has failed to establish this factor favors confusion.

### C.  Proximity of the Products

In addressing the third *Polaroid* factor, the "court should examine the differences in the products' 'appearance, size, content, geographical distribution, and audience appeal.'" *Federal Express Corp.,* 1998 U.S. Dist. LEXIS 15607 at 44 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 [2d Cir. 1985]). "This factor focuses on whether the two products compete with each other." *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 582 (2d Cir. 1991).

National Pilgrim merely references the similarity of the services provided.  *See* NPV Mem., p. 47.  National Pilgrim does not allege that the two organizations used the mark in competition "over the same donor pool."  *Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 292.  This is because  National Pilgrim has never had "U.S. donors."  *See* Docket No. 100-6, SJM004672; Docket No. 102-2, NPV01842 (Note 5); NPV01918 (Note 10); NPV01901 (Note 10); Docket No. 109-5, p. 622, 1. 9 – 12, p. 683, l. 6 - 15; Docket No. 109-10, p. 14, 1. 13 – 20. National Pilgrim has never been recognized as a tax-exempt charitable organization in the United States.  *Id.* National Pilgrim's mission is directed "amongst the people of Canada" and to "display throughout Canada" its statue of the Virgin Mary.  *See* NPV Exhibit 1, NPV01488. National Pilgrim never solicited donations directly from United States residents. *See* Docket No. 109-3, p.

383, 1. 23 – p. 384, 1. 21; Docket No. 109-5, p. 176, 1. 14 – p. 179, 1. 8.  National Pilgrim is unable to establish this factor weighs in its favor.

### D. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so*." Star Indus. v. Bacardi & Co.,* 412 F.3d 373, 387 (2d Cir. 2005).  This factor, however, is irrelevant if the parties already compete in the same market.  *See  Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 218 (2d Cir. 2003).

National Pilgrim – without any proof – argues that it offers "virtually identical products and services throughout the U.S. and worldwide," eliminating the need to address this factor.  NPV Mem., p. 47.  This is simply not true.  As set forth above, the evidence establishes that National Pilgrim has never solicited donors from the United States, nor is there evidence that it is likely to do so, particularly given that it cannot issue tax-exempt receipts.  *See* Docket No. 100-6, SJM004672; Docket No. 102-2, NPV01842 (Note 5); NPV01918 (Note 10); NPV01901 (Note 10); Docket No. 109-5, p. 622, 1. 9 – 12, p. 683, l. 6 - 15; Docket No. 109-10, p. 14, 1. 13 – 20. National Pilgrim has failed to meets its burden on this factor.

### E. Actual Confusion

"For purposes of the Lanham Act, actual confusions means 'consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Authority, Inc.,* 89 F.3d at 963.  "Actual confusion" is not found by a "handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants."  *Star Indus.*, 412 F.3d at 388.  In fact, the "failure to present its own consumer survey weighs against a finding of consumer confusion." *Sports Authority, Inc.* 89 F.3d at 963.

Even if such evidence of actual confusion is presented, it "must be viewed in its evidentiary context. Confusion may not be causally related to the use of similar marks at all." *Id.   Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 293 (internal citations omitted). Put differently, the actual confusion must be attributable to or "stemming from" the alleged infringing party's advertising practices.  *Id.; see also, Sports Authority, Inc.,* 89 F.3d at 963.

National Pilgrim offers no consumer surveys or similar evidence demonstrating actual confusion.  Rather, National Pilgrim merely refers to "numerous instances of actual confusion, where donors were either intentionally misled or mistaken as to the source of the literature or materials soliciting donations."  NPV Mem., p. 48.  There is no such evidence in the cited record establishing confusion by donors over FATIMA CENTER Mark between SJM and National Pilgrim.  The testimony in the cited record indicates that "some of these people are confused by The Fatima Center, USA and Servants of Jesus and Mary."   See NPV Exhibit 10, p. 187, l. 15 – 21.  To the extent there was confusion among donors between SJM and Fatima Center U.S.A., it was caused by the establishment of Fatima Center U.S.A. and the conduct of National Pilgrim, Fatima Center U.S.A. and Cesanek, not SJM.  *See* Docket No. 109-13, p. 153, l. 8 – 18; *see also* Docket No. 108-2; Docket No. 108-3; Docket No. 109-9, p. 330, l. 3 – p. 331, l. 15, p. 333, l. 23 – p. 334, l. 17.  This factor does not balance in National Pilgrim's favor.

### F. Defendant's Good Faith in Adopting its Mark

The Second Circuit has noted that although "issues of good faith are generally ill-suited for disposition on summary judgment", the court may still conclude that defendant acted in good faith in adopting its mark. *Lang*, 949 F.2d at 583 (internal citations omitted).  "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Id.* at 583-84.  Good faith is found "in the absence of additional

evidence indicating an intent to promote confusion or exploit goodwill or reputation." *Star Indus.,* 412 F.3d at 388.

National Pilgrim argues that SJM acted in bad faith in light of its familiarity with National Pilgrim's use of the mark and its temporary cessation from use following the parties' separation. *See* NPV Mem., p. 48.  National Pilgrim offers no evidence of SJM's intent to promote confusion or exploit the goodwill or reputation of National Pilgrim.  In fact, the cited record establishes the confusion purposefully caused by National Pilgrim, Fatima Center U.S.A., and Cesanek in forming a rival entity to divert United States donations away from SJM.  *See* Docket No. 109-13, p. 153, l. 8 – 18; *see also* Docket No. 108-2; Docket No. 108-3; Docket No. 109-9, p. 330, l. 3 – 331, l. 15, p. 333, l. 23 – p. 334, l. 17.  National Pilgrim has again failed to meet its burden on this factor.

### G.  Quality of Defendant's Products or Services

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's *product* is of inferior quality." *Arrow Fastener Co.,* 59 F.3d at 398 (2d Cir. 1995) (emphasis added).  This factor does not involve harm to reputation caused by factors other than an inferior product.  *See Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 298 (rejecting the plaintiff's "attempts to re-frame this factor as focusing on the harm to their brand.")

National Pilgrim does not allege that SJM provides an inferior product or service, but instead, refers to potential reputational harm by SJM's alleged "controversial and inflammatory viewpoints regarding Pope Francis."  National Pilgrim, therefore, has failed to establish that its products are of superior quality, as necessary to establish this factor in favor of confusion.

### H.  Sophistication of the Buyers

"This final factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Arrow Fastener Co.,* 59 F.3d at 384 (internal citations omitted).   While National Pilgrim correctly argues that the sophistication of the average donor to a charitable organization balances in favor of the party alleging a likelihood of confusion, it does little to sway the balance in favor of infringement. *Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 299 (holding no infringement by a competing charity, noting the "most important factors" are "strength of mark, similarity of the marks, and evidence of actual confusion.")

### I. Balancing the aforesaid factors

While the Court "must focus on the ultimate issue of whether consumers are likely to be confused, rather than on a numerical break-down of the factors," *WE Media, Inc. v. Cablevision Sys. Corp.,* 94 F. App'x 29, 33 (2d Cir. 2004), National Pilgrim. has failed to establish that seven of the eight *Polaroid* factors balance in favor of finding a likelihood of confusion.  Accordingly, National Pilgrim has failed to meet its *prima facie* burden and thus, its motion for summary judgment must be denied.

### POINT IV

### ALTERNATIVELY, THE MOTION SHOULD BE DENIED AS TO NATIONAL PILGRIM'S THIRD COUNTERCLAIM BECAUSE NATIONAL PILGRIM FAILED TO ESTABLISH BLURRING AND TARNISHMENT

National Pilgrim's motion for summary judgment on its Third Counterclaim for trademark dilution claim must also fail.  New York's dilution law, GBL § 360-L, requires National Pilgrim to prove (1) ownership of a mark that is distinctive or has acquired distinctiveness through secondary meaning, and (2) a likelihood of dilution through blurring or

tarnishment.  *See New York Stock Exchange, Inc.*, 293 F.3d at 557-558.  National Pilgrim has failed to establish these elements sufficient to warrant summary judgment.

### A.   Blurring

Six factors are often used to determine the likelihood of blurring: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumer, (4) predatory intent, (5) renown of the senior mark, (6) renown of the junior mark. *See Katz v. Modiri,* 283 F. Supp. 2d 883, 901 (S.D.N.Y. 2003) (citing *Deere & Co. v. MTD Products, Inc*., 41 F.3d 39, 43 (2d Cir. 1994)).

The first four factors are addressed in the identical *Polaroid* factors above (similarity of the marks, proximity of the products, sophistication of the consumer, and good faith of SJM in adopting the mark) and, therefore, no further analysis on those factors is necessary.  *See New York Stock Exchange, Inc.,* 293 F.3d at 558 (noting that the court's "discussion of infringement also disposes of the blurring claim").  Furthermore, despite National Pilgrim's conclusory assertions to the contrary, there is no evidence in the record that National Pilgrim's use of the FATIMA CENTER Mark has renown in New York or the United States.  In fact, as explained above, there is no evidence National Pilgrim even used the mark in commerce in the United States, let alone is perceived by United States donors as having ownership.  Yet, the record establishes that renown United States donors attributed the mark to SJM.

### B.   Tarnishment

Meanwhile, tarnishment occurs where a trademark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *New York Stock Exchange, Inc.*, 293 F.3d at 558.  According to National

Pilgrim, SJM's "harmful beliefs" are the "shoddy" and "unwholesome or unsavory" goods at issue here.  *See* NPV Mem., p. 54. Granting National Pilgrim summary judgment on such a claim would clearly and impermissibly involve the Court in an issue of religious doctrine.

The Supreme Court has held that the "First Amendment precludes judicial review of a claim that requires 'a searching . . . inquiry into church [doctrine]' and prohibits courts from deciding 'religious dispute[s,].'" *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 249 (S.D.N.Y. 2014) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 723 (1976)).

National Pilgrim defines its claim of tarnishment as follows:

> SJM is an organization which holds, promotes, and espouses certain beliefs which are counter to traditional catholic doctrine, and which are considered by many within the religious communities, and SJM itself, to be controversial and/or harmful. SJM's actions in improperly using NPV's THE FATIMA CENTER Mark and related Marks undoubtedly has, and will continue, to cause the public to associate NPV with these controversial and/or harmful beliefs and positions.

NPV Mem., p. 54.

"It is a fundamental principle of American law that courts may not take sides in a religious controversy."  McCarthy, § 9:7.50.  The Second Circuit has noted that the First Amendment is implicated where courts make "any decision for or against any religious doctrine or practice." *Martinelli v Bridgeport R.C. Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999).  Yet, that is precisely what National Pilgrim's seeks from the Court here.  The Court cannot, consistent with Constitutional principles, find that National Pilgrim is entitled to judgment as a matter of law because SJM's "beliefs . . . are counter to traditional catholic doctrine. . . controversial and/or harmful."  The First Amendment requires the Court to deny the motion couched on these arguments. *See e.g., Natl. Bd. of the YWCA v YWCA*, 335 F. Supp. 615, 624 D.S.C. 1971) ("any determination by a Court of Law as to whether plaintiff has deviated from a 'Christian' purpose,

or whether the use of the word 'Christian' in its corporate name and trademarks amounts to such a misrepresentation as would invalidate plaintiff's rights under the trademark law, is prohibited by the First Amendment to the United States Constitution.")

### C.  Conclusion

National Pilgrim has failed to establish its entitlement to summary judgment on its trademark dilution counterclaim under theories of blurring or tarnishment.   Moreover, the tarnishment claim, as stated, requires the Court to impermissibly wade into issues of religious doctrine.  As a result, the Court should deny the motion as to the Third Counterclaim.

**POINT V**

**ALTERNATIVELY, THE MOTION SHOULD BE DENIED
AS TO NATIONAL PILGRIM'S FOURTH
COUNTERCLAIM BECAUSE NATIONAL PILGRIM
FAILED TO ESTABLISH INTENT TO DECEIVE**

National Pilgrim's Fourth Counterclaim for a violation of GBL § 133 "requires a showing that Defendant acted with the 'intent to deceive or mislead the public.'" *Rush Indus. v. Garnier LLC*, 496 F. Supp. 2d 220 (E.D.N.Y. 2007); *see also L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179 (S.D.N.Y. 2009).  In determining whether a party acted with "intent to deceive" Courts "courts can rely on the considerable jurisprudence that has been developed applying the "good faith" prong of the *Polaroid* test."  *N.Y. State Soc'y of CPA's v. Eric Louis Assocs.,* 79 F. Supp. 2d 331 (S.D.N.Y. 1999).  Mere knowledge of another party's use of a mark "does not necessarily give rise to an inference of bad faith,:  *W.W. Pharm. Co. v. Gillette Co*., 984 F.2d at 574.  Likewise, use of a mark following the receipt of a cease-and-desist letter is not bad faith.  *See Dessert Beauty, Inc. v. Fox,* 568 F. Supp. 2d 416, 427 (S.D.N.Y. July 31, 2008) (the "failure to completely abandon the use after receiving a cease and desist letter is insufficient to support an allegation of bad faith" as a matter of law); *see also Wonder Labs, Inc. v. Procter & Gamble Co.*,

728 F. Supp. 1058, 1064 (S.D.N.Y. Jan. 17, 1990) (the failure to abort advertising campaign upon receipt of cease and desist letter "is absolutely no proof that the defendant acted in bad faith to capitalize on the plaintiff's trademark").

For the reasons set forth in Point III(F) above, SJM acted with good faith in utilizing the FATIMA CENTER mark.  NPV's motion for summary judgment on its Fourth Counterclaim contains nothing more than unsupported and conclusory assertions that SJM intended to deceive the public.  *See* NPV's Mem, pp. 59 -60.   NPV offers no factual basis for SJM's bad faith other than SJM's knowledge of the mark and that SJM received a cease-and-desist letter from Fatima Center U.S.A., which even if imputed to NPV, is absolutely no proof of SJM's intent to deceive.

## POINT VI

### ALTERNATIVELY, THE MOTION SHOULD BE DENIED PURSUANT TO THE DOCTRINES OF ACQUIESCENCE, LACHES AND UNCLEAN HANDS

National Pilgrim alleges that it has been the sole and exclusive user of the FATIMA CENTER Mark in the United States since April 1, 1994.  *See* Docket No. 79, ¶ 50.  National Pilgrim further alleges: "At no point in time did NPV ever grant SJM rights to NPV's 'THE FATIMA CENTER' mark."  *Id.*  Further, the record is settled that there was never any contractual agreements between SJM and National Pilgrim during their many years of affiliation.  *See* NPV Stmt. of Facts, ¶¶ 35, 52; NPV Exhibit 4, p. 23, l. 16 – 19; NPV Exhibit 3, p. 283, l. 9 – p. 284, l. 23.  Yet, SJM used the FATIMA CENTER Mark in the United States without objection from National Pilgrim from 1994 until this action commenced in 2018.   Indeed, even after National Pilgrim separated from SJM, it never sent SJM a cease and desist letter or made any claim that SJM's use of the FATIMA CENTER Mark infringed on or violated National Pilgrim's rights.  *See* NPV Exhibit 49, p. 1 (letter sent from "legal counsel to THE FATIMA CENTER U.S.A., INC., a New York corporation").

50

Describing the "closely related doctrines of acquiescence and laches," the Second Circuit noted that "[f]indings of delay and prejudice are central to both of these defenses."  *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002).  The court explained that "'both [acquiescence and laches] connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent.'"  *Id.*, (citations omitted).

In the context of a trademark dispute, acquiescence may be invoked against the owner of a trademark "because of substantial reliance over a long period of time on affirmative statement by or friendly business dealings with the trademark owner."  McCarthy, § 31:42.  More poetically, Judge Learned Hand, posed the question: "how [the owner] can expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge business  built up with its connivance and consent; this we find it impossible to understand."  *Dwinell-Wright Co. v White House Milk Co.*, 132 F2d 822, 825-826 (2d Cir. 1943).

"The elements of acquiescence are: '(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.'"  *Id.* (citations omitted). *Profitness*, 314 F.3d at 67.   If Defendants' version is believed, Fr. Gruner's decision to use the FATIMA CENTER Mark on materials soliciting donations to SJM, certainly would satisfy the first prong.  Consent, however, need not be shown through the owner's affirmative agreement.  "Active consent is implied by 'conduct on the plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his

trademark rights against the defendant.'" *Id.*   The second and third elements of this test are self-evident in the history of SJM and National Pilgrim in the record.

In addition, the defense of laches "is available against both Lanham Act claims and New York state law claims of trademark infringement and unfair competition." *Harley-Davidson, Inc. v. O'Connell*, 13 F. Supp.2d 271, 279 (N.D.N.Y. 1998) (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040-41 (2d Cir. 1980)). "To make out a defense of laches, the defendant must show (1) that the plaintiff had knowledge of defendant's use of its marks, (2) that plaintiff inexcusably delayed in taking action, and (3) that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights by its delay in bringing suit." *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,* 88 F. Supp.2d 188, 196 (S.D.N.Y. 2000). The Second Circuit has held that a presumption of laches will arise in a trademark action if the plaintiff fails to bring suit within the six-year statute of limitations period used in New York state law fraud actions. *See Harley-Davidson*, 13 F. Supp.2d at 279 (citing *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191-92 (2d Cir. 1996)). This six-year period will begin to run once the plaintiff is aware of the facts underlying its cause of action. *Id.*  Again, if National Pilgrim's account is believed, so too are all of the elements of laches.

Clearly, if National Pilgrim's claims of ownership of the FATIMA CENTER Mark and SJM's decades long use of the trademark without consent is believed, the elements of acquiescence and laches are sufficiently established to defeat National Pilgrim's motion for summary judgment.

The motion should also be denied under the doctrine of unclean hands.  The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc*., 890 F.2d 165, 173 (9th

Cir.1989).  It may be invoked in trademark related and Lanham Act cases.  *See e.g. Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 354-356 (S.D.N.Y. 2008).  Specifically, it has been invoked where "confidential customer lists" have been misappropriated and where an employee "breached his employment contract."  *See* McCarthy, § 31:58.  It has also been invoked in cases involved filing false documents.  *See Hall v. Wright*, 125 F. Supp. 269, (D. Cal. 1954), *aff'd* 240 F. 2d 787 (1957).

 As set forth at length in SJM's motion, Defendants have converted SJM's donor list, filed documents falsely using SJM's address and Cesanek has breached is duties as an employee.  In addition, the current arrangement between National Pilgrim and Fatima Center U.S.A., where money is essentially passed over the border, runs afoul of IRS rules which do not permit qualifying domestic organizations, such as Fatima Center U.S.A., to transfer donations to a foreign organization, such as National Pilgrim, unless the domestic organization "retains control and discretion as to the use of the funds."  *See* Docket No. 109-9, p. 216, l. 24 – p. 217, l. 2. p. 219, l. 7 – 22; IRS Ann. 2003-29; *see also* Rev. Rul. 68-489; IRS Pub. 526.

Certainly, these are issues that should be presented to a jury in support of SJM's unclean hands defense.

### POINT VII

### THE MOTION SHOULD BE DENIED AS TO SJM's CAUSES OF ACTION FOR VIOLATION OF GBL §§ 349, 397 BECAUSE DEFENDANTS HAVE MISCONSTRUED THOSE CLAIMS AND FAILED TO ESTABLISH THEIR ENTITLEMENT TO SUMMARY JUDGMENT

The Third Cause of Action in the Second Amended Complaint alleges that National Pilgrim and Fatima Center U.S.A. violated GBL § 397(1), which prohibits the unauthorized use of the name or other identification of non-profit organizations.  *See* Docket No. 78, ¶¶ 153 – 159.

Specifically, the statute prohibits the "use, for advertising purposes or for purposes of trade, the name, symbol, device or other identification of any non-profit corporation, association, society or organization organized exclusively for religious, . . . charitable . . . purposes, without having first obtained the written consent of such non-profit corporation, association, society or organization." GBL § 397(1). "The statute constitutes a complete prohibition against using plaintiff's name for purposes of advertising or trade without the written consent of plaintiff." *Metropolitan Opera Assoc., Inc. v. Figaro Systems, Inc.*, 7 Misc.3d 503, 506 (Sup. Ct., N.Y., Cty 2005).

Defendants misconstrue this cause of action to be limited to dispute over the FATIMA CENTER Mark. *See* NPV Mem., p. 56. This claim, however, is not limited trademark issues. As clearly stated in the Second Amended Complaint, SJM did not circumscribe its claims. *See* Docket No. 78, ¶¶ 18 – 138 ("**FACTUAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**"). As set forth in SJM's motion, "National Pilgrim and Fatima Center U.S.A. used SJM's name, address and identity in public filings, legal documents and other communications, in order to procure donations that were intended for SJM and to falsely indicate an association or affiliation between SJM and National Pilgrim that no longer existed and a relationship with Fatima Center U.S.A. that never existed." *See* Docket No. 111, p. 5.

The Sixth Cause of Action alleges that National Pilgrim and Fatima Center U.S.A. engaged in deceptive business practices in violation of GBL § 349. *See* Docket No. 78, ¶¶ 172 – 179. It is unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a). The New York Court of Appeals has explained that GBL § 349 "contemplates actionable conduct that does not necessarily rise to the level of fraud." *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 343 (1999).

22270473.1

Defendants seek dismissal of this claim on the grounds that it is based solely on the trademark issues which generally do not give rise to a GBL § 349 cause of action.  See NPV Mem., p. 54 – 56.  Again, this is a misstatement of the claim.  National Pilgrim and Fatima Center U.S.A. engaged in various forms of deceptive business practices toward the common goal of obtaining donations from members of the public that would otherwise have been made to SJM.  First, they engaged in a campaign of disparagement against SJM through materially misleading solicitations for donations to Fatima Center U.S.A.  Second, they made a series of dishonest representations in public filings, legal documents and other communications, that gave the false impression that Fatima Center U.S.A. and SJM were related entities or were one in the same. Third, National Pilgrim misappropriated donations designated to fund SJM's Niagara Falls Facility.  These actions were materially misleading, caused damages to SJM and were directed at the consuming public. *See* Docket No. 111, p. 7.

In the interest of brevity, SJM relies on the facts and argument supporting its motion for summary judgment to the extent they relate to the issues raised by Defendants.  *See* Docket No. 111, p. 4 – 23 (Point I).  For those reasons, this branch of Defendants' motion should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff, The Servants of Jesus and Mary, Inc. d/b/a The Fatima Center, respectfully requests that the Court deny Defendants' motion in its entirety and instead grant Plaintiff's motion for summary judgment and such other relief as the Court may deem just and proper.

22270473.1

Dated:   April 16, 2021                    **BARCLAY DAMON LLP**

By:   s/Matthew J. Larkin
      Matthew J. Larkin, Esq.
      John D. Cook, Esq.
      David M. Fulvio, Esq.

*Attorneys for Plaintiff*
Office and Post Office Address
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Telephone:  (315) 425-2805
Email:  mlarkin@barclaydamon.com
Email:  jcook@barclaydamon.com
Email:  dfulvio@barclaydamon.com

**TO:**   **KLOSS, STENGER & GORMLEY**
      Justin D. Kloss, Esq.
      69 Delaware Avenue, Suite 1003
      Buffalo, New York 14202
      Telephone: (716) 853-1111
      Email: jdkloss@klosslaw.com

      **HAGERTY BRADY**
      Daniel J. Brady, Esq.
      Michael A. Brady, Esq.
      69 Delaware Avenue, Suite 1010
      Buffalo, New York 14202
      Telephone: (716) 856-9443
      Email:  Dbrady@hagerty-Brady.Com
             Mbrady@hagerty-Brady.Com

56