# KLOSS STENGER & GORMLEY LLP

ATTORNEYS AT LAW
www.klosslaw.com

69 DELAWARE AVE. STE. 1003                                    TELEPHONE: 716-853-1111
BUFFALO, NEW YORK 14202                                       FACSIMILE: 716-759-1094

JUSTIN D. KLOSS, PARTNER                              EMAIL: JDKLOSS@KLOSSLAW.COM

May 21, 2021

<u>Via</u> ECF Only
Hon. Jeremiah J. McCarthy
United States Magistrate Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, NY 14202

RE:   SERVANTS OF JESUS AND MARY, INC., d/b/a THE FATIMA CENTER
      v. THE NATIONAL COMMITTEE FOR THE NATIONAL PILGRIM
      VIRGIN OF CANADA AND THE FATIMA CENTER U.S.A., INC., et al.
      WDNY Civil Action No.: 1:18-CV-731

Dear Magistrate McCarthy:

        In accordance with Your Honor's Text Order (Docket No. 152) and in furtherance of the
May 12th oral argument on Defendants' Joint Motion for Partial Summary Judgment,[1] please allow
this correspondence to serve as Defendants' Supplemental Letter Brief in Further Support of
Defendants' motion.

        Defendants' motion should be granted because, as set forth previously in greater detail,
NPV prevails under each of the only two analysis frameworks that this Court could apply to
determine ownership of THE FATIMA CENTER Mark (the "Mark"), either the "use in
commerce" analysis or the *Sengoku/Tecnimed* analysis.

## I.      Based upon the law and the undisputed facts, NPV has established its ownership of the Mark.

### a.   NPV was the party to first use the Mark in commerce in the U.S. in 1994. [2]

        The Lanham Act provides a two-part definition of what constitutes a party's "use in
commerce" such that it gains ownership of a trademark.[3]  The first part, the affixation or placement
element, occurs when the mark "is placed in any manner on the goods." The second part requires
that the goods bearing the mark be "sold or *transported* in commerce…"[4]

---

[1] Docket No. 92.
[2] Docket No. 92-1, at § I; Docket No. 147, at § I.
[3] 15 U.S.C. § 1127.
[4] <u>Id</u>. (emphasis added).

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 2

It is undisputed that the "first use in commerce" of the Mark alleged by either party is in *The Fatima Crusader* Issue 46 ("*Crusader* 46"). NPV has established that it was the publisher that first affixed the Mark to *Crusader* 46. It is undisputed that NPV was always the publisher of *The Fatima Crusader*, and that the magazine was never published by SJM.[5] It is further self-evident from the face of the masthead of *Crusader* 46 that NPV was identified as the publisher, and that SJM was identified as a distributor.[6] It is undisputed that *Crusader* 46 was transported across the U.S./Canadian border, and NPV directly paid the U.S. Postmaster at least $35,009.44 to mail at least 285,387 copies of *Crusader* 46 to recipients in the U.S. and abroad.[7] Finally, it is undisputed NPV has ultimately received all the donation funds generated from its *Crusader* solicitations, less SJM's operating costs.[8]

During oral argument Your Honor questioned whether the existence of the *Crusader* 46 masthead created an arguable issue of fact as to the owner of the Mark. Defendants submit that this does not pose a question of fact for several reasons, most importantly that SJM does not argue that it was the publisher of *Crusader* 46 that affixed the Mark. Without any proof of SJM's own affixation of the Mark, SJM cannot meet the first element required under 15 U.S.C. § 1127's definition of "use in commerce" to sustain their claims of ownership. Therefore, this Court can decide the question (and claims) of ownership as a matter of law by applying the plain language of the Lanham Act's definition of "use in commerce" found in 15 U.S.C. § 1127 to the relevant facts which SJM either admits or does not dispute,[9] as well as the documentary evidence itself. These admitted or undisputed facts establish NPV's ownership of the Mark as a matter of law.

Also raised during oral argument was the question of whether NPV could meet the second part of the use in commerce definition. SJM argued that NPV did not operate in the U.S. and had no direct sales to U.S. donors. The argument that NPV did not operate in the U.S. or operate "in commerce" in 1994 is easily disproved by the NPV checks drawn from its Buffalo, N.Y. bank account which were used to pay to mail the *Crusader* 46.[10] Regarding direct sales to U.S. donors, "[the Lanham Act] is clear that the actual sale of goods is not required to satisfy [15 U.S.C.] § 1127's "use in commerce" requirement, provided that the goods are "transported" in commerce."[11] Therefore, there is no requirement that a party have direct sales (or solicitations) within the U.S. in order to establish trademark rights.

To argue that direct sales or the ability to directly issue tax receipts to U.S. donors is required in order to constitute a "use in commerce" is also absurd given the broad scope of "commerce" which the Lanham Act regulates. "The Lanham Act by its terms extends to all

---

[5] Docket No. 135-1, at Nos. 56-58.
[6] Docket No. 95-1, at bates SJM006129.
[7] Docket No. 98-5. These checks were drawn on NPV's Fleet Bank account located in Buffalo, N.Y., further demonstrating that NPV was operating in the U.S. in 1994.
[8] Docket No. 135-1, at No. 103.
[9] *See* Docket No. 147, at p. 1-2.
[10] Docket No. 98-5.
[11] Lens.com, Inc. v. 1-800 Contacts, Inc., 686 F.3d 1376, 1380 (Fed. Cir. 2012).

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 3

commerce which Congress may regulate."[12] The Supreme Court has held and repeatedly affirmed that such commerce includes activities that have a substantial effect on interstate commerce:

> even if … activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'[13]

Accordingly, even if the evidence that NPV transported and directly paid the U.S. Postmaster $35,009.44 to mail at least 285,387 copies of *Crusader* 46 to donors located within the U.S. and abroad did not exist, this activity most surely would constitute an activity which had a "substantial effect" on interstate commerce. Even if the recipients of *Crusader* 46 had not subsequently sent donations as a result of the magazine and that money had not ultimately been transmitted back to NPV,[14] NPV's actions would still would be considered as having a "substantial effect" on commerce and thus sufficient for the purposes of the Lanham Act's requirements.[15]

SJM also disputed the testimony from the NPV witness that he transported the copies of *Crusader* 46 across the U.S./Canadian border.[16] However, for the sake of argument, NPV does not need to have been the entity to literally transport the issues across the border in order to satisfy the "transported in commerce" requirement of the Lanham Act. Ignoring the direct witness testimony that NPV itself transported the publications across the border, NPV still meets the requirements of use in commerce because it was involved with the arrangements for the transportation and/or distribution of *Crusader* 46 in the U.S.[17]

Not only did NPV pay to mail the *Crusader* 46 issues,[18] but NPV employees generated the list of recipients as well as the manner of mailing the copies of *Crusader* 46 in order to comply

---

[12] Larry Harmon Pictures Corp. v. Williams Rest. Corp., 929 F.2d 662, 666 (Fed. Cir. 1991); Christian Faith Fellowship Church v. adidas AG, 841 F.3d 986, 995 (Fed. Cir. 2016) ("It is beyond dispute that 'the definition of commerce in the Lanham Act means exactly what the statute says, i.e. all commerce which may lawfully be regulated by Congress"); 15 U.S.C. § 1127.

[13] Wickard v. Filburn, 317 U.S. 111, 125 (1942); *see also*, Gonzales v. Raich, 545 U.S. 1, 17 (2005).

[14] Docket No. 135-1, at No. 103.

[15] Christian Faith Fellowship Church v. adidas AG, 841 F.3d 986, 992 (Fed. Cir. 2016) ("because Congress passed the Lanham Act in the wake of *Wickard* and because the Act expansively defines commerce as 'all commerce which may lawfully be regulated by Congress,' it 'clearly involves a broadening of jurisdiction' from earlier federal trademark statutes").

[16] Docket No. 92-9, at 386:12-387:6.

[17] Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc., No. CV 08-0068 (KAM) (JO, 2010 WL 2133937, at *5 (E.D.N.Y. Mar. 11, 2010), report and recommendation adopted, No. 08-CV-0068(KAM)(JO), 2010 WL 2160058 (E.D.N.Y. May 27, 2010) (Court found "use in commerce" by infringer even though it did not personally transport the goods bearing the counterfeit marks into the U.S. itself. By "arranging for…transport into the United States," infringer used the marks in commerce.); Nike, Inc. v. E. Ports Custom Brokers, Inc., No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628, at *6 (D.N.J. July 19, 2018) (collecting cases) (Arranging for the transportation of counterfeit goods into the United States constitutes a use in commerce); Christian Faith Fellowship Church v. adidas AG, 841 F.3d 986, 995 (Fed. Cir. 2016) ("Because one need not direct goods across state lines for Congress to regulate the activity under the Commerce Clause, there is likewise no such per se condition for satisfying the Lanham Act's 'use in commerce' requirement.").

[18] Docket No. 98-5.

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 4

with postal regulations.[19] This transportation resulted in open and public distribution[20] of 285,387 copies of *Crusader* 46 to donors residing in both the U.S. and internationally from February 5, 1994 and continuing until at least as late as February/March 1995.

Even giving SJM the benefit of all reasonable inferences, the NPV checks and accompanying records (which have been authenticated by the corporate secretary[21]) unequivocally show that NPV directly paid the U.S. Postmaster to mail 285,387 copies of *Crusader* 46 to recipients located within the U.S. and abroad. This evidence *alone* shows that NPV caused *Crusader* 46 to be "transport[ed]" in commerce in the U.S. after affixing the Mark to the publication. This is sufficient to establish NPV as the owner of the Mark.

b. NPV also prevails under the Sengoku/Tecnimed analysis as it was the manufacturer(publisher) of product (*Crusader* 46) first bearing the Mark.

Even if this Court was to determine that NPV did not sufficiently meet the Lanham Act's standards for participation in the transport and distribution of *Crusader* 46, NPV still prevails under the *Sengoku/Tecnimed* analysis.[22]

NPV has established that it supplied SJM with all the issues of *The Fatima Crusader* (including *Crusader* 46) that SJM would ever distribute. NPV as the manufacturer (publisher) of *Crusader* 46, is the presumed owner of the Mark.[23] "[A]s between a foreign manufacturer and its exclusive United States distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise."[24] SJM thereafter had an opportunity to argue four-factors which this Court could consider in order to rebut that point. The evidence shows that they did not rebut the presumption.[25] Since the presumption that NPV is the owner of the Mark is the starting point for the Court's *Sengoku/Tecnimed* analysis, and because SJM could not overcome that presumption, the default position is for this Court to decide as a matter of law that NPV is the owner of the Mark.

---

[19] NPV employees Rick Votano, Michael Longval, and Elizabeth Holdsworth were responsible for compiling and approving the list of U.S. recipients and the method of mailing copies of *Crusader* 46. Docket No. 92-7, at 169:18-171:19, 181:10-182:4, 187:23-188:4, 191:14-20, and 75:10-76:16; Docket No. 92-9, at 94:10-96:10.

[20] Other Circuit Courts have required that the transportation in commerce be accompanied by a showing that the public subsequently became aware of the trademark. Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1195 (11th Cir. 2001); Brookfield Commc'ns., Inc., 174 F.3d 1036, 1052 (9th Cir. 1999); New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1200 (9th Cir. 1979) (same). "Secret, undisclosed shipments are generally inadequate to support the denomination use." Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975); General Healthcare Ltd. v. Qashat, 365 F.2d 332, 70 U.S.P.Q.2d 1566 (1st Cir. 2004). Here, there is no dispute that the public became aware of the use of the Mark.

[21] Docket No. 92-7, at 166:9-175:12, 180:4-199:16

[22] Docket No. 92-1, at § II; Docket No. 147, at § II.

[23] McCarthy's § 29:8; *See* Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc., 154 F. Supp. 2d 586, 599-600 (S.D.N.Y. 2001) (citing Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1220 (9th Cir.), as modified, 97 F.3d 1460 (9th Cir. 1996)); Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d 395 (S.D.N.Y. 2011), aff'd, 462 F. App'x 31 (2d Cir. 2012)).

[24] Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329, 336 (S.D.N.Y. 1999).

[25] Docket No. 147, at § II.

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 5

This transaction wherein a New York corporation [SJM] was engaged by a Canadian corporation [NPV] to assist NPV with the distribution of NPV Literature, which NPV produced and supplied to SJM, is also sufficient to constitute "use in interstate commerce" by NPV under the Lanham Act.[26] Furthermore, under these circumstances, a distributor operates in the capacity of a licensee to the manufacturer,[27] and SJM is not able to overcome the presumption that the manufacturer has superior rights in the trademark.[28]

Contrary to SJM's assertion at oral argument, the transactions between NPV and SJM are not considered "internal uses," for several crucial reasons. First, SJM is a separate not-for-profit corporation which was not owned by NPV, but which served assisted as a distributor of *Crusader* 46 ("[*Crusader* 46] is distributed in U.S.A. with the cooperation of [SJM]"). SJM separately argued at great length that it was its own independent corporation, not under the control or management of NPV.[29] Second, and perhaps most significantly, it is inaccurate to characterize NPV's provision of *Crusader* 46 issues to SJM for distribution, as merely an "internal use" because these copies supplied to SJM were subsequently *distributed to the public*, in addition to the 285,387 other copies that were separately mailed by NPV, directly to donors residing throughout the United States. Therefore, the facts of this case are wholly different than the cases cited by SJM where there was only "secret, undisclosed internal shipments."

c.   Clarification of additional items relating to trademark ownership.

Defendants wish to clarify several additional points that either Plaintiff's counsel or Your Honor raised during oral argument. First, Plaintiff's counsel suggested at one point that NPV did not "continuously use" the Mark. Once trademark rights have been established, such rights can only be lost through either abandonment or an assignment.[30] It is undisputed that there was never any assignment of rights to the Mark.

---

[26] Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 370 (4th Cir. 2003) (Holding that the rendering of goods and services between a foreign entity and a U.S. entity fulfils the "use in commerce" requirement of the Lanham Act); *See* generally United We Stand Am., Inc. v. United We Stand, Am. New York, Inc., 128 F.3d 86, 92-93 (2d Cir. 1997); Raintree Publishers, Inc. v. Brewer, 218 U.S.P.Q. 272 (T.T.A.B. 1983) (Held that the party who was first to make a bona fide sale to a commercial distributor and followed it up by continuous use has priority).

[27] J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 16:48-49 (5th ed. 2020) ("*McCarthy*"): *Trademark Ownership as Between a Manufacturer and a Dealer* (describing this type of distribution relationship as "either one of a non-trademark licensed buyer who resells branded merchandise or of a dealer licensed under the trademark to hold himself out as an authorized dealer").

[28] Haggar Int'l Corp. v. United Co. for Food Indus. Corp., 906 F. Supp. 2d 96, 111 (E.D.N.Y. 2012); Tecnimed SRL v. Kidz-Med, Inc. 763 F.Supp.2d 395, 403 (S.D.N.Y. 1999).

[29] Docket No. 111, at p. 16 ("SJM was not directed, managed or maintained by [NPV]…") ([NPV] and SJM have separate boards of Directors which do not completely overlap . . . ; each has its own headquarters, staff, payroll and bank account; . . . each has its own corporate charter and purpose clause; and . . . each is subjected to a separate audit by major accounting firms in order to maintain the accounting integrity of each corporation"), at p. 17 ("the SJM board never ceded control [of SJM] to [NPV]"), at p. 14 ("[NPV] and SJM remained separate legal entities…").

[30] McCarthy's § 17:12, § 18:4.

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 6

Regarding abandonment, a trademark is considered abandoned if "its use has been discontinued with intent not to resume such use." The intent not to resume may be inferred from circumstances, and nonuse for three consecutive years shall be prima facie evidence of abandonment.[31] SJM did not raise the issue of abandonment until a passing reference at oral argument, and there is no evidence presented by SJM that NPV *ever* ceased using the Mark for a period of three years, much less that there was ever any intention not to resume its use.[32] This Court can clearly see that the over twenty-five years of NPV's subsequent use of the Mark, through the present, establish that there was never any intention to cease using the Mark.

To the extent that during oral argument, Plaintiff's counsel raised instances of SJM's alleged subsequent use of the Mark as evidence of SJM's alleged rights to the Mark, Defendants reiterate that once ownership rights in a trademark are established, a party can only be divested of these rights via an abandonment or an assignment, neither of which ever occurred in this case. Therefore, any reliance by SJM upon instances of SJM's alleged subsequent use of the Mark are irrelevant and fail as a matter of law.

It is further noted that Plaintiff's counsel went to great lengths during oral argument to focus on the alleged intentions of Fr. Gruner. The implication of such argument being a request that Your Honor impose joint ownership of the Mark on the parties, and further granting exclusive rights to the Mark to SJM in the U.S. However, joint ownership of a trademark is (i) heavily disfavored, (ii) never a default position, and (iii) rarely imposed by a court outside of the context of an explicit and detailed written agreement (and even then, courts will go out of their way to avoid joint ownership). Implied intentions are never enough to force joint trademark ownership, and certainly not in this context. "When there is a dispute over who owns a trademark, the worst possible solution is to allow mark ownership to be shared among the warring parties. Fragmentation of ownership is to be avoided, both by contract and by judicial fiat."[33] This is especially true in cases where customer confusion would be inevitable in an event of joint ownership, as would be the case with the Mark.[34]

Clearly, based upon the law and the undisputed facts in this case, the Mark was (i) first used in commerce by NPV in 1994; (ii) was never assigned by NPV; and (iii) was never abandoned by NPV. Thus, as a matter of law, NPV is the owner of the Mark.

**II.    This Court's Question as to the "Single-Source" Requirement.**

---

[31] 15 U.S.C. § 1127.

[32] Although *The Fatima Crusader* magazine is just one piece of literature which used the Mark, after *Crusader* 46, the Mark appears in Crusader Issue Nos. 47 (Summer 1994) (SJM006164), 48 (Winter 1995) (SJM006173, 006194), 49 (Summer 1995) (SJM006212, SJM006218), 55 (Autumn 1997)(SJM006451, SJM006477), 56 (Winter 1998)(SJM006493), 57 (Spring/Summer 1998)(SJM006565), 58 (Autumn 1998)(SJM006597, SJM006600), 59 (Spring 1999) (SJM006619, SJM006623, SJM006637-SJM006639), etc.

[33] McCarthy's § 16:40.

[34] See Yellowbook Inc. v. Brandeberry, 708 F.3d 837, 841–845, 105 U.S.P.Q.2d 1901 (6th Cir. 2013) ("We will not presume the creation of jointly owned or non-exclusively licensed trademark rights, especially where dissipation of goodwill, and increased customer confusion, is inevitable." 708 F.3d at 846.).

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 7

In an email dated May 18, 2021, Your Honor posed the question to counsel of how it can be concluded that the Mark identifies a single source. Defendants submit that up until 2017 when NPV terminated its relationship with SJM, the Mark did, in fact, identify a single source - NPV.

Under modern trademark law, the "source" identified by a trademark has been broadened to include not only the manufacturing source, but also the source of standards as to the nature and quality of goods and services with which the mark is used.[35] A trademark owner is the ultimate "source" of goods, regardless of any number of permitted licensees.  In this way, the source-indicating function of trademarks is furthered by focusing on who controls the quality and characteristics of the goods. This permits a trademark to be licensed, without impacting the source-identifying function of trademarks, when the trademark owner adequately controls the quality and characteristics of the goods in association with the mark. For a valid license to exist, the licensor must control the nature and quality of the goods or services provided by the licensee users of the mark.

In the case referenced by Your Honor, Universal City Studios v. Nintendo, the court held that the mark "King Kong" had essentially become a generic term which no longer signified one particular source, namely Universal Studios, of the relevant products and services.[36] The Universal City Studios case addressed an issue largely akin to genericism, where the "extensive uncontrolled use of the [KING KONG] mark" indicated either abandonment of the mark or the inability of the mark to designate a single source of origin to consumers.[37] Respectfully, Defendants submit that the instant case poses an entirely distinguishable situation.

In this case, NPV has, at all times, controlled the quality and characteristics of *The Fatima Crusader* publication and other instances of use of the Mark,[38] including most notably, *Crusader* 46. SJM either admits or does not dispute that NPV would supply this literature and other materials to SJM, and that any time SJM needed more literature, they would contact NPV to provide it.[39] This makes sense because for decades, SJM operated as a U.S. affiliate for NPV, assisting NPV with the distribution of *The Fatima Crusader* and other materials. The Lanham Act permits trademarks to be used by "related companies" without affecting the owner's trademark rights. A related company is defined as "any person whose use of a mark is controlled by the owner of the

---

[35] McCarthy's § 3:8.

[36] "Because of competing property interests in King Kong, and considering third parties' unauthorized use of King Kong trademark for various products, King Kong no longer signifies single source of origin to consumers and thus is not a valid trademark." Universal City Studios, Inc. v. Nintendo Co., 578 F. Supp. 911 (S.D.N.Y. 1983), aff'd, 746 F.2d 112 (2d Cir. 1984).

[37] Id.

[38] "The Editor of *The Fatima Crusader* was always employed by NPV or FC USA, and the Editor of the *Crusader* directed and supervised the editorial and production staff which prepared the text and pictorial content of the magazine. Docket No. 135-1, at Nos. 60 and 63.

[39] Docket No. 135-1, at Nos. 111 and 113.

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 8

mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."[40]

From the very first use of the Mark through the present, the Mark has ultimately identified NPV as the source of the products and services associated with the Mark. To the extent that SJM assisted in the distribution of NPV materials bearing the Mark, such affiliated, permissive use does not have any bearing upon the ultimate question of trademark ownership. Unlike the Universal City Studios case, where the mark in question essentially became generic as a result of unchecked use by countless unrelated and unaffiliate third parties, as well as several transfers and assignments, here we have one party, NPV, which has continuously and exclusively used the Mark since its first use in 1994, both on its own and via its distributor/licensee SJM. It is only now, following the 2017 split, that SJM has begun using the Mark in commerce separate from NPV, and this unauthorized use is what has resulted in the instant litigation. There is no evidence of, nor claim of, any "third-party" use of the Mark, separate from that of the parties to this litigation. Therefore, this case is distinguishable from the Universal City Studios case.

Finally, it should be noted that the USPTO had an opportunity to review NPV's application for registration of the Mark, and has made the determination that the Mark may move forward to registration.[41] This determination necessarily demonstrates that the USPTO found that the Mark was *not* descriptive, generic, or otherwise not suitable for registration. This determination is entitled to "substantial weight" by this Court.[42]

## III.     Canadian Corporations Law and NPV's Letters Patent

Lastly, a question was raised as to whether NPV's Letters Patent would restrict NPV's ability to conduct business within the U.S. As the undersigned is not licensed to practice law in Canada or to render an opinion with respect to Canadian Law, attached is the analysis of the applicable Canadian law as it pertains to NPV's Letters Patent, rendered by the Canadian Law Firm of Loopstra Nixon, LLP. The analysis reflects that there are no such restrictions which would prohibit NPV from owning U.S. trademark rights or operating within the U.S. Defendants reiterate that they do not believe that this question of Canadian law is relevant to the legal issues before this Court (the question of ownership and infringement of the Mark). Further, to the extent that SJM may raise this issue, they would lack standing to do so.

---

[40] 15 U.S.C. § 1127.
[41] Docket No. 98-34. As stated previously, the Trademark Trial and Appeal Board opposition proceeding instituted by SJM has been suspended by consent of the parties pending a resolution of this action.
[42] Syntex Labs., Inc. v. Norwich Pharmacal Co., 315 F. Supp. 45, 52 (S.D.N.Y. 1970), aff'd, 437 F.2d 566 (2d Cir. 1971).

Honorable Jeremiah J. McCarthy
May 21, 2021
Page 9

Respectfully,

Justin D. Kloss

Enclosure.

CC:     Matthew J. Larkin, Esq. (*via* ECF only)
        Daniel J. Brady, Esq. (*via* ECF only)

Enclosure



**Allan J. Ritchie***
Tel: 416.748.4754
Email: aritchie@loonix.com
*Allan J. Ritchie Professional Corporation

**BY EMAIL (jdkloss@klosslaw.com)**

May 19, 2021

Kloss Stenger & Gormley LLP
69 Delaware Ave. Suite 1003
Buffalo NY  14202
Attn: Justin Kloss, Partner

Dear Mr. Kloss,

**RE: The National Committee For The National Pilgrim Virgin of Canada ("NPV")**
**Our file: 24933-0001**

You asked us to opine on whether Canadian Courts would interfere with NPV's operations in the United States. After reviewing the applicable Canadian law and NPV's constating documents, we concluded Canadian Courts are unlikely to interfere with NPV's decision to operate in the United States. Our reasoning is outlined below.

### *Summary of Analysis*

The applicable common law and legislative framework suggests NPV is free to operate in the United States. Although Canadian Courts may interfere with a not-for-profit's actions when the organization fails to comply with its own rules (e.g. its letters patent or by-laws), the Courts only exercise this discretion in a limited number of circumstances. In our opinion,  NPV's actions in the United States – fundraising or otherwise – would not justify judicial interference. Moreover, the governing statutory framework further suggests NPV may operate in the United States. The relevant statute – the *Corporations Act* (of Ontario) – does not suggest NPV's actions must be limited to the positive obligations outlined in the organization's constating documents.

### *Judicial Discretion to Interfere with Private Associations/Religious Organizations*

Canadian Courts are generally reluctant to interfere with the actions or undertakings of a private association or religious organization.

In *Highwood Congregation of Jehovah's Witnesses (Judicial Committee) v Wall,* 2018 SCC 26, the Supreme Court of Canada "clarified when a court may review of a decision of a religious organization." [see *Mathai v George*, 2019 ABQB 116 at para 9] According to *Highwood Congregation*, "the general rule is a Court does not have jurisdiction to make orders about church actions or membership…".[see *Mathai v George*, 2019 ABQB 116 at para 9]

{L2130475.3}

Woodbine Place, 135 Queens Plate Drive, Suite 600, Toronto, Ontario, Canada  M9W 6V7
**Tel:** 416.746.4710   **Fax:** 416.746.8319   **loopstranixon.com**





In *Hellenic Congress of Quebec v Canadian Hellenic Congress*, 2020 ONSC 2224 at para 56, the Superior Court of Ontario detailed when interference with a religious organization is justified. The Court stated, among other things, that Canadian "courts will not ordinarily interfere in the internal affairs of voluntary clubs and religious organizations…" unless the organization has failed to comply with its own rules.

After reviewing NPV's Letters Patent and By-Laws, NPV's decision to operate in the United States would not constitute a failure to comply with its own rules. We have not found any positive obligation prohibiting NPV from operating in the United States. Likewise, we have found no positive obligation prohibiting NPV from operating outside of Canada.

The Objects of NPV's Letters Patent, for example, require it:

    (a) to promote, amongst the people of Canada, a greater awareness of the Holy Mother of God, and of her position within the Church; and

    (b) to own, and display throughout Canada, a statue known as "The National Pilgrim Virgin of Canada" and also known as "La Vierge Pelerine Nationale du Canada"

According to its Letters Patent, NPV is merely required to promote awareness of the Holy Mother of God in Canada, as well as own and display a statue. The organization's actions in the United States would not contradict these objects. Acting in the United States does not necessarily inhibit NPV's ability to promote awareness or own and display a statue. On the contrary, acting in the United States could further these objects: Fundraising in the United States, for instance, could provide NPV with additional funds to further these initiatives. Accordingly, NPV's US operations would not result in NPV's failure to comply with its own rules.

Moreover, when a court evaluates whether it should interfere with a club or organization, "the question is not so much whether this is a property right or a contractual right, but whether it is of sufficient importance to deserve the intervention of the court and whether the remedy sought is susceptible of enforcement by the court." [see *Lakeside Colony of Hutterian Brethren v Hofer*, [1992] 3 S.C.R. at para 173]

NPV's actions are not likely "of sufficient importance", deserving of a judicial intervention. In *Pal v Chatterjee*, 2013 ONSC 1329 at para 30, the Superior Court of Ontario noted that "[i]t is clear from the cases… that the Courts will ordinarily not interfere in the internal affairs of a club or religious organization." [see also *Coombes v National Pheonix 1984 Firearms Information & Communication Assn.*, 2009 ABQB 566 at para 21] NPV's decision to operate in the United States is an internal, operational decision. Meanwhile, Courts have often likened "importance" to cases involving one's employment or livelihood. [see *Woloshyn v Assn. of United Ukrainian Canadians*, 2013 ABQB 262 at para 24] Accordingly, the Canadian judiciary would not be justified in interfering with the organization's decision to act in the United States.

### *The Statutory Framework*



The statutory framework governing NPV further confirms there is limited risk the organization's US operations are impermissible.

NPV is governed by the *Corporations Act*, R.S.O. 1990, c. C.38. Section 126.1 of the *Corporations Act* provides (in part):

> …
>
> *(4) A corporation shall not carry on any activity or exercise any power <u>that it is restricted from carrying on or exercising</u> by its Act or other instrument of incorporation (which, for greater certainty, would include an instrument amending that instrument), nor shall the corporation exercise any of its powers in a manner contrary to its Act or other instrument of incorporation.*
>
> *(5) <u>No act of a corporation</u>, including any transfer of property to or by a corporation, <u>is invalid by reason only that the act is contrary to its Act or other instrument of incorporation</u> (which, for greater certainty, would include an instrument amending that instrument), its by-laws or this Act.*
>
> …
>
> [Emphasis added]

According to the *Corporations Act*, NPV may not "carry any activity or exercise any power that it is restricted from carrying on or exercising". [see s 126.1(4) above] NPV's Objects do not impose any limitations on the organization, however. The Objects merely impose positive requirements. Accordingly, we are of the opinion that NPV's US operations would not contravene the *Corporations Act*. Since NPV's letters patent do not include any prohibitions where the organization may operate, NPV is fully able to carry on business in the US.

Even if NPV's positive obligations can be construed as limiting its ability to operate in the US, Subsection 126.1(5) of the *Corporations Act* (above)  allows an organization to operate beyond the scope of its letters patent. Subsection 126.1(5) appears to override the requirements of Subsection 126.1(4), limiting Subsection 126.1(4)'s ability to invalidate any actions contravening an organization's letters patent. As a result, NPV's US operations may be permissible, even if we assume the organization's letters patent provide otherwise.

Yours truly,

LOOPSTRA NIXON LLP